**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA, |
| -v.- |
| ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH, and CHARLES BOLTON |
| Defendants. |

(S1) 07 Cr. 453 (SHS)

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO TRANSFER VENUE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 21(B)**

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2116
Facsimile: (212) 326-2061
E-mail: hheiss@omm.com

*Attorneys for Defendant Charles Bolton*

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................. 1

**LEGAL STANDARD** ............................................................................. 2

**ARGUMENT**

    I.    Charles Bolton's Residence In Memphis Strongly Favors A Transfer................. 4

        A.               **REDACTED**

        B.    Mr. Bolton's Family Obligations Are In Memphis ................................. 11

    II.    The Convenience Of The Witnesses Weighs Heavily In Favor Of A
        Transfer. ............................................................................................. 12

        A.    Government Witnesses ........................................................ 12

        B.    Witnesses For Mr. Bolton .................................................... 14

    III.    The Events Likely At Issue In A Case Against Mr. Bolton Took Place In
        Memphis .......................................................................................... 16

    IV.    A New York Trial Would Significantly Disrupt Mr. Bolton's Business............. 18

    V.    A New York Trial Plainly Would Be More Expensive Than A Memphis
        Trial.................................................................................................. 21

    VI.    The Location Of Counsel Does Not Favor Keeping The Case In New York...... 22

    VII.    Memphis Is An Accessible Venue .................................................... 22

    VIII.    The Relative Docket Conditions And The Location of the Documents Do
        Not Weigh Against Transferring The Case ........................................ 23

    IX.    Other Special Considerations Also Favor A Transfer ......................... 23

        A.    A Transfer Will Not Lead To Duplicate Trials.......................... 23

        B.    A Joint Trial Would Unfairly Prejudice Mr. Bolton................................ 24

**CONCLUSION** .............................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

Platt v. Minnesota Mining & Mfg. Co.,
376 U.S. 240, 243 (1964)................................................................................. 4

United States v. Aronoff,
463 F. Supp. 454 (S.D.N.Y. 1978) ................................................. 3, 5, 15, 20

United States v. Cashin,
281 F.2d 669 (2d Cir. 1960)............................................................................ 3

United States v. Gallo,
668 F. Supp. 736 (E.D.N.Y. 1987) ......................................................... 24, 25

United States v. Hanley,
1995 WL 60019 (S.D.N.Y.)..................................................................... 3, 4, 23

United States v. Johnson,
323 U.S. 273 (1944) ............................................................................... 2, 3, 15

United States v. Kouzmine,
921 F. Supp. 1131 (S.D.N.Y. 1996)............................................................... 25

United States v. Layne,
2005 WL 1009765 (S.D.N.Y.) .................................................... 4, 5, 13, 15

United States v. Lech,
161 F.R.D. 255 (S.D.N.Y. 1995) .................................................................. 25

United States v. Maldonado-Rivera,
922 F.2d 934, 966 (2d Cir. 1990)............................................................. 2, 4

United States v. Martino,
2000 WL 1843233 (S.D.N.Y.) ................................................ 4, 5, 13, 15, 22

United States v. McDermott,
245 F.3d 133 (2d Cir. 2001).......................................................................... 25

United States v. Menashe,
1990 WL 121525 (S.D.N.Y.).................................................................... 17, 22

United States v. Ohran,
2000 WL 620217 (S.D.N.Y)........................................................ 3, 4, 5, 15, 22

United States v. Olen,
183 F. Supp. 212 (S.D.N.Y. 1960) ................................................................. 3

United States v. Posner,
549 F. Supp. 475 (S.D.N.Y. 1982) .............................................................. 3, 5

United States v. Prescott,
1990 WL 127577 (E.D.N.Y.)......................................................................... 3, 5

United States v. Rigas,
281 F. Supp.2d 660 (S.D.N.Y. 2003)............................................................ 25

United States v. Russell,
582 F. Supp. 660 (S.D.N.Y. 1984) ........................................................ passim

## TABLE OF AUTHORITIES
### (continued)

Page

United States v. Upton,
    856 F. Supp. 727 (S.D.N.Y. 1994) ........................................................................... 24

United States v. Valdes,
    2006 WL 738403 (S.D.N.Y.) ........................................................................ *passim*


## RULES

Fed. R. Crim. P. 8(b) ........................................................................................... 25

Fed. R. Crim. P. 14(a) ......................................................................................... 25

Fed. R. Crim. P. 21(b) .................................................................................. *passim*

Fed. R. Crim. P. 29(a) ......................................................................................... 25


## STATUTES

U.S. Const. art. III, § 2, cl. 3 ................................................................................. 3

U.S. Const. amend. VI ........................................................................................... 3

18 U.S.C. § 1960 ................................................................................................. 16

## PRELIMINARY STATEMENT

Charles Bolton moves, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, to transfer the case against him to Memphis, Tennessee, where he lives and works, and always has. Measured by the real damage a lengthy trial in New York would do to Mr. Bolton, his family and his business; by the fact that almost all of the conduct alleged against Mr. Bolton in the Indictment occurred in Memphis, not New York; by the convenience of potential government and defense witnesses who know Mr. Bolton, nearly all of whom live in Memphis; and by the lodestar that it does not serve the interests of justice to require someone to stand trial in a city with which he has had only glancing contact, this case offers a paradigm of the reasons consistently cited by courts in this Circuit for granting transfers to a defendant's home city.

**REDACTED**

A trial in Memphis involving Mr. Bolton alone would be markedly shorter and more streamlined—likely lasting weeks rather than months. Indeed, much, if not most, of the evidence that the government would otherwise introduce in a trial of all the defendants has nothing to do with

Mr. Bolton, and would not be relevant in a case focused on him. Mr. Bolton is an investment advisor. He had no hand in designing or creating the only two tax transactions he worked on—CDS and Add-on. His role was limited—as will be most of the trial evidence pertaining to him—to one thing: implementing CDS and Add-on to make clients money as an investment. Nor is evidence relating to the other transactions mentioned in the Indictment—COBRA, PICO or Tradehill— relevant to Mr. Bolton since he had absolutely nothing to do with any of those deals. He did not agree to participate in them, and never did. Much of the evidence introduced in a joint trial, then, would not bear on Mr. Bolton, and likely would play no part at all in a trial against him alone in Memphis.

**REDACTED**

It would be significantly less expensive for him, would be more convenient to both the government and defense witnesses who are relevant to any case involving him, and would take place in the city where Mr. Bolton allegedly engaged in the conduct charged in the Indictment. For all these reasons, the Court should grant the transfer.

**LEGAL STANDARD**

Rule 21(b) of the Federal Rules of Criminal Procedure provides that, "[f]or the convenience of the parties and witnesses, and in the interest of justice, the court upon motion of the defendant, may transfer the proceeding as to that defendant or any one or more counts thereof to another district." The decision whether to grant the motion is "vested in the sound discretion of the district court." United States v. Maldonado-Rivera, 922 F.2d 934, 966 (2d Cir. 1990).

The Supreme Court, Second Circuit and courts in this District have recognized that the place where a defendant is required to defend himself in a criminal case involves issues that "are not merely matters of formal legal procedure. They raise deep issues of public policy[.]" United

2

States v. Johnson, 323 U.S. 273, 276 (1944) (Frankfurter, J.); United States v. Ohran, No. 99 Cr.

142 (JSM) 2000 WL 620217, at *1–2 (S.D.N.Y May 12, 2000).  That policy, embodied in two

different provisions of the Constitution which admonish that defendants be tried where their alleged

crimes occurred (U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI), is straightforward:  being

forced to stand trial far from home, "in an environment alien to the accused exposes him" to

"unfairness and hardship."  Johnson 323 U.S. at 275; see also United States v. Cashin, 281 F.2d

669, 675 (2d Cir. 1960).

Guided by these principles, courts in this Circuit considering Rule 21(b) motions

have long and consistently given "maximum recognition to a defendant's interest in a trial at his

home base," and have held that venue should "whenever possible be construed so as to permit trial

at the residence of the defendant."  Cashin, 281 F.2d at 675; United States v. Hanley, No. 94 Cr.

394 (DAB), 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) (same); United States v. Prescott, No.

90 Cr. 70, 1990 WL 127577, at *2 (E.D.N.Y. Aug. 28, 1990) (same); United States v. Russell, 582

F. Supp. 660, 662 (S.D.N.Y. 1984) (same); United States v. Aronoff, 463 F. Supp. 454, 457

(S.D.N.Y. 1978) (same); United States v. Olen, 183 F. Supp. 212, 217 (S.D.N.Y. 1960) (same).

As Judge Martin noted in Ohran, motions to transfer raise a fundamental question:

regardless of whether venue is proper in the district where the indictment was brought, "[w]here, in

fairness, should the trial take place" with respect to a defendant who lives far away?"  Ohran, 2000

WL 620217, at *2.  Thus, while a "general rule" favors prosecution in the original district, "[t]he

determination of whether a particular case calls for transfer depends upon the peculiar facts and

circumstances of that case."  United States v. Posner, 549 F. Supp. 475, 477 (S.D.N.Y. 1982) (Sand,

J.).

For that, courts have looked to a ten-factor test, articulated in Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 243–44 (1964), which examines:

- The location of the defendant;
- The location of the witnesses;
- The location of the events likely to be in issue;
- The location of documents and records likely to be involved;
- Disruption of the defendant's business if the case is not transferred;
- The expense to the parties;
- The location of counsel;
- The relative accessibility of the place of trial;
- Docket conditions in each district; and
- Any other special elements which might affect the transfer.

While no one factor "is dispositive," (Maldonado-Rivera, 922 F.2d at 966), courts in this District have been clear that "greater weight [is given] to the defendant's interest in being tried in the district of his residence than to any other factor." Ohran, 2000 WL 620217, at *3 (Martin, J.); United States v. Valdes, No. 05 Cr. 156 (KMK) 2006 WL 738403, at *4 (S.D.N.Y. March 21, 2006) (Karas, J.) (same); United States v. Layne, No. 05 Cr. 87 (HB) 2005 WL 1009765, at *2 (S.D.N.Y. May 2, 2005) (Baer, J.) (same); United States v. Martino, No. S1 00 Cr. 389 (RCC) 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) (Casey, J.) (same); Hanley, 1995 WL 60019, at *2 (Batts, J.); Russell, 582 F. Supp. at 662 (Goettel, J.) (same).

The importance of that factor, and the reason courts give it the most weight, is sharply illustrated by the facts here. A trial of many months in New York, away from his family, home and business, would cause great harm to almost every aspect of Mr. Bolton's life.

## ARGUMENT

## I.     Charles Bolton's Residence In Memphis Strongly Favors A Transfer.

Charles Bolton has lived and worked in Memphis all his life. He lives there now with his wife and two young daughters; his son, who attends college, visits home on weekends. His business is also located in Memphis. Courts have found that that kind of solid connection to a

4

distant home is alone a powerful reason to transfer a case from New York to the district where a defendant lives. <u>Ohran</u>, 2000 WL 620217, at *3; <u>Prescott</u>, 1990 WL 127577, at *2; <u>Russell</u>, 582 F. Supp. at 662; <u>Posner</u>, 549 F. Supp. at 477; <u>Aronoff</u>, 463 F. Supp. at 458.

More powerful still are connections to home beyond just residence. Those connections include support networks needed to address health problems. <u>Martino</u>, 2000 WL 1843233, at *6 (defendant was "under medical supervision in Florida," and trial near home would less severely impact her anxiety disorder). And they include "family obligations," such as caring for children and others. <u>Valdes</u>, 2006 WL 738403, at *4; <u>see also</u> <u>Layne</u>, 2005 WL 1009765, at *2 (defendant was "medical decision maker" for incapacitated mother). Courts have granted transfers when an extended trial in an alien city would damage those connections.

**REDACTED**

5

REDACTED

**REDACTED**

REDACTED

REDACTED

REDACTED

**REDACTED**

REDACTED

## II.    The Convenience Of The Witnesses Weighs Heavily In Favor Of A Transfer.

While the government has not provided a witness list, we believe that most of its potential witnesses who dealt with Mr. Bolton or his business live either in Memphis or in cities other than New York.  Moreover, the fact and character witnesses whom we would call in Mr. Bolton's defense principally live in Memphis.  A trial in Memphis therefore would be more convenient for most of the witnesses relevant to Mr. Bolton.

### A.    Government Witnesses

The witnesses the government is most likely to call to testify about Mr. Bolton are the people who work, or once worked, with him.  These current and former employees had the most substantive and detailed knowledge about how CDS and Add-on operated.  They were directly involved in all aspects of these transactions; among other things, they hired and monitored the currency and other traders, they created models projecting the financial benefits of the deals, they managed the swap transactions and they communicated with E&Y representatives.  In short, these witnesses made the CDS and Add-on partnerships work.  Indeed, the best indication of the government's interest in these current and former Bolton employees as witnesses is that it granted statutory immunity to no fewer than five of them, and entered into a cooperation agreement with a sixth.

12

Of these six potential witnesses, all but two live in or around Memphis.  And the remaining two do not live in New York:  one lives in Texas and the other around Washington, D.C.  Courts granting Rule 21(b) transfers have found it significant when just some of the government's potential witnesses live in the district where the defendant seeks to transfer the case.  See Layne, 2005 WL 1009765, at *3; Martino, 2000 WL 1843233, at *6.  Here, nearly all of the witnesses who dealt directly with Mr. Bolton live in the Memphis area.

Many other potential government witnesses are located outside New York, and for them a trial in Memphis would not be inconvenient.  For instance, the government presumably will call principals at some or all of the trading firms Mr. Bolton's company hired to conduct trades for CDS investors, as the Indictment alleges that those trades were only meant to "preserve the client's capital," and not generate profits.  (Indictment at ¶ 23(c).)  But of the 10 trading firms Mr. Bolton dealt with, seven are located outside this District:  they do business, among other places, in the British Virgin Islands, England and Connecticut.  (Declaration of Mark Racanelli at ¶ 8).  One of the few traders specifically referenced in the Indictment is located in Boise, Idaho.  (Indictment at ¶ 97(z); Racanelli Decl. at ¶ 8(e).)

Neither is New York a more convenient forum for the CDS or CDS Add-on investors.  Even assuming their testimony is relevant to Mr. Bolton—which is questionable as they were clients of E&Y and dealt principally with E&Y representatives—a trial outside New York would not be more inconvenient.  There were more than 100 investors in these deals, and they reside all across the country and abroad.  According to documents produced by the government relating to the partnerships in which these individuals invested, only two of the investors live in New York.  Indeed, Memphis appears to be a more convenient forum than New York for a number of these investors, as the documents indicate that five of them live there.  And of the investors in the

13

three partnerships specifically mentioned in the Indictment—in Counts Two, Three and Four—<u>none</u>

lives in New York; they reside in Illinois, Ohio, Michigan, Arizona and California.

### B.    Witnesses For Mr. Bolton

Most of the people whom Mr. Bolton would call to testify in his defense live in

Memphis. Among these are current and former employees of Mr. Bolton whom we expect to call if

the government does not. We anticipate that these witnesses will provide important exculpatory

fact testimony on the key issue of whether Mr. Bolton intended to defraud the IRS. Among other

things, we expect that they will testify that Mr. Bolton believed the deals had economic substance

and that he insisted that the partnerships he managed be registered as tax shelters with the IRS.

Almost all of these current and former employees live around Memphis.

In addition to those individuals, we have provided the Court, *in camera*, a list of 20

potential character witnesses who are willing to testify for Mr. Bolton. All of them live in or around

Memphis. While we do not expect to call all of these witnesses, that is the group from which we

would select those who will attest to Mr. Bolton's strength of character and solid reputation in his

community for integrity and honesty—qualities inconsistent with any theory that he knowingly

joined a conspiracy to defraud the IRS.

It would be difficult for many of these potential character witnesses to travel to New

York. A number of them run their own small businesses in Memphis, which requires a significant

amount of their time and attention. Others have limited means to afford a trip to a city as expensive

as New York. For example, one potential witness works in a field position for a utility company;

another is unemployed; another manages his family's auto body shop; another works for a charity;

others are pastors from the local churches Mr. Bolton attends              **REDACTED**

14

REDACTED

There is a danger that many of these witnesses could not afford to come to New York to testify.

Moreover, even if they were able to travel, as courts have recognized, the impact of their testimony in New York about Mr. Bolton's reputation in the Memphis community would be significantly blunted.  "[T]he location of character witnesses is significant" (Aronoff, 463 F. Supp. at 458), and "should be given considerable weight." Russell, 582 F. Supp. at 663.  As the concurring opinion in the Supreme Court's Johnson decision made clear:

> Very often the difference between liberty and imprisonment in cases where the direct evidence offered by the government and the defendant is evenly balanced depends upon the presence of character witnesses ... The inconvenience, expense and loss of time involved in transplanting these witnesses to testify in trials far removed from their homes are  often too great to warrant their use.  Moreover, they are likely to lose much of their effectiveness before a distant jury that knows nothing of their reputations.

323 U.S. at 279.

Judges in this District have given weight to that principle, ordering that cases be transferred where a defendant's intent is a central issue and where there is a plan to call character witnesses from his home state.  In cases that "involve[] allegations of fraud, the *mens rea* of the defendants and their general character will be of some consequence." Russell, 582 F.Supp. at 663; see also Aronoff, 463 F.Supp. at 458–59 (in fraud cases, "the defendant's knowledge of the fraudulent objectives of the conspiracy, and his intent to join it, are likely to be key issues on which evidence of his reputation for honesty and integrity may be highly probative.").  Moreover, "the impact of character witnesses is generally greater in the district where such witnesses live and work." Martino, 2000 WL 1843233, at *5 (citing Ohran, 2000 WL 620217, at *3).  "This makes good sense since the character witnesses will come from the same neighborhood as the jury." Layne, 2005 WL 1009765, at *3.

The location of the witnesses for Mr. Bolton strongly favors a transfer to Memphis; their impact and his ability "to call them will be much less, and the cost much more, if the case is tried in New York rather than Memphis." Russell, 582 F. Supp. at 663.

**III.     The Events Likely At Issue In A Case Against Mr. Bolton Took Place In Memphis.**

While the Indictment alleges a far-reaching conspiracy punctuated by conduct of certain defendants that occurred in New York, nearly everything the government contends Mr. Bolton did that is likely to be at issue, he did in Memphis, where he has worked all his life.

Courts deciding Rule 21(b) motions in multi-defendant conspiracy cases look past conclusory allegations about the national impact of the charged conspiracy and actions of other defendants, and train their focus instead on the alleged conduct of the defendant seeking a transfer. In Valdes, for example, the government charged multiple conspiracies involving overlapping groups of defendants. 2006 WL 738403. One set of defendants, charged with operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, moved to transfer their case to Florida, where their businesses were located. Id. at *6. The government opposed the motion on the ground that "the criminal activity alleged to have occurred was national in scope," and that the defendants used their Florida bank accounts "to conduct money transfers to and from 'many places outside of Florida,'" including New York. Id. The court rejected that argument, noting that, regardless of where the defendants wired the money, "[m]ost, if not all, of the alleged acts and conduct of the Section 1960 Defendants in furtherance of the alleged unlawful money transmitting occurred" in Florida. Id.

Similarly, the court in Russell was not persuaded by the government's argument that the case should not be transferred because the defendants were part of a conspiracy that involved moving money through, and placing phone calls into, New York. 582 F. Supp. at 661-62. The court held that the relevant focus was on "[t]he events directly involving the [moving defendants],"

16

which "occurred between the Bahamas and Memphis, where the defendants' properties, bank accounts and records are located." Id. at 663. The court held that that fact "supports the transfer of the case to Memphis." Id. See also United States v. Menashe, No. 90 Cr. 010 (LLS) 1990 WL 121525, at *2 (S.D.N.Y. Aug. 16, 1990) (where defendant made phone calls into New York from his home state, the "location of the events at issue does not weigh in favor of New York as a forum.").

Here, the alleged "acts and conduct" of Mr. Bolton, and the "events directly involving" him, occurred in Memphis. According to the Indictment, Mr. Bolton:

- Operated and created companies that implemented CDS and Add-on, and worked with traders and banks which executed those deals. (Indictment ¶¶ 12, 37, 97(s).)

- Signed agreements and other transactional documents to become the general partner of partnerships that participated in CDS and Add-on, and facilitated the operation of those transactions. (Indictment ¶¶ 43, 47.)

- Received and—much more infrequently—sent, emails and other correspondence concerning CDS and Add-on, including to and from banks and E&Y representatives involved in the transactions. (Indictment ¶¶ 42, 49, 50, 97(s).)

- Received opinion letters from, and sent representation letters to, a law firm that opined CDS and Add-on would survive an IRS challenge. (Indictment ¶¶ 52, 86, 87, 122.)

- Participated in his own CDS transactions. (Indictment ¶¶ 84, 85.)

- Made payments to defendants David Smith and Brian Vaughn in connection with the CDS and Add-on transactions. (Indictment ¶¶ 97(w), 97(x).)

- Gave testimony to the IRS. (Indictment ¶¶ 67, 89.)

- Provided the IRS documents and other information about CDS and Add-on. (Indictment ¶¶ 64, 88, 90, 97(ii).)

We do not believe there will be any dispute that, to the extent Mr. Bolton did these things, he did them from Memphis. At all times, the companies he operated that were involved in implementing CDS and Add-on were based in Memphis. Unless traveling, he was in Memphis

when he received or sent emails and other correspondence relating to these transactions, as he was

when he signed agreements and transactional documents. The legal opinion letters were sent to Mr.

Bolton's office in Memphis. The forms registering the CDS partnerships as tax shelters were sent

to the IRS from Mr. Bolton's Memphis office. To the extent he spoke on the phone with E&Y,

trading firms or banks, he almost always did so from Memphis; and to the extent he monitored the

performance of the traders and banks, he did it from Memphis. His own CDS partnership was

established and operated in Memphis. Any payments he authorized to be made to Messrs. Smith

and Vaughn were made from bank accounts in or around Memphis. Mr. Bolton's testimony to the

IRS was given in Memphis. And, although Mr. Bolton was not directly involved in the production

of documents to the IRS, to the extent that he was involved at all, it was from Memphis.[1]

      To be sure, some—but not much—of Mr. Bolton's alleged conduct touched on New

York. He communicated by email and over the phone with certain E&Y representatives and

employees of Refco and Bear Stearns who were in New York. He visited New York on occasion to

discuss CDS and Add-on with E&Y representatives. And he met with defendant David Smith in

New York to discuss licensing the CDS transaction. But, as Valdes, Russell and other cases make

clear, such glancing contact with New York is not sufficient to defeat a motion to transfer when the

center of gravity of Mr. Bolton's conduct was in Memphis.

## IV.    A New York Trial Would Significantly Disrupt Mr. Bolton's Business.

      A three-month or longer trial in New York would cause considerably more damage

to Mr. Bolton's business than a trial of several weeks in Memphis. That business has already

suffered many setbacks. Several years ago, Mr. Bolton managed trading for a number of clients.

(Bolton Decl. at ¶ 44.) In 2005, he lost his biggest client; soon thereafter his company was drawn

---

[1] Some of the documents the Bolton companies provided to the IRS were produced from Memphis. Other documents were produced from a Bolton office in Dallas where another Bolton employee—Belle Six—was located.

18

into this investigation, making it almost impossible to attract new ones and ultimately forcing him to close his broker-dealer firm. (Id. at ¶¶ 44–45.) Today, he has no trading clients; his business consists of trading his own money and managing a start-up venture in China. (Id. at ¶¶ 45, 46.) He once had 14 employees; he now has two: Greg Firtik, who helps with the trading and the China deal, and Loflin Falls, a CPA who handles office administration. (Id. at ¶ 45.)

Mr. Bolton's involvement in what is left of his business is substantial and hands-on. The trading involves his own money and is highly leveraged, which can cause slight market volatility to result in large swings in value. Mr. Bolton closely monitors the commodity traders he supervises and often has to make quick decisions about strategies. (Id. at ¶ 47.) He needs to keep a close eye on the traders' performance because he relies heavily on any trading profits—it is his only income, which he uses to feed his family and pay his bills. (Id. at ¶ 46.)

Mr. Bolton is also personally involved in the China venture. Because it is a start-up in an unfamiliar market, that investment requires that Mr. Bolton participate in negotiations with his business partners and government officials. (Id. at ¶¶ 48–49.) The China deal does not currently generate revenue, and an important reason for Mr. Bolton's personal involvement is his hope that it will provide a source of income beyond the worry of relying on trading profits. (Id.)

If Mr. Bolton had to be in New York for many months, both the trading business and the China investment likely would suffer. All responsibility for those businesses—currently a two-person job—would fall on Mr. Bolton's employee, Greg Firtik. (Ms. Falls is not a business person). (Id. at ¶¶ 49-50.) It would be extremely difficult for Mr. Firtik to handle both businesses by himself, having never done so before. For instance, because the trading involves Mr. Bolton's money, Mr. Firtik will likely be uncomfortable making certain decisions alone. (Id. at ¶ 50.) Even though Mr. Bolton will be reachable to a limited extent, he will not have access to the same kind of

information that he typically relies on make to decisions. (Id. at ¶ 49.)  Moreover, because Mr. Firtik also will have to run the China venture, he will not be able to focus as closely on the trading. There will be times when Mr. Firtik will need to travel to China for extended periods of time, as he has done recently.  On those occasions, there would be no one managing the trading at all, which could be disastrous to Mr. Bolton's finances.  (Id. at ¶ 51.)

A trial in Memphis would cause much less harm to Mr. Bolton's business.  The signal difference is that a Memphis trial would be substantially shorter than one in New York, keeping Mr. Bolton away from his business for weeks rather than months.  That would put much less pressure on Mr. Firtik to hold the business together during that time.  (Id. at ¶ 53.)  If he were in Memphis, Mr. Bolton also could visit his office to review market information and other materials before and after each trial day, and Mr. Firtik or Ms. Falls could even bring him relevant documents to review during breaks in the trial.  (Id. at ¶ 54.)

These are precisely the considerations that have resulted in courts granting transfers under Rule 21(b).  While judges have been mindful that "interruption [to a defendant's business] is inevitable regardless of where the trial is held," they have transferred cases when, as here, "the extent of any potential disruption would be less if the trial took place" in the defendant's home district.  Valdes, 2006 WL 738403, at *7; see also Russell, 582 F.Supp. at 663 ("it will still be possible for [the defendants] to carry on their business at least to a limited extent if they are tried in Memphis," resulting in "a potential reduction in business interruption…").  That is especially true when—again, as here—the company is struggling and "depends so much on personal involvement." Aronoff, 463 F. Supp. at 459.  Under those circumstances, "even a few hours each weekday plus weekends could make a substantial difference."  Id.  See also Valdes, 2006 WL 738403, at *6

("where a business, especially a struggling business, depends heavily on the personal involvement of the defendants, this factor favors transfer.").

## V.     A New York Trial Plainly Would Be More Expensive Than A Memphis Trial.

It will be significantly more expensive for Mr. Bolton to face a lengthy trial in New York than a much shorter Memphis trial.  The expenses associated with having to live in Manhattan for months, including the costs of hotels and meals, alone would be much greater than if the trial were in Memphis, where Mr. Bolton could live at home.  But the most significant costs of a New York trial would be the legal fees.  We have projected that, at our firm's rates, it will cost Mr. Bolton millions of dollars for us to prepare for and defend him through a several-month-long trial. (See Racanelli Decl. at ¶¶ 4-5.)  Mr. Bolton is not indemnified by a large corporation; he must pay those fees from his own pocket.  (Bolton Decl. at ¶ 55.)  And living in New York, away from his business, would further compound the problem by impairing his ability to earn money to pay those legal bills.

A much shorter trial in Memphis would be dramatically less expensive.  A criminal defense attorney who practices in federal court in Tennessee, and whom Mr. Bolton may retain if the case is transferred, has informed us that he could litigate this matter in Memphis through trial for a flat fee of approximately $500,000.  (Racanelli Decl. at ¶ 6.)  While we would remain involved if the case were transferred, the Memphis lawyer would be lead counsel and our role (and thus what Mr. Bolton incurs in fees) would be greatly reduced.

The significant difference in cost between a New York and a Memphis trial is the kind of "substantial financial burden" that has prompted courts to transfer cases. Martino, 2000 WL 1843233, at * 7; see also Russell, 582 F. Supp. at 663 ("it is very clear that a trial in Memphis would cost considerably less than would a trial here."); Menashe, 1990 WL 121525, at *2 (trial in defendant's home state "will result in a substantial savings" to him).

**VI.    The Location Of Counsel Does Not Favor Keeping The Case In New York.**

While Mr. Bolton now has New York counsel, he would retain an attorney who practices in federal court in Memphis if the case were transferred. (Racanelli Decl. at ¶ 6.) There is nothing peculiar to New York about the facts or law that would prevent a Memphis attorney from effectively representing Mr. Bolton. And even with time needed to learn the facts, it would be less expensive for Mr. Bolton to retain new counsel in Memphis than to have New York counsel try the case. As most of the witnesses and events relevant to Mr. Bolton are based in Memphis, it would be more efficient for Memphis counsel to conduct interviews and investigate the facts. See Ohran, 2000 WL 620217, at *4 (it would be less expensive to hire new counsel in Florida than for New York counsel to investigate facts in Florida).

**VII.    Memphis Is An Accessible Venue.**

Because many of the potential fact and character witnesses live in or around Memphis, that city is clearly more accessible than New York for those witnesses. See Russell, 582 F. Supp. at 664. And other potential witnesses would not be inconvenienced by a trial in Memphis. Indeed, in considering the relative accessibility of Memphis in connection with a Rule 21(b) motion, one court observed that Memphis "has an international airport with hundreds of flights daily." Id. In fact, there are non-stop flights to Memphis from major cities across the country, including New York, San Francisco, Los Angeles, Chicago, Boston, Atlanta, Washington, D.C., Seattle, Minneapolis, Tampa, and Philadelphia. (Racanelli Decl. at ¶ 7.)

**VIII.  The Relative Docket Conditions And The Location of the Documents Do Not Weigh Against Transferring The Case.**

It is likely that trial in Memphis will be scheduled quickly.  According to the Bureau of Justice Statistics, 39 criminal cases went to trial in the Western District of Tennessee in the year ending September 30, 2007.  The median time for those cases to reach trial was 19.8 months (as opposed to 26.9 months in the Southern District of New York).  (See Exhibit N.)

As for the location of documents and records, that consideration "has consistently been found not to be a 'major concern in these days of easy and rapid transportation.'"  Valdes, 2006 WL 738403, at *6 (citing Hanley, 1995 WL 60019, at *3).  Nearly all the documents the government has produced were provided electronically and are transportable.  The remaining paper files easily could be sent to Memphis.

**IX.     Other Special Considerations Also Favor A Transfer.**

**A.     A Transfer Will Not Lead To Duplicate Trials.**

A separate trial against Mr. Bolton in Memphis will be much shorter than, and will not require the government to duplicate, any trial against the remaining defendants.  While Mr. Bolton is charged in a broad conspiracy that draws within its sweep a number of different transactions and events, there should be no dispute that the only transactions that Mr. Bolton had any hand in were CDS and Add-on.  The Indictment alleges that Mr. Bolton conspired with the other defendants in deals such as PICO, COBRA and Tradehill, but it does not suggest that he had anything to do with those transactions—because he did not.  Indeed, Mr. Bolton's name is not mentioned in any factual allegation the Indictment except with respect to CDS and Add-on.

A trial against Mr. Bolton alone, therefore, will not duplicate a trial against the other defendants.  It will be focused on CDS and Add-on, will not involve the significant amount of evidence having no relevance to Mr. Bolton that the government would otherwise introduce in a

joint trial, and will likely extend only several weeks rather than the several months the government has estimated for a trial against all the defendants.

### B.    A Joint Trial Would Unfairly Prejudice Mr. Bolton.

Transferring Mr. Bolton's case to Memphis is in the interest of justice. Because much of the evidence the government would introduce in a joint trial has nothing to do with him, that evidence likely would not be admissible against him. Courts have recognized that "[t]he difficulties of a complex, multifarious case … are compounded for those defendants against whom only a small portion of the evidence is relevant" and who are only involved in "discrete and finite schemes or activities." United States v. Gallo, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) (Weinstein, J.). In cases involving a broad landscape of events, "there will inevitably be a great many instances in which the court will at trial admit evidence as to some of the defendants but not others…. These evidentiary discriminations often result in prejudice to the defendant against whom the proof is inadmissible." Id. at 751. See also United States v. Upton, 856 F. Supp. 727, 736 (S.D.N.Y. 1994) (Glasser, J.) (severing defendants "named in a small portion of the indictment and against whom only a small portion of the evidence is relevant" as they would otherwise "endure a trial involving many incidents of misconduct which do not involve them.").

While the Indictment summarily claims that all of the tax transactions were part of the same "scheme," it nowhere alleges—nor can it—that Mr. Bolton knew about PICO, COBRA or Tradehill, let alone that he joined a conspiracy with respect to those transactions. The Second Circuit has held that merely saying that distinct transactions are part of the same conspiracy does not make it so. A conspiracy is not defined by a generic, purported overarching purpose, but by an actual "agreement of its members to that purpose." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) (emphasis added). As Judge Sand has noted, McDermott stands for the proposition that an indictment cannot charge someone, under the aegis of a single conspiracy, with agreeing "to

24

an entire course of conduct of which he has no knowledge."[2] <u>United States</u> v. <u>Rigas</u>, 281 F. Supp.

2d 660, 674 (S.D.N.Y. 2003).

There should be serious question, then, whether the conspiracy charge would survive

a motion to dismiss pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.  In any

event, it would be unfairly prejudicial, under Federal Rule of Criminal Procedure 14(a), for Mr.

Bolton to sit through a trial where much of the focus will be on events having nothing to do with

him.  <u>See</u> <u>Gallo</u>, 668 F. Supp. at 750.  A transfer to Memphis would cure both problems.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, we respectfully request that the Court transfer the case as

to Mr. Bolton to the Western District of Tennessee pursuant to Federal Rule of Criminal Procedure

21(b).  In the alternative, and for the same reasons, the Court should sever Mr. Bolton from the

remainder of the case pursuant to Federal Rule of Criminal Procedure 14(a).

Dated: May 5, 2008
New York, New York

O'MELVENY & MYERS LLP

By: _____

Mark A. Racanelli
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-4403
Facsimile: (212) 326-2061
E-Mail: mracanelli@omm.com

*Attorneys for Defendant*
Charles Bolton

---

[2]  Courts have followed a similar analysis under Fed. R. Crim. P. 8(b) with respect to whether defendants are properly joined in a single indictment.  <u>See</u> <u>United States</u> v. <u>Kouzmine</u>, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996) (granting Rule 8(b) severance because "there was no evidence that the defendants joined in the indictments were aware of or joined in all of the schemes alleged."); <u>United States</u> v. <u>Lech</u>, 161 F.R.D. 255, 256 (S.D.N.Y. 1995) ("two separate transactions do not constitute [the same series of acts or transactions] within the meaning of Rule 8(b) 'merely because they are of a similar character or involve one or more common participants.'") (citation omitted).

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CERTIFICATE OF SERVICE** |
| -v.- | |
| ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH, and CHARLES BOLTON | (S1) 07 Cr. 453 (SHS) |
| Defendants. | Hon. Sidney H. Stein |

I, SHIVA EFTEKHARI, hereby certify that on May 5, 2008, I served via Federal

Express and e-mail true and correct copies of Charles Bolton's Memorandum of Law in Support

of the Motion to Transfer Venue under Federal Rule of Criminal Procedure 21(b) and

accompanying documents on the counsel listed below:

Deborah Landis, Esq.
Lauren Goldberg, Esq.
Marshall A. Camp, Esq.
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Paula M. Junghans, Esq.
Andrew Goldfarb, Esq.
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, D.C. 20036

Brian D. Lindner, Esq.
Isabelle A. Kirshner, Esq.
Clayman & Rosenberg
305 Madison Avenue, Suite 1301
New York, New York 10165

John Joseph Tigue, Jr.
Kristy Watson Milkov
Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C.
565 Fifth Avenue
New York, New York 10017

James B. Tucker, Esq.
Peter H. Barrett, Esq.
Robert G. Anderson, Esq.
Amanda B. Barbour, Esq.
Butler, Snow, O'Mara, Stevens & Canada, PLLC
P.O. Box 22567
Jackson, MS 39225

Paul B. Bergman, Esq.
Paul B. Bergman, P.C.
950 Third Avenue
New York, New York 10022


Dated: May 5, 2008
       New York, New York

Shiva Eftekhari