UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA,                          :

                                               :          (S1) 07 Cr. 453 (SHS)

          - v. -                              :

                                               :

ROBERT COPLAN,                                     :          **AFFIDAVIT OF**
MARTIN NISSENBAUM,                                 :          **JOHN J. TIGUE, JR.**
RICHARD SHAPIRO,                                   :
BRIAN VAUGHN,                                      :
DAVID L. SMITH, and                                :
CHARLES BOLTON,                                    :
                                               :

                     Defendants.          :

------------------------------------x

STATE OF NEW YORK     )
                            ) ss.:
COUNTY OF NEW YORK  )

John J. Tigue, Jr., being duly sworn, deposes and says:

      1.     I am a principal of the firm of Morvillo, Abramowitz, Grand, Iason,

Anello & Bohrer, P.C., attorneys for defendant Richard Shapiro ("Shapiro") in the above-

captioned matter.  I submit this affidavit in support of Shapiro's pretrial motion (a) to

require the government to specify the nature of the criminality charged against him; (b) to

dismiss the charges against him; and (c) to strike surplusage from the Superseding

Indictment.  I further submit this affidavit in support of the joint motion of defendants

Robert Coplan, Martin Nissenbaum, Shapiro, Brian Vaughn, and Charles Bolton (the

"defendants") for an order directing the government (a) to provide a bill of particulars;

(b) to identify documents that it intends to offer at trial by no later than December 24,

2008; (c) to make immediate production of Brady material, to produce all Giglio material

no later than December 1, 2008, and to produce Jencks Act materials no later than

December 24, 2008; (d) to provide a witness list by no later than December 24, 2008; and (e) to identify any evidence it intends to offer pursuant to Rule 404(b) of the Federal Rules of Evidence by no later than February 1, 2009.

2.    On May 22, 2007, a grand jury returned an eight-count indictment charging defendants Coplan, Nissenbaum, Shapiro and Vaughn with one count of participating in a conspiracy to (a) defraud an agency of the United States, to wit, the Internal Revenue Service (the "IRS"); (b) evading income taxes due and owing by themselves, clients of Ernst & Young ("E&Y"), and other partners of E&Y; (c) corruptly obstructing and impeding the due administration of the internal revenue laws; and (d) making false statements to the IRS, all in violation of Title 18, United States Code, Section 371. It also charged Coplan, Nissenbaum and Shapiro each with a single count of tax evasion, in violation of Title 26, United States Code, Section 7201; Coplan and Nissenbaum each with a single count of obstruction of the due administration of the internal revenue laws in violation of Title 26, United States Code, Section 7212; and Coplan and Vaughn each with a single count of making false statements to the IRS, in violation of Title 18, United States Code, Section 1001.

3.    On February 19, 2008, a grand jury returned a thirteen-count superseding indictment that added defendants Bolton and Smith (the "Indictment"). The Indictment retains the eight counts contained in the original indictment, adding Bolton and Smith as defendants in the conspiracy count, and removing obstruction of the due administration of the internal revenue laws as one of the objects of that conspiracy. The Indictment also charges Coplan, Nissenbaum, Shapiro, Vaughn and Bolton each with three counts of aiding and abetting income tax evasion, in violation of Title 26, United States Code,

Section 7201 and Title 18, United States Code, Section 2. Finally, it charges Smith with a single count of tax evasion, in violation of Title 26, United States Code, Section 7201, and a single count of filing a false tax return, in violation of Title 26, United States Code, Section 7206(1). A true and correct copy of the Indictment is attached as Exhibit A to this affidavit.

4.      On June 22, 2007, the government began providing discovery to the defendants. Since that time, the government has produced over 15 million pages of electronic discovery and 155 boxes of hard copy documents from at least 20 sources. The government continues to produce more discovery on a regular basis. In fact, as recently as April 18, 2008, the government informed defendants that it would be producing approximately 60-70 GB of additional electronic discovery. (I am informed that 60-70 GB of electronic discovery is equivalent to approximately 1 million pages of data. This number is included in the over 15 million pages referenced above.)

5.      In reviewing this voluminous discovery, defendants are aided by the fact that the government (a) has produced a separate box of "core documents," which it identified as being significant; (b) has, generally, provided the electronic discovery in word searchable databases; and (c) has provided indices for several of the collections it has produced. Although these tools are of some assistance in defendants' review of the electronic and hard copy discovery, defendants are still faced with the Herculean task of searching through, sorting and analyzing a staggering number of documents in order to prepare for trial.

6.      The Indictment describes four types of tax shelter transactions, and refers to a total of 218 transactions in which 402 E&Y clients participated. Based on our

review of the discovery, it appears that several E&Y clients participated in more than one transaction and that approximately 325 E&Y clients invested in the 218 transactions identified in the Indictment.  Moreover, the voluminous pretrial discovery refers to hundreds of individuals and entities that, in some way, touched the referenced transactions, including E&Y clients that ultimately decided not to enter into any of the transactions.  As a result, it is impossible for defense counsel to identify the individuals alleged by the government to have been co-conspirators.

7.      Given the passage of time, it is doubtful that the identification of the unidentified co-conspirators will negatively impact any possible on-going governmental investigation into the conduct charged in the Indictment.

8.      At the arraignment held on February 22, 2008, Assistant United States Attorney Deborah E. Landis informed the Court that she believed the trial of this case would last approximately three months.  Based on my experience, given the scope of Indictment, the volume of discovery produced to date, and the number and complexity of the transactions at issue, I believe that it is more likely that this trial will last between four and one-half months and six months.

9.      By letter dated March 24, 2008, defendants made a formal request for more particularized items of discovery pursuant to the Federal Rules of Criminal Procedure; Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; and 18 U.S.C. § 3500 (the "March 24 Discovery Request").  A true and correct copy of the March 24 Discovery Request is attached as Exhibit B to this affidavit.

10.     On April 9, 2008, Isabelle Kirshner, Esq., counsel for defendant Martin Nissenbaum, sent a letter to Ms. Landis requesting particulars on behalf of all defendants

(the "Nissenbaum Particulars Request"). A true and correct copy of that letter is attached as Exhibit C to this affidavit. A copy of the Nissenbaum Particulars Request was also sent to Assistant United States Attorneys Lauren Goldberg and Marshall Camp, who are now responsible for the prosecution of this case.

11.     On April 15, 2008, Ms. Goldberg responded to the March 24 Discovery Request in a letter addressed to all defense counsel. A true and correct copy of that letter is attached as Exhibit D to this affidavit.

12.     On April 18, 2008, all defense counsel addressed a letter to Ms. Landis requesting that the government identify all investors that had been or were being prosecuted for investing in (i) the purported tax shelters described in the Indictment, or (ii) other transactions the government claimed were designed to create the appearance of having been undertaken to generate profits or were actually intended to generate tax losses and deductions. A true and correct copy of this letter is attached as Exhibit E to this affidavit.

13.     On April 22, 2008, Ms. Goldberg responded to the Nissenbaum Particulars Request in a letter addressed to all defense counsel. A true and correct copy of that letter is attached as Exhibit F to this affidavit.

14.     By letter dated April 24, 2008, I asked the government to specify the transactions about which it intended to offer evidence of at trial. A true and correct copy of that letter is attached as Exhibit G to this affidavit.

15.     Based on communications with Ms. Kirshner, it is my understanding that, on April 29, 2008, Ms. Kirshner discussed defendants' request for particulars with Ms. Goldberg and Mr. Camp. With respect to the defendants' April 24, 2008 request that the

government identify which of the 218 transactions referenced in the Indictment it intended to offer evidence of at trial, Ms. Goldberg informed Ms. Kirshner that the government (a) presently intended to offer at trial a summary chart listing all of the transactions in question; and (b) did not intend to present detailed evidence with respect to every transaction, but rather only as to a subset of transactions. Ms. Goldberg did not identify the transactions she intended to prove at trial, but indicated that she would do so as the trial date approached.

16.    Counts Five, Six and Seven charge Coplan, Nissenbaum and Shapiro, respectively, with tax evasion in connection with their personal investment in a strategy described in the Indictment as similar to COBRA. See Indictment, ¶ 68. In my experience, it is highly unusual for the government to prosecute taxpayers who invest in tax shelters. I have consulted members of the Committee on Civil & Criminal Tax Penalties of the American Bar Association Section of Taxation, who have confirmed my view that tax shelter investors are generally not charged with tax evasion, except in those cases in which the investors are also alleged to have been involved in the development or promotion of the alleged shelter.

17.    In United States v. Stein, 424 F. Supp. 2d 720, 724-25 (S.D.N.Y. 2006), the prosecution arising out of tax shelters designed and sold by KPMG LLP, the Honorable Lewis A. Kaplan directed the government to provide a bill of particulars specifying which transactions the government claimed were fraudulent as designed. A true and correct copy of the bill of particulars filed by the government in response to Judge Kaplan's order is attached as Exhibit H to this affidavit.

WHEREFORE, for the reasons set forth in the accompanying Memoranda of Law, to which this Court's attention is respectfully invited, as well as the Memorandum of Law in Support of the Discovery Motions Filed on Behalf of All Defendants, the Court should grant the relief sought in paragraph 1 above and the accompanying motion papers.

John J. Tigue, Jr.

Sworn to before me this
5th day of May, 2008.

Notary Public

MAUREEN SMITH
Notary Public, State of New York
No. 01SM5077496
Qualified in Kings County
Commission Expires May 12, 20 \ \

# Exhibit A-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

       - v. -                           :        INDICTMENT

ROBERT COPLAN,                              :        (S1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,                            :
BRIAN VAUGHN,
DAVID L. SMITH, and                         :
CHARLES BOLTON,

                     :

           Defendants.                      :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____                  │
│ DATE FILED: ____ FEB 1 9 2008    │
└─────────────────────────────────┘
```

## COUNT ONE

**(Conspiracy)**

The Grand Jury charges:

**Background**

    1.    At all times relevant to this Indictment, Ernst & Young ("E&Y") was

one of the largest accounting firms in the world.  E&Y provided audit services to many of the

world's largest corporate clients, and provided tax services to corporate and individual clients,

including some of the wealthiest individuals in the United States.  Those tax services included

preparing tax returns, providing tax advice and tax planning advice, and representing clients in

audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

    2.    At all times relevant to this Indictment, as part of its tax practice, E&Y had

a business unit that was responsible for providing tax advice, as well as financial planning

advice, to individuals.  That business unit was known as Personal Financial Counseling, or

"PFC." E&Y had partners and other professionals throughout the country who were members of

the PFC practice.

        3.     At all times relevant to this Indictment, E&Y also had a department within

its tax practice known as the National Tax Department ("National Tax"). The individuals

assigned to National Tax were generally experts in particular areas of taxation, and they provided

expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of

experts whose particular areas of expertise related to E&Y's PFC practice.

        4.     In or about early 1998, the national leader of PFC formed a group that

would devote itself to designing, marketing, and implementing high-fee tax strategies for

individual clients. These strategies included tax shelters that could be used by high-net-worth

clients to eliminate, reduce or defer taxes on significant income or gains. The group initially

called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"),

but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early

2000.

        5.     Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD

SHAPIRO and BRIAN VAUGHN ("the E&Y defendants") were members of the VIPER/SISG

group for all or a significant part of the period relevant to this Indictment. The E&Y defendants

worked together with banks, financial institutions, investment advisory firms, law firms and

others, including defendants DAVID L. SMITH and CHARLES BOLTON, to design, market and

implement tax shelters called CDS ("Contingent Deferred Swap"); COBRA ("Currency Options

Bring Reward Alternatives"); CDS Add-On; and PICO ("Personal Investment Corporation").

6.     The tax shelters developed by the VIPER/SISG group were marketed to clients and prospective clients by members of the group, as well as by PFC professionals located throughout the country, who had primary responsibility for client contact. In or about mid-1999, certain PFC professionals around the country were designated to be members of the "Quickstrike Team," a nationwide area-based network created to provide greater efficiency in the marketing and execution of the VIPER/SISG strategies, including tax shelters.

### The Defendants

7.     At all times relevant to this Indictment, defendant ROBERT COPLAN, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's Washington, D.C. office. COPLAN worked within the PFC section of National Tax, and was one of E&Y's "subject matter experts," or "SMEs," in the areas of personal income taxes, estate and gift taxes, and excise taxes. COPLAN, who was the National Director of E&Y's Center For Family Wealth Planning, was a member of the VIPER/SISG group from its inception in or about early 1998. For most of the next several years, COPLAN supervised the activities of the group. Among his other activities, COPLAN approved promotional materials, and ensured that essential information about the design and implementation of E&Y's tax shelters was shared throughout the PFC practice. He consulted regularly with defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and also participated in sales presentations to clients. Before his employment at E&Y, COPLAN had worked for the IRS as a Branch Chief in the Legislation and Regulations Division.

-3-

8.     At all times relevant to this Indictment, defendant MARTIN

NISSENBAUM, a lawyer with a Master's Degree in tax law, was a partner at E&Y.  Located in

E&Y's New York office, NISSENBAUM was a member of the PFC group within National Tax,

and was a subject matter expert in the areas of individual income taxation, retirement benefits

and compensation.  NISSENBAUM was the National Director of E&Y's Personal Income Tax

and Retirement Planning practice, and was a member of the VIPER/SISG group from its

inception.  Among other things, NISSENBAUM worked closely with defendants ROBERT

COPLAN and RICHARD SHAPIRO in evaluating and developing the various tax shelters

marketed by the group, and participated in sales presentations to clients and prospective clients.

9.     At all times relevant to this Indictment, defendant RICHARD SHAPIRO,

a lawyer with a Master's Degree in tax law, was a partner located in E&Y's New York office.

SHAPIRO was a subject matter expert in the taxation and structuring of financial products and

instruments.  Although he was not a formal member of National Tax or the VIPER/SISG group

until 2000, SHAPIRO worked regularly with the group from its inception in or about early 1998.

SHAPIRO worked closely with defendants ROBERT COPLAN and MARTIN NISSENBAUM

in evaluating the shelters marketed by the group.  Because of his background and expertise in

financial instruments, he played an essential role in the approval process of several of the group's

shelters.  He also participated in sales presentations to clients and prospective clients.  Before his

employment at E&Y, SHAPIRO had been the Director of Tax for the Financial Services Industry

Practice at another large accounting firm.

10.     At all times relevant to this Indictment, defendant BRIAN VAUGHN --

who had a college degree in accounting -- was a certified public accountant (CPA) and a certified

-4-

financial planner (CFP). After working at three other major accounting firms, VAUGHN joined

E&Y as a senior manager in 1998. As a member of the VIPER/SISG group from its inception

through at least 2001, VAUGHN led sales efforts for most of the SISG shelters, and also played a

development role. VAUGHN was promoted to partner in or about 2002, in large part based upon

his role in successfully developing and marketing E&Y's tax shelters.

        11.      Defendant DAVID L. SMITH was a lawyer with a master's degree in

business administration (MBA) and a CPA. During the period from approximately 1978 through

1996, he worked at several major accounting firms and brokerage houses, where he helped

design and develop various tax strategies and tax shelters. In 1997, SMITH joined an investment

advisory firm, where he developed, marketed and implemented tax shelters, including CDS.

SMITH left that firm in 1998, and soon afterward co-founded the Private Capital Management

Group ("PCMG"). PCMG marketed and implemented tax shelters, including CDS. While at

PCMG, SMITH – who was the 50% owner of the company – marketed and implemented CDS

with the E&Y defendants, as well as with defendant CHARLES BOLTON. SMITH also assisted

the E&Y defendants and BOLTON in marketing the CDS Add-On shelter in 2000. During the

period from 1999 through 2000, SMITH earned millions of dollars from his involvement in

CDS

        12.      From in or about 1999 through at least in or about 2006, defendant

CHARLES BOLTON owned and operated a group of companies ("the Bolton companies") that

implemented and assisted in implementing tax shelters for E&Y's clients. BOLTON – who

studied business finance in college – held a series of finance jobs during the period from 1983

through 1992. In 1992, BOLTON formed the first of his own companies, Bolton Financial

Services. In or about mid-1999, BOLTON met defendant DAVID L. SMITH, and soon

afterward began to assist SMITH in implementing CDS for E&Y's clients. In or about early

2000, BOLTON arranged for one of his companies to license the CDS idea from SMITH.

BOLTON thereafter assisted in further developing and implementing CDS, together with E&Y.

In or about mid-2000, BOLTON agreed to assist the E&Y defendants in marketing and

implementing the CDS Add-On shelter. During the period from 1999 through 2002, BOLTON

made millions of dollars from his involvement in CDS and CDS Add-On.

### Tax Shelter Fraud

13.    During the period from in or about 1998 through in or

about 2006, the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD

SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, and others known

and unknown to the Grand Jury (hereinafter "the co-conspirators"), participated in a scheme to

defraud the IRS by designing, marketing, implementing and defending tax shelters using means

and methods intended to deceive the IRS about the bona fides of those shelters, and about the

circumstances under which the shelters were marketed and implemented.

14.    The defendants and their co-conspirators designed, marketed,

implemented and defended these tax shelters so that wealthy individuals with taxable income

generally in excess of $10 or $20 million could eliminate or reduce the individual income taxes

they would have to pay to the IRS. As designed, marketed and implemented, instead of wealthy

clients paying U.S. individual income taxes that were legally owed (generally, between 20% and

40% of their taxable income), the clients could pay total costs calculated largely as a percentage

of the desired tax loss or deduction generated by the particular tax shelter. These costs included

the fees payable to E&Y and the other participants, including PCMG, the Bolton companies, the various law firms that supplied opinion letters to the clients, and the banks and other financial institutions that executed the transactions.  The costs also included an amount that would be used to execute purported "investments," which were designed, in part, to disguise and conceal the true nature and purpose of the tax shelters.

      15.    The defendants and their co-conspirators understood that if the IRS were to detect the clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of these shelters, the IRS would aggressively challenge the claimed tax benefits.  In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients. Accordingly, the defendants and their co-conspirators undertook to prevent the IRS from: a) detecting their clients' use of these shelters; b) understanding how the steps of the transactions operated to produce the tax results reported by the clients; c) learning that these shelters were marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d) learning that the clients had not undertaken these transactions because they were seeking profit-making investment opportunities, but had instead done so because they were seeking huge tax benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned series of steps that had been designed by the conspirators to lead to the specific tax benefits sought by the clients.

      16.    In order to maximize the appearance that the tax shelters were investments undertaken to generate profits, and to minimize the likelihood that the IRS would learn the transactions were actually designed to create tax losses and deductions, the defendants

and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits and pricing schedules of the various shelters against disclosure to the IRS. The conspirators' goal of deceiving the IRS into believing that the tax shelters were driven by investment objectives rather than tax savings objectives was demonstrated in an email sent by defendant ROBERT COPLAN to a PFC professional in 2001. That individual had prepared a proposed client solicitation letter, in which he provided short descriptions of various SISG strategies and their accompanying tax benefits. COPLAN expressed reservations about sending such a letter to clients, as the IRS would inevitably ask the clients for marketing and promotional materials in the course of any audit. COPLAN explained, "Since our ultimate goal is to make our strategies appear to be investment techniques that have advantageous tax consequences, letters like this are not helpful to the client's case[.]"

17.    The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer -- ranging from 20% to 40% of the underpayment attributable to the shelter -- unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. In order to encourage clients to participate in the shelters, and to shield the clients from possible penalties, the defendants worked with law firms that agreed to provide E&Y's clients with opinion letters that claimed the tax shelter losses

-8-

or deductions would "more likely than not" survive IRS challenge, or "should" survive IRS challenge. However, the defendants knew those opinions were based upon false and fraudulent statements, and omitted material facts. By helping their clients obtain false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, the defendants not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to determine whether penalties should be imposed.

18.     The defendants and their co-conspirators undertook these actions so that E&Y, PCMG, the Bolton companies and the other entities involved could participate in the highly lucrative tax shelter market in which other accounting firms and "investment advisory" firms were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; so the individual E&Y defendants could enhance their own opportunities for professional recognition, advancement, job security, and remuneration; and so the Bolton companies could obtain access to E&Y's high net worth clientele for purposes of developing future business.

19.     In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO implemented a tax shelter to evade their own taxes, and arranged for eight of their E&Y partners to participate in the transaction with them. Use of that tax shelter enabled the group of eleven E&Y partners to eliminate a total of approximately $3.7 million in taxes.

-9-

Case 1:07-cr-00453-SHS     Document 45     Filed 02/19/2008     Page 9 of 31

20.     In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000 and 2001 defendant CHARLES BOLTON implemented fraudulent tax shelters to reduce and defer his own tax liabilities. Use of those tax shelters enabled BOLTON to reduce his tax liabilities by millions of dollars.

### The Fraudulent CDS Shelters

21.     CDS (an abbreviation for "Contingent Deferred Swap") was marketed and sold by E&Y from mid-1999 through 2001. During that period, approximately 69 CDS transactions were implemented for approximately 140 of E&Y's wealthy clients. As designed and marketed, E&Y's fee for CDS was approximately 1.25% of the tax deductions to be generated for each client. Various clients paid greater or lesser amounts, but ultimately the transaction generated more than $27 million in fees for E&Y. Clients who implemented CDS also paid fees to other participants in the transaction, including at least 1.25% to PCMG (for CDS transactions implemented in 1999) or the Bolton companies (for CDS transactions implemented in 2000 and 2001), as well as a fee to Law Firm A for an opinion stating that if the IRS were to disallow the CDS tax benefits, the client "should" ultimately prevail (a "should opinion"). Typically, Law Firm A's fee was at least $50,000.

22.     The objective of CDS was to convert a client's ordinary income into long-term capital gains, and defer the client's tax liability from the year in which the income was earned ("Year 1") to the following year ("Year 2"). During the period when CDS was sold, ordinary income for very wealthy individuals was typically taxed at a rate of approximately 40%, while long-term capital gains were taxed at approximately 20%. Accordingly, the conversion of

-10-

a client's income from the ordinary rate to the capital gains rate resulted in tax savings to the
client of approximately 20% of their income.  CDS was marketed to individuals or groups of
individuals who had at least $20 million in ordinary income to shelter.

       23.     Although there were variations, in a typical CDS transaction, the client
sought to convert $20 million in ordinary income into capital gains.  CDS was designed and
implemented as a series of pre-determined steps intended to deceive the IRS by making it appear
that the client was engaged in the business of currency trading for profit, and that the various
component parts of the transaction were routine financial activities comprising a coherent
business philosophy.  The conspirators concealed the fact that CDS was mass-marketed to clients
who had no genuine interest in putting their money at risk by engaging in the business of
currency trading, but were instead merely carrying out steps they were told to carry out in order
to achieve CDS's tax benefits.  These steps, and the manner in which these steps were
manipulated to deceive the IRS, included the following:

       a)     The CDS strategy was implemented through the creation of a
limited partnership in which an entity characterized as an investment advisor was the general
partner and E&Y's client was the limited partner.  Defendant DAVID L. SMITH's company,
PCMG, was the general partner for the CDS partnerships set up in 1999.  After CHARLES
BOLTON licensed CDS from SMITH in early 2000, one of the Bolton companies -- Bolton
Capital Planning ("BCP") -- became the general partner for the CDS partnerships set up in 2000
and 2001.  Although the main purpose for creation of each CDS limited partnership was for the
client to obtain tax benefits, and for E&Y, PCMG, and the Bolton companies to earn tax shelter
fees, the documents created to execute the transaction described each partnership as a "trading

partnership," and made no mention of the tax benefits, but instead stated that the partnership was "organized to generate capital appreciation."

      b)    After determining how much ordinary income the client wished to shelter from taxes in Year 1, the conspirators would typically arrange for the client to contribute approximately one-third of that amount ($6.6 million in the typical example) to the purported "trading partnership."

      c)    The success of the client's tax position with the IRS required that the partnership be characterized for tax purposes as a "trade or business," so that "business deductions" could be generated, and then used by the clients to offset their taxable income. Accordingly, the conspirators arranged for approximately $1 million of the client's $6.6 million contribution to be placed in a trading account. In order to make it appear that the "trading partnership" was genuinely engaged in the "business of trading for profit," the funds in that trading account were generally used to carry out a high volume of short-term trades. However, the activity in that account consisted largely of trades designed to preserve the client's capital, so the funds in the account could be returned to the client once the tax benefits of CDS had been obtained. As described by a co-conspirator employed by one of the Bolton companies in an email to another co-conspirator, "Our true investment objective in the various trading accounts was minimal gains and losses." As stated by the same co-conspirator in an email sent to defendant CHARLES BOLTON and others, "I am happy to report that ... [f]or the most part we were down an average of approximately 1% on all of the trading accounts. In my eyes, that is 100% in line with what our objective was." The conspirators affirmatively sought to conceal the fact that no trading profits were expected, as reflected in an email sent by another co-conspirator

in February 2000, asking that certain references be removed from CDS documents, and

explaining, "We don't want to highlight that we don't anticipate trading profits."

      d)      A portion of the client's cash contribution to the "trading

partnership" (approximately $5 million in the example) was put toward a $20 million swap

contract, which was entered into between the partnership and a bank or financial institution ("the

bank"). The swap contract called for the "trading partnership" to make periodic payments

totaling approximately $20 million to the bank over the life of the swap. Because the payments

made to the bank in Year 1 were made by an entity purportedly engaged in the "business" of

trading, those payments were claimed by the partnership as "business deductions." The

purported "business deductions" – which flowed through the "trading partnership" to the client –

would be used to offset the $20 million in ordinary income earned by the client in Year 1, and

thus would eliminate the client's tax liability that year.

      e)      In order for a CDS client to shelter $20 million in income, it was

necessary, under the tax code, for that client to have $20 million "at risk" in the CDS transaction.

In a typical transaction, only $5 million of the client's contribution was put toward the swap; the

additional $15 million was obtained by the partnership as a purported "loan" from the bank.

However, the so-called "loan" from the bank did not involve any actual disbursement of funds to

the CDS partnership. Instead, the bank merely made a "book entry" indicating that loan proceeds

were being deposited into a collateral account at the bank. The CDS swaps were structured so

that no real funds were transferred to the control of the partnership, and there was no possibility

that any real funds of the bank would be placed at any risk of loss. Because the bank was at all

times fully collateralized on the "loan," there was also no possibility of a default on the "loan" by

the partnership. The conspirators caused the CDS clients to execute documents by which they agreed to accept personal liability on the loans, while at the same time assuring the clients that they would not have to contribute any additional money to the transaction. In causing the clients to execute such documents, the conspirators sought to deceive the IRS into believing that the individual clients were actually "at risk" for the loan amounts. In truth and in fact, they knew that no such risk existed, that the so-called "loans" served no business purpose, and that the "loans" served only to increase the amount of the tax deduction the individual could claim. This tax purpose is reflected in a 1998 email concerning the CDS transaction, sent between employees of the bank that executed the 1999 CDS transactions for E&Y's clients:

> You are right to say that the collateral is part funded out of our loan
> and, to that extent, seems non-sensical, but there is a tax reason
> why this circularity is necessary. . . . (You will recall that the
> purpose of the trade is to convert current income into long-term
> capital gains.) . . . Incidentally, this "loan" has zero capital
> implications for the bank.

        f)       The CDS swap contract also provided for a "termination payment" to be paid by the bank to the CDS partnership in Year 2, at the end of the swap. For a $20 million swap, the termination payment was approximately $20 million, with some variation based on market fluctuation. In order for the termination payment made to the CDS partnership to qualify for long-term capital gains treatment, the swap termination in Year 2 had to occur more than a year after the swap was executed, and had to be characterized as an "early termination" of the swap contract. Although prospective CDS clients were told by E&Y that the swaps would last for just over one year, the conspirators arranged for swap contracts to be drawn up with 18-month maturity dates. This was done to mislead the IRS into believing that the

-14-

parties actually contemplated an 18-month swap, and that "early termination" was an option, but

not a foregone conclusion. The conspirators sought to conceal this plan from the IRS, as

reflected in an email sent by defendant BRIAN VAUGHN to a co-conspirator in June 2001. In

that email, VAUGHN suggested removing reference to "early termination" from a CDS

economic model, explaining, "This could adversely affect our tax situation given the level of

audits that are currently in progress. . . . Remember our goal is to convince the agents the client

did not have a predisposition of early termination." For a similar reason, defendant RICHARD

SHAPIRO recommended against use of an internal E&Y document called a "CDS Action Plan,"

which set forth all the steps of the transaction in advance, including early termination of the

swap. In an email SHAPIRO sent to defendants ROBERT COPLAN, MARTIN NISSENBAUM

and BRIAN VAUGHN, he explained:

> [O]ne of the problems with tax advantaged transactions when they
> are viewed is that they are perceived (correctly I might add) as too
> scripted. While having a plan is important, should we have in
> writing 'before the fact' such things as the fact that our swap will
> be terminated early? Clearly, that is necessary for the flow of the
> transaction. But should there be a document in existence (such as
> this) that has all the chapters and verses laid out? I question that
> seriously.

Thus, by manipulating the terms of the swap and by concealing the genuine intentions of all the

parties, the conspirators concocted a scenario that enabled them fraudulently to characterize the

termination payments received by the CDS partnerships from the bank as long-term capital gains.

Those capital gains flowed through the partnerships to the clients, so the clients could be taxed at

the lower, capital gains rate.

-15-

24.    As part of the scheme to defraud the IRS, the conspirators created

additional documents that purported to provide non-tax business motivations for steps that were

actually tax-motivated. For example, defendant ROBERT COPLAN drafted a letter to be signed

by clients who had decided to terminate their CDS partnerships after the tax benefits had been

obtained. In that letter, the clients falsely attributed their decision to discontinue their trading

activities to the September 11, 2001 terrorist attacks, and to "possible economic repercussions

resulting from such attacks." In an email sent to various members of E&Y's PFC practice, as

well as to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, COPLAN attached

his draft letter, and explained that the letter could be used "as a means of establishing a logical

reason for winding down the trading account in the partnership. . . . This could document for the

file a logical non-tax rationale for ending the trading account – if that is otherwise what the client

wants to do." A copy of COPLAN's email and the attached letter was forwarded to defendant

CHARLES BOLTON.

25.    As part of executing the fraudulent CDS tax shelters, the conspirators

arranged for CDS clients to sign false factual representations that could be, and were,

incorporated into the CDS opinion letters prepared by Law Firm A. For example, although the

real purpose of the CDS trading activity was to achieve a particular volume and frequency of

trading so the conspirators could plausibly characterize the CDS partnerships as involved in a

"trade or business," and could thereby assert that the swap payments made by the partnerships in

Year 1 were "business deductions," the CDS clients were directed to sign, and did sign, a

document stating, "I regard the various investments of the partnership -- including the swaps and

the trading activities -- as comprising one coherent business philosophy, and this diversity of

-16-

investments was an important element in my decision to invest in the partnership." In truth, as the conspirators well knew, the diversity of investments was not an important element in the clients' decisions, and the only "coherent philosophy" reflected in the various components of the CDS transaction was a philosophy to reduce taxes.

26.     In addition to incorporating the false factual representations described in paragraph 25, above, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)     The opinions stated that the objective of the partnership's trading activities was to "profit from short term market movements," when in reality, the primary objective of the trading activity was to achieve a particular volume and frequency of trades, while preserving the client's capital by minimizing trading losses.

b)     The opinions stated that because either party to the swap contract could elect to terminate the swap early, the partnership was "not in control of that decision, should it occur," and therefore the partnership should not be viewed as "being able to manipulate the timing of income," when in reality, both parties to the swap contracts planned to terminate the swaps early from the outset, and the sole purpose of that plan was to manipulate the timing of income.

c)     The opinions stated that the limited partner (the client) was "at risk" for an amount greater than the amount invested because the client had agreed to be personally liable for the debts of the partnership, when in reality, the clients had been assured that they would not be liable for any amount over their initial cash contribution, and the transaction

-17-

was arranged so there would be no such liability.

         d)     The opinions stated that "[n]one of the business conducted by the Partnership [had] a predetermined outcome," when in reality, the E&Y defendants and their co-conspirators had marketed to E&Y's clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

         e)     The opinions did not disclose that the client's primary purpose for implementing the CDS transaction was to obtain the tax benefits, or that the fees associated with the transaction were calculated on the basis of the intended tax deduction to be generated.

         f)     The opinions did not disclose that they were rendered by an attorney who had assisted the defendants in designing, marketing, and implementing the CDS transaction, and had been offered to the clients as part of a promotional package.

### The Fraudulent COBRA Shelters

      27.     COBRA (an acronym for "Currency Options Bring Reward Alternatives") was marketed and sold by E&Y during the last few months of 1999 to 51 wealthy taxpayers. Of the 16 COBRA transactions, all but one were implemented in late 1999; the other was implemented in 2000. Although some clients paid greater or lesser amounts, as designed and marketed, E&Y's fee was approximately 1.5% of the tax losses to be generated using the strategy, and COBRA generated approximately $14.7 million in fees for E&Y. The fees paid by COBRA clients amounted to approximately 4.5% of the losses to be generated, including a fee of just under 3% charged by the law firm of Jenkens & Gilchrist ("J&G"). J&G prepared most of

the transaction documents for the COBRA shelters, and implemented the COBRA transactions

for the clients. J&G also issued "more likely than not" opinion letters to the COBRA clients.

Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN

VAUGHN realized that because J&G was involved in designing, structuring and implementing

the transaction, the clients would not be able to obtain penalty protection on the basis of J&G's

opinion letter. Therefore, the E&Y defendants arranged for another attorney, a partner at Law

Firm B, to issue each of the COBRA clients a second "more likely than not" opinion for a fee of

up to $150,000.

      28.    The objective of COBRA was the complete and permanent elimination of

all tax liability on whatever amount of ordinary income or capital gain a client might choose.

COBRA, which involved the manipulation of basis in digital foreign currency options, was

E&Y's brand of a strategy also known as the "digital option trade" or the "short option strategy."

      29.    COBRA was designed, marketed and implemented as a series of pre-

planned steps which, within a period of 30 to 45 days, would generate artificial losses sufficient

to offset a client's income or gains completely. COBRA was intended to deceive the IRS by

making it appear that the client – together with other like-minded individuals – was "investing"

in foreign currency options in order to make a profit, and that non-tax business reasons existed

for the various steps of the transaction. In reality, in exchange for substantial fees that were

calculated largely as a percentage of the tax loss to be generated for E&Y's clients, the E&Y

defendants and their co-conspirators provided the clients with a cookie-cutter transaction that

utilized pairs of almost completely offsetting foreign currency options to generate huge artificial

tax losses. Although the options had some chance of earning the clients a profit after the fees

were paid, this so-called "investment" opportunity was not offered generally through E&Y's

Investment Advisory Service, but was instead marketed to a select group of individual clients

with more than $20 million in income or gains to offset.

      30.    COBRA included the following key steps:

      a)    The client would identify an amount of ordinary income or capital

gains on which the client wished to eliminate taxes. The client or E&Y would then identify other

individuals who also wished to eliminate their taxes, with whom the client could participate in

the transaction.

      b)    Using J&G, each client would create a wholly-owned limited

liability company ("LLC"). That LLC would purchase a digital foreign currency option (the

"long option") from a bank, and would sell an almost completely off-setting digital foreign

currency option ("the short option") to the same bank. The client's LLC paid a net amount to the

bank for the pair of options; that amount equaled 5% of the tax loss the client wished to generate

(in other words, 5% of the income the client wished to offset).

      c)    The pair of offsetting options constituted a single financial bet

between the client and the bank that, at the end of 30 days, a particular currency would have gone

up or down in value against another currency by a specific amount. The option pairs were priced

and structured by arrangement between E&Y and the bank so that if the client won the bet (or,

was "in the money") at the end of the 30-day period, the bank would pay the client an amount

sufficient to yield a profit over and above the client's initial 5% contribution plus the fees

associated with the transaction. E&Y told its clients that the odds of that happening were

approximately 38%. If the client lost the bet (or, was "out of the money") after 30 days, then the

client would lose his 5% contribution and his fees. E&Y told its clients that the likelihood of that outcome was approximately 62%. Thus, the E&Y defendants and the clients knew from the outset that the clients would probably lose their 5% contribution and their fees.

         d)     Almost immediately after acquiring the option pair or pairs from the bank, each client – acting through his newly created LLC – would contribute the option pairs to a newly created partnership, also formed by J&G, in which one or more other COBRA clients were also partners. After approximately 30 days, the options would expire. Each client would also contribute a low-value asset to the partnership – an ordinary asset or a capital asset, depending on whether the client desired ordinary or capital losses.

         e)     Each client would then transfer his partnership interest to a new S-Corporation, also formed by J&G. When this occurred, the partnership would automatically terminate. According to the E&Y defendants and their co-conspirators, each client could then claim – for tax purposes – that his tax basis in the partnership was equal to the cost of the long option (which had been calculated intentionally to equal the income the client wished to offset), rather than the net amount actually paid by the client to participate in the transaction (5% of the price of the long option). The conspirators claimed that the low-value asset contributed by the client to the partnership would take on that high tax basis when the partnership terminated, so that when the S-Corporation sold the low-value asset at fair market value only days later, a huge artificial loss – equal to almost twenty times the client's initial cash contribution – was created for the client.

        31.     The E&Y defendants and their co-conspirators were aware that if the IRS were to discover all the facts surrounding the design, marketing and implementation of COBRA,

-21-

and that the COBRA clients were primarily or exclusively motivated by a desire to eliminate

huge tax liabilities, the IRS would aggressively challenge the claimed tax benefits.  Accordingly,

among other steps they took to prevent the IRS from learning those facts, the conspirators: 1)

falsely and misleadingly represented the COBRA clients' motivations for entering into the

transaction, and for taking the various steps necessary to create the huge artificial losses; 2)

encouraged COBRA clients to engage in activities designed to disguise and conceal their tax

motivations for entering into the transaction; 3) falsely represented to the IRS the likelihood that

clients could earn a profit from COBRA; 4) directed the destruction of documents which would

reveal the true facts surrounding the design, marketing and implementation of COBRA; 5)

caused and approved the issuance of false and fraudulent opinion letters; and 6) misled the IRS

during audits of the COBRA transaction.

        32.     Among the ways in which the conspirators sought to conceal the fact that

COBRA was tax-motivated, and was designed and implemented as a pre-planned series of steps,

were the following:

        a)     Defendant ROBERT COPLAN directed that client engagement

letters make no reference to tax losses, or to the fact that fees were calculated as a percentage of

the tax losses the clients sought to generate.

        b)     Defendant ROBERT COPLAN directed that PowerPoint

presentations which laid out all the steps of the COBRA transaction not be left with clients.

        c)     In addition to having clients contribute 5% of the desired loss

amount to the transaction, the E&Y defendants directed clients to contribute an additional 2% of

the desired loss amount to the COBRA partnerships, and recommended using that additional cash

to engage in trading activity.  The sole purpose of that trading activity was to deceive the IRS into believing that the COBRA partnerships had been formed to conduct investment activities, and not merely to generate tax losses.  The E&Y defendants' intent to deceive the IRS in this regard was reflected in a series of emails sent by defendant ROBERT COPLAN to various PFC members whose clients had initiated COBRA transactions, as well as to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN.  COPLAN explained in the first email, "[T]he more trading activity the better [because] the trading activity is important to the maintenance of a business purpose for the partnership."  In a later email he advised, "Trades should occur weekly in the partnership, with weekly turnover of positions at or near 100% . . . . The tax position will be aided if there is at least some type of trading activity[.]"

       d)     Defendant ROBERT COPLAN sent an email to PFC professionals, with a copy to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN, suggesting that their COBRA clients download foreign currency trading information from a website, and explaining that such material could be useful "as file material to evidence investigation into currency trading."

       e)     After the COBRA partnerships terminated in late 1999, and after the artificial losses had been generated, the E&Y defendants recommended that clients maintain the 2% cash contribution in their S-Corporations, and continue to engage in trading activities.  This step was designed to deceive the IRS into believing that the S-Corporations had been created for some actual business purpose, instead of simply to achieve COBRA's tax benefits.  In an email to PFC professionals in January 2000, defendant ROBERT COPLAN stated that he, together with defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, were "providing

guidance . . . as to what is recommended to strengthen the client's tax position[.]"  COPLAN

continued:

> It is preferable to leave the S Corp in place through the end of the
> year 2000 to enhance the substance of the transaction – i.e., so that
> the entire structure is not closed down within two months. . . . As
> for activity in the account we believe 'The more the better'
> [because] the tax position will be strengthened by significant
> trading activity . . . .

With respect to the S-Corporation, COPLAN explained to another PFC member, "The longer it

runs, the better it looks from a business standpoint as to why the thing was formed."

        f)       After the IRS began auditing COBRA clients, defendant ROBERT

COPLAN sent an email to PFC professionals throughout the country, directing that they destroy

COBRA documents.  The email was titled "Important - Purge Of All Key COBRA Documents,"

and it instructed that recipients "immediately delete and dispose of" COBRA documents such as

PowerPoint slides and work plans.

        33.      As part of the COBRA client's fees, the client received two "more-

likely-than-not" opinion letters, one from J&G, and the second from Law Firm B.  The E&Y

defendants and their co-conspirators knew that these opinion letters contained false and

fraudulent statements, and omitted material facts.

        a)       J&G's opinions were false and fraudulent for the following

reasons, among others: i) they stated that the clients had made factual representations to J&G

concerning their reasons for entering into the transaction, when in reality, no such factual

representations had been made to J&G; ii) they stated that the clients had contributed their

foreign currency options to the COBRA partnerships for "substantial non-tax business reasons,"

when in reality, there were no substantial non-tax business reasons for that step, and the clients

took that step because the conspirators directed them to do so; and iii) they stated that the clients

had contributed their partnership interests to the S Corporations for "substantial non-tax business

reasons," when in reality, there were no substantial non-tax business reasons for that step, and the

clients took that step because the conspirators directed them to do so.

b)    Law Firm B's opinions were false and fraudulent for the following

reasons, among others: i) they stated that the clients had contributed their foreign currency

options to the COBRA partnerships for "substantial non-tax business reasons," when in reality,

there were no "substantial non-tax business reasons" for that step, and the clients took that step

because the conspirators directed them to do so; ii) they stated that the clients had contributed

their partnership interests to the S Corporations for "substantial non-tax business reasons," when

in reality, there were no "substantial non-tax business reasons" for that step, and the clients took

that step because the conspirators directed them to do so; and iii) they stated that "there existed

no understanding, obligation or agreement" under which the clients committed to undertake the

various steps in the COBRA transaction, when in reality, the COBRA clients had been told they

could obtain the promised tax benefits only if all the steps were completed, and therefore the

clients intended to complete them.

c)    The J&G opinions purported to be based upon "all the facts and

circumstances necessary" for J&G to form its opinion, and Law Firm B's opinions purported to

be based upon all "pertinent facts." However, the J&G opinions failed to disclose that J&G had

implemented the COBRA transaction on behalf of the clients, and that J&G had collected as its

fee a percentage of the loss amount generated. In addition, neither opinion disclosed the

-25-

following material facts, among others: i) that most of the COBRA clients responded to a

promotional pitch that emphasized COBRA's tax benefits, and they entered into the transaction

primarily or exclusively to obtain those tax benefits; ii) that the clients knew from the outset that

a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific

tax result; iii) that COBRA was structured so that each client would probably lose his entire cash

contribution plus fees, rather than make any profit; and iv) that the "more likely than not"

opinion letters had been offered to the clients as part of E&Y's promotion of the shelter.

      34.     On or about January 5, 2000, E&Y's management decided that

E&Y would no longer market COBRA to its clients. That decision was reached after subject

matter experts outside the VIPER/SISG group expressed the view that COBRA would not

survive scrutiny under applicable law. Among the objections raised by others within E&Y was

that COBRA did not have a meaningful "business purpose."

### The Fraudulent CDS Add-On Shelters

      35.     CDS Add-On, which involved adding a COBRA-like transaction onto a

CDS transaction, was marketed for a brief period in mid-2000. Approximately 61 wealthy

individuals took part in a total of 37 Add-On transactions, which generated more than $24

million in fees for E&Y. CDS Add-On was implemented by defendant CHARLES BOLTON

through the Bolton companies, and generated millions of dollars in fees for BOLTON and the

Bolton companies. In addition to the fees paid to E&Y, the Bolton companies, and other

participants in the transactions, clients paid $75,000 for a "more likely than not" opinion letter

from Law Firm A.

36.    The objective of CDS Add-On was for the client to defer indefinitely
the income tax liability on the capital gains generated in the second year of the CDS transaction.
In most cases, CDS Add-On consisted of two parts: 1) a two-year CDS transaction that would
result in capital gains to the CDS partnership; and 2) a COBRA-like strategy that would generate
artificial losses for the CDS partnership, and thus offset those capital gains.  However, unlike in
COBRA, the losses generated using CDS Add-On did not permanently eliminate taxes, but
instead resulted in a tax deferral for as long as the income to be sheltered remained in the hands
of the partnership.

37.    The second part of the transaction (the COBRA-like structure, referred to
as the "Add-On") was implemented by having each participating CDS partnership acquire one or
more pairs of almost completely off-setting digital foreign currency options.   As in COBRA, the
premium for the long options equaled the amount of income the client wished to offset.  Thus,
each client's partnership could acquire options that would offset the capital gains received in the
second year of CDS, or the partnership could acquire options with a higher premium, and thereby
shelter additional income or gains.  Participating partnerships would then contribute their option
pairs to a new entity, BCP Trading & Investments, LLC ("BCPT&I"), which was created by
defendant CHARLES BOLTON and was used solely to implement the Add-On shelter.  By
contributing their option pairs to BCPT&I, the CDS partnerships became members of BCPT&I.
Before the end of the tax year in which the client wanted to shelter their CDS capital gains (Year
2 of the CDS transaction), the CDS partnership would withdraw from BCPT&I, and would
receive foreign currency which – as in COBRA – took on an artificially inflated tax basis.  The
CDS partnership would then sell or exchange the foreign currency to trigger a loss equal to the

-27-

capital gain from the CDS swap termination payment, or such larger amount as the client had chosen. The client's taxes would be deferred until cash was removed from the CDS partnership, or until that partnership terminated.

38.     Like CDS, the Add-On transaction also involved a so-called "loan" from a financial institution. Just as the "loan" made to the partnership in CDS involved no genuine transfer of funds and served no purpose other than to generate tax benefits, the "loan" extended to the Add-On clients was also made with a "book entry" and served no purpose other than to assist the clients in claiming artificial tax losses.

39.     The idea for CDS Add-On arose in or about early May 2000, after a similar idea was described to defendant BRIAN VAUGHN. VAUGHN passed the idea to defendant ROBERT COPLAN in an Instant Message ("IM"), stating, "If we could integrate CDS and the foreign currency trading program with the short option transaction, we could have a great transaction." COPLAN responded that he would consider VAUGHN's proposal, and forwarded the IM to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

40.     During the next several weeks, the E&Y defendants developed the Add-On strategy, and obtained the participation of defendant CHARLES BOLTON. The E&Y defendants were well aware that only a few months earlier, E&Y's management had decided that COBRA would no longer be marketed by E&Y, and that others within E&Y would oppose the Add-On strategy unless it had a more meaningful business purpose than COBRA. In order to provide the Add-On strategy with such a "business purpose," and thus to obtain approval to market Add-On, the E&Y defendants created a false cover story: they claimed that the idea for the CDS partnerships to purchase the digital foreign currency options, and the idea to consolidate

-28-

those options in a new LLC, had come from one of the traders who was managing activity in the CDS partnership trading accounts on behalf of BCP, and that the purpose of those steps was "to diversify trading and enhance performance" in the trading accounts. They also falsely claimed that the plan to take those steps had been presented to them by defendant CHARLES BOLTON, and that they had merely recognized the favorable tax consequences that could be obtained. According to defendant ROBERT COPLAN, these events were simply a "fortuitous circumstance."

41.    In reality, there was no way the Add-On transaction could "enhance performance" in the CDS trading accounts. Unlike the COBRA transaction, which entailed a foreign currency bet that could actually result in a profit for the client if the client's option pair ended up "in the money," no such possibility existed for the Add-On transaction. This was because the Add-On client was required to contribute only about 0.5% of the desired loss amount to the Add-On transaction (as opposed to 5% contributed by the COBRA client). Although the payout on a successful Add-On bet was 2:1, any profit potential on such a payout was far exceeded by the amount the client was required to pay in fees to E&Y, the Bolton companies, Law Firm A and the financial institution involved. Thus, the Add-On transaction carried no reasonable possibility of profit; it served no purpose other than to defer the client's tax liability indefinitely, and to generate fees for the other participants.

42.    The conspirators agreed, with respect to the marketing of Add-On, that PCMG (the general partner of the CDS partnerships set up in 1999) and BCP (the general partner of the CDS partnerships set up in early 2000) would send letters to the CDS clients, announcing the opportunity to participate in a new "program" that would diversify their trading returns and

-29-

enhance performance. Defendant DAVID L. SMITH signed the letters sent on behalf of PCMG, and Belle Six – a co-conspirator not named as a defendant herein, who served as a Managing Director of BCP – signed the letters sent on behalf of BCP. Defendant ROBERT COPLAN also drafted a letter to be sent to the CDS clients by E&Y. In that letter – which was sent to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN and CHARLES BOLTON to review and edit – COPLAN also referred to BCP's desire "to diversify trading and enhance performance." As COPLAN explained in an email to the E&Y defendants, he deliberately drafted the letter in such a way as to conceal the fact that withdrawal from the BCPT&I – a step necessary to generate the artificial losses that would defer the client's taxes – was planned from the outset: "I softened the last reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future." These letters were prepared in anticipation of possible future audits, in order to deceive the IRS into believing that the transaction was motivated by investment concerns, and that the steps leading to the tax result were not pre-planned from the outset.

43.     In order for the many steps of the Add-On shelter to be implemented efficiently for all the CDS clients who wished to participate, defendant DAVID L. SMITH agreed to transfer from PCMG to BCP the control of all 1999 CDS partnerships whose limited partners wished to participate in Add-On. This was accomplished through three agreements executed in July 2000, all of which were signed by both SMITH and defendant CHARLES BOLTON. BCP thereafter served as the general partner for all the CDS partnerships that implemented Add-On shelters, and ensured that all the necessary steps were executed on behalf of each one.

-30-

44.     During the marketing of CDS Add-On in 2000, the E&Y defendants took additional steps to ensure that the true motivation behind the strategy was not revealed. A PowerPoint presentation was created by an individual outside the VIPER/SISG group, to illustrate the inter-relationship between CDS and CDS Add-On, and it was distributed to PFC personnel. In a series of emails that followed, defendant ROBERT COPLAN expressed concern that the PowerPoint presentation would undermine the story the conspirators had constructed to establish a business purpose for the strategy, and would thus reveal the tax motivation behind it:

a)     On June 14, 2000, COPLAN sent an email to defendants BRIAN VAUGHN and RICHARD SHAPIRO, explaining that the Add-On strategy would "lose all of its business purpose if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force rather than the money manager's interest in consolidating the accounts."

b)     The same day, COPLAN sent an email to all the PFC personnel who had received the PowerPoint presentation, stating that the slides were for internal use only, and were not to be shown when presenting CDS to clients. COPLAN cautioned, "There should be no materials in the client's hands – or even in their memory – that describe CDS as a single strategy that includes the Add-on feature."

c)     COPLAN then wrote to the individual who had prepared the PowerPoint slides:

> I hope you can understand the problem with portraying the strategy
> as an integrated transaction designed to produce a capital gain
> deferral. If these slides ever made their way to the IRS . . . the
> entire business purpose argument that gives us the ability to
> distinguish this from COBRA would be out the window. Since we

-31-

got the internal OK to do this add-on feature on the basis that there
is a much stronger business purpose than we had with COBRA,
doing anything to undermine that business purpose would be
creating unnecessary risk for our clients and unnecessary risk for
the PFC practice.

45.     In an email to defendant ROBERT COPLAN, defendant RICHARD

SHAPIRO also expressed his concern about linking the two strategies, stating, "I remain

concerned of the formal pre-wired tie-in to cobra. I think it adversely impacts the story that we

can tell regarding the purpose of the transaction."

46.     In addition to offering the Add-On shelter to partnerships that had been

created in order to participate in CDS, the E&Y defendants offered Add-On to several existing

entities that were genuinely engaged in the business of trading options, but which had not

participated in the CDS tax shelter. Representatives of these entities met with E&Y personnel,

and were offered the opportunity to reduce and defer the owners' income tax liabilities by

acquiring pairs of digital currency options, which would ultimately be contributed to BCPT&I,

together with the digital option pairs acquired by the CDS partnerships. Several such entities

agreed to participate.

47.     In July and August 2000, after pairs of digital options were acquired for

the various Add-On participants, defendant CHARLES BOLTON signed documents directing

that all the digital option pairs be transferred from accounts held by the CDS partnerships to an

account held by BCPT&I. BOLTON also caused the digital option pairs purchased by the

entities described in paragraph 46, above, to be transferred from accounts held by those entities

to the account held by BCPT&I.

-32-

# Exhibit A-2

48.     After the digital option pairs had all been transferred to BCPT&I,

additional steps were taken to further deceive the IRS about the reason the clients entered into

the Add-On transaction. For example, in November 2000, the conspirators crafted a letter for

Add-On clients to submit to BCP, expressing either interest or disinterest in participating in a

"second round of digital option purchases." In reality, there was no plan for BCP to engage in a

"second round of digital option purchases," and this letter was designed purely to create the false

impression that the decision of the particular Add-On clients to withdraw from BCPT&I or to

remain as members – a decision that would determine whether each client's artificial tax loss

would be triggered in 2000 or 2001 – was made for business reasons rather than tax reasons. The

real purpose of the "second round of digital option purchases" letter is illustrated in emails sent

by defendant ROBERT COPLAN to PFC personnel whose clients had implemented Add-On

transactions, as well as to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and

BRIAN VAUGHN. In an email dated November 8, 2000. COPLAN explained:

> Belle Six has sent you a letter (sample below) intended for each of
> your CDS Add-On clients. The letter mentions that the Bolton
> LLC into which the . . . trading account was transferred is
> considering doing a second round of digital option trading. The
> client is offered the option of declining to participate in this digital
> activity, in which case he is to notify Bolton (Belle Six) by written
> reply, thereby triggering the termination of their partnership's
> interest in the LLC. . . . Those of you advising clients whose CDS
> partnerships will remain active into 2001 to maintain deferral
> should be aware that the letter does not mean that [Bolton] will
> **actually** be investing in new digitals – only that they are
> **considering it.**

One recipient of COPLAN's email who was apparently unsure how to advise his client

responded:

-33-

> Our client ... is a CDS 2000 client (with add on) – we do not want
> to redeem the LLC interest and trigger the loss until 2001 (when
> the capital gain from the CDS 2000 will result).  Therefore, I
> assume that our client should not sign the letter (even though they
> are not necessarily interested in doing more digitals for investment
> purposes).  Correct?

COPLAN replied, "You are correct.  The only clients who should sign the letter are those who

want to be redeemed out of the LLC this year.  The fact that your client does not sign the letter

does not mean that more digitals will in fact be acquired."

49.     Steps were also taken to conceal from the IRS the fact that the "loans"

purportedly extended in connection with the Add-On transaction were not real loans but were

instead "book entries" made so that the Add-On clients would have sufficient basis in their CDS

partnerships to deduct their Add-On tax losses.  After the financial institution that had

supposedly funded the "loans" provided a sample statement reflecting interest payments to and

from the partnerships, Belle Six, a co-conspirator not named as a defendant herein, commented

on the format of the statement in an email defendant CHARLES BOLTON and others within the

Bolton companies:

> I like that we have statements that show the date of the loan . . .;
> I like that we can see both interest earned/paid.  The thing that
> concerns me is that on one statement we are showing that we took
> out a loan that is 100% fully collateralized.  In other words, we
> have made it easy to ask the question, "What is the purpose of the
> loan?"  I have copied BV to ask his opinion.

Defendant BRIAN VAUGHN responded to Belle Six in an email she forwarded to BOLTON and

the others.  VAUGHN stated:

-34-

> I agree with your comments. The clients should love this format. It is
> very easy to follow. However, I don't think [the Law Firm A lawyer]
> would want to see this schedule nor the IRS. It clearly demonstrates the
> loan is used to obtain tax basis and not for investment. . . . Maybe if we
> could demonstrate the client is staying in "cash" for a short period of time
> . . . it would disguise the tax basis loan issue.

50.     In addition, with knowledge that the financial institution that extended the

so-called "loans" would not actually allow real funds to be used by the partnerships, defendant

CHARLES BOLTON sent a letter to the financial institution that was designed to conceal that

fact. By pre-arrangement with the financial institution, BOLTON's letter said:

> It is the intention of BCP to utilize the proceeds of these loans to invest in
> securities and trading strategies other than [financial institution's] paper.
> As such, we would like to inquire on [your] willingness to remove some of
> the restrictions that are currently in place with regards to the proceeds of
> the loan. It is the intent of BCP to handle each partnership on a case by
> case basis. Please let us know your decision on our request as soon as
> possible as it is our desire to move forward with these trading strategies
> promptly.

A representative of the financial institution then assisted in concealing that the loans were not

genuine by responding:

> I am in receipt of your letter dated February 16, 2001. Let me
> assure you that [financial institution] will be flexible as possible
> with transactions of the various CDS partnerships. We will review
> each request on a case by case basis. Please consider me as your
> point person for your requests and I will review each one
> personally.

51.     As part of executing the fraudulent Add-On tax shelter, the

conspirators arranged for Add-On clients to sign representation letters prepared by Law Firm A,

which contained false and misleading factual representations that could be, and were,

-35-

incorporated into Law Firm A's Add-On opinion letters. For example, each client signed a document stating, among other things, that the client regarded the various activities of the partnership – specifically including the client's "investment" in BCPT&I – as comprising "one coherent business philosophy." In truth, as the conspirators well knew, the acquisition of the digital option pairs and the contribution of those option pairs to BCPT&I was not an "investment" at all, and was not part of any "coherent business philosophy."

52.    As part of executing the fraudulent CDS Add-On tax shelter, defendant CHARLES BOLTON also signed representation letters prepared by Law Firm A, which contained false and misleading factual representations that could be, and were, incorporated into Law Firm A's opinion letters. For example, with knowledge that no genuine "loan proceeds" were available for use by the partnerships that participated in Add-On, BOLTON signed documents which stated:

> I intend to utilize Loan funds, as appropriate, to leverage the existing trading programs of the Partnership and/or invest in other programs, designed to yield returns in excess of the cost of funds while minimizing risk to capital, such as strategic investments in sovereign debt with manageable currency risk.

53.    In order to persuade the IRS that the tax results achieved through the Add-On strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to disallow those results, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

-36-

a)      The opinions stated that "organization of the LLC was based upon probability analysis and engaging a well reputed expert in the largest and most active trading market in the world . . . in order to profit from a trading program," when in reality, BCPT&I was organized at the behest of the E&Y defendants, who recognized that the purported "trading program" carried no chance of generating a profit, but would generate tax benefits for the clients and fees for the conspirators.

b)      The opinions stated that "[n]one of the business conducted by the Partnership or the LLC [had] a predetermined outcome" and that "[n]one of the transactions . . . [were] prearranged or structured to yield a predetermined economic result," when in reality, E&Y had marketed to its clients -- and the clients had paid fees to obtain -- a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

c)      The opinions stated that the partnership's "decision to maintain an investment in the LLC or terminate such investment [was] no different than any other investment decision exhibited by the Partnership," when in reality, the partnership's decision to terminate its membership in BCPT&I was not an investment decision at all, but was based solely on the timing of desired tax losses.

d)      The opinions stated that the business purpose of BCPT&I was "asset appreciation," when in reality, the digital option pairs contributed to BCPT&I were likely to expire "out of the money," and they carried no practical possibility of a profit for the clients even if they expired "in the money."

e)      The opinions stated that the loan funds obtained in connection with the transaction would be used "to opportunistically invest in trading or other programs," and

-37-

accordingly, that the loan would likely be treated as a "genuine indebtedness."

       f)      The opinions failed to disclose that the purpose for entering into the Add-On transaction was for participating E&Y clients to obtain tax benefits, and that the fees associated with the transaction were calculated on the basis of the intended tax losses to be generated.

       g)      The opinions failed to disclose that they were rendered by an attorney who had assisted the defendants in designing and implementing the transaction, and therefore were not independent.

### The Fraudulent PICO Shelters

54.     PICO was marketed and sold during 2000 and 2001. E&Y implemented approximately 96 PICO transactions for approximately 150 wealthy individuals. E&Y generated more than $56 million in fees from PICO, charging its clients approximately 2% of the tax losses the clients sought to generate. Each PICO client was provided with a "more likely than not" opinion letter from one of two law firms, Law Firm C and Law Firm D; the fees for those letters ranged between $50,000 and $100,000, depending on the size of the transaction.

55.     The objective of PICO was to defer taxation and, in some cases, to convert ordinary income into capital gains, thus reducing the client's tax rate. Within a period of a few months, a PICO client would follow a pre-planned series of steps, and generate artificial losses that could be used to defer taxes indefinitely on the income the client wanted to shelter.

-38-

56.    PICO included the following essential steps:

a)    A client seeking to defer tax liability would form an S-Corporation (a "Personal Investment Corporation," or "PICO"), together with one or two individuals affiliated with an entity which described itself as an "investment advisor," and which purported to have special trading expertise ("Company Z").   The client was a 20% shareholder in the PICO, and the other individuals were 80% shareholders ("the Company Z shareholders" or the "majority shareholders").  The PICO client funded the S-Corporation with an amount equal to approximately 4% of the tax loss the client wanted to generate (in other words, 4% of the income the client wished to shelter from taxes).

b)    Company Z would then use those funds to engage in trading activity, entering into financial instruments commonly known as "straddles."  The "straddles" were designed to generate essentially off-setting gains and losses, which could be realized for tax purposes, or "triggered," separately.  By pre-arrangement, the trading would be carried out for approximately 60-90 days, and then the gains would be triggered.  When that occurred, 80% of the gains would be allocated to the majority shareholders for tax purposes, and only 20% of the gains would be allocated to the client.

c)    By further pre-arrangement, the client would then buy out or "redeem" the Company Z shareholders from the PICO.  At that point, the client would be the 100% shareholder.  Once the client was the 100% shareholder, the losses would be triggered, and 100% of the losses (an amount roughly equivalent to the amount of income the client was seeking to shelter) would be allocated to the client for tax purposes.  These losses were artificial losses, in that there were no corresponding economic losses suffered by the client.

-39-

d)      In order for the client to claim the full benefit of the losses
generated, the client would then contribute additional assets to the PICO entity. As long as the
additional assets remained in the PICO entity, the tax liability on the client's income would be
deferred. When the assets were removed from the entity, those assets would be taxed at the
capital gains rate.

57.      As the conspirators knew, in order for the PICO strategy to survive IRS
scrutiny, it required a non-tax "business purpose." With knowledge that the true motivation
behind the strategy was for the clients to obtain tax benefits, the conspirators developed a false
cover story to explain to the IRS – if the client were audited – why the client created an S-
Corporation together with the Company Z shareholders, only to "buy out" those shareholders
after 60-90 days. According to the cover story, each client formed an S-Corporation because the
client wanted to use that entity as their principal investment vehicle, and because the client
wanted to achieve asset protection and estate planning objectives. The client included the
Company Z shareholders in the S-Corporation, according to the cover story, in order to "try out"
Company Z's trading strategy, and the client intended to make a decision at the end of 60 or 90
days -- based on trading performance -- whether to continue with that strategy. According to the
story, if the client was satisfied with the trading strategy, the client would buy out the other
shareholders, and then enter into a two-year asset management agreement with Company Z, or
with one of Company Z's affiliates, so that the client could continue to enjoy the benefit of
Company Z's special trading expertise.

58.      In addition to developing the false cover story, the conspirators took other
steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated,

-40-

and that it was designed, marketed and implemented as a pre-planned series of steps. Among

other things:

   a)     The E&Y defendants developed and used promotional materials

that referred to PICO as "a long-term personal investment vehicle, integrating investment

management services with estate planning and asset protection services."

   b)     Defendant ROBERT COPLAN directed that no promotional

materials be left with clients, in order to prevent those materials from falling into the hands of the

IRS. In an email sent in June 2001 to PFC personnel, as well as to defendants MARTIN

NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, COPLAN stated, "PICO slides

are not to be left with clients, and this is a policy we must all adhere to. This is ultimately for the

client's protection." In a later email, also sent to PFC personnel and to his co-defendants,

COPLAN remarked that "a fax of the materials to certain people in the . . . government would

have calamitous results," and he urged, "Please take us seriously when we instruct that you not

leave PICO materials behind at your presentations. . . . Impress upon [prospective PICO clients]

that it [is] for their protection should they proceed with the strategy that we are not leaving them

behind (i.e., in the event of an audit)."

   c)     Defendant ROBERT COPLAN opposed a proposal by one PFC

professional to provide clients with a work plan that laid out the steps of the transaction. In an

email copied to defendant RICHARD SHAPIRO, COPLAN stated, "[A]fter we go to the trouble

to make sure the client does not have any documents that walk through the steps of the

transaction, I cannot imagine that we would want to hand him a work plan that shows each

minute step including the redemption of the S shareholder. I would strongly advise against

-41-

providing a written document to the client that lays out these steps as a prearranged plan."

    d)  Defendant ROBERT COPLAN directed that a promotional brochure developed by Company Z, and biographical information concerning Company Z's officers, be provided not only to prospective PICO clients, but also to clients who had already completed PICO transactions. He explained that these documents "convey necessary information for the client to have made an informed decision to embark on a new investment program with [Company Z]."

    e)  Although E&Y's fee for the PICO transaction was calculated as approximately 2% of the loss the client wished to generate, defendant ROBERT COPLAN directed that a fee of only $50,000 be listed in the client's engagement letter.

    f)  The conspirators arranged for the balance of E&Y's fee to be paid by the client to Company Z or to one of its affiliates, and for Company Z's affiliate then to pay the remainder to E&Y. In order to justify such large payments from Company Z's affiliate to E&Y, the conspirators created a phony contract under which E&Y claimed to have performed consulting services to the affiliate. Those contracts – which were actually created and signed well after most of the clients' PICO fees had already been passed through the affiliate to E&Y – were back-dated in order to make this discrepancy less obvious. Defendant RICHARD SHAPIRO's concern that the so-called "consulting contract" for the 2000 PICO transactions had not been executed as of April 2001 was reflected in an email he sent to individuals at Company Z and Law Firm C, in which he stated, "I STILL DO NOT HAVE THE TAX CONSULTING AGREEMENT FROM LAST YEAR. WITH MOST OF THE PAYMENTS MADE UNDER THAT AGREEMENT ALREADY, DON'T YOU THINK WE (AND YOUR CLIENTS)

SHOULD HAVE A FINAL DRAFT THAT CAN BE SIGNED??????? WE MUST HAVE

SOMETHING FOR OUR FILES."

            g)     After it became apparent that PICO clients were not inclined

to continue conducting trading activities in their PICO entities after redeeming the Company Z

shareholders, the E&Y defendants encouraged them to do so in order to protect the clients'

claims that the PICO transaction was not tax-motivated. In a March 2001 email to PFC

personnel, with copies to his three E&Y co-defendants, defendant ROBERT COPLAN

explained, "When the PICO strategy was developed, E&Y and [Company Z] understood that the

client's representations regarding his non-tax investment motives and expectation of a pre-tax

profit would depend on maintaining trading activity after the 80% shareholders were redeemed."

COPLAN observed that this was apparently "not the preferred approach of clients," and

therefore, that PFC personnel had to "establish some guidelines and properly manage client

expectations[.]" The problem continued; a few months later, COPLAN followed up with a

similar email, reiterating the need for clients to engage in trading activity in their PICO entities,

and stating, "Because we see reports that this is not the direction certain clients are headed in, we

feel it necessary to establish some guidelines."

            59.    In order to persuade the IRS that the tax results achieved through the PICO

strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to

disallow those results, the conspirators arranged for Law Firm C and Law Firm D to provide the

clients with opinion letters. The E&Y defendants and their co-conspirators knew these opinion

letters contained false and fraudulent statements and omitted material facts, including but not

limited to the following:

-43-

a)    The opinion letters stated that the PICO S-Corporations were not formed to avoid or evade federal income taxes, but were instead designed to facilitate investment activities, provide asset protection and achieve estate planning objectives. In reality, as the conspirators well knew, the S-Corporations were formed precisely so that clients could avoid or evade taxes.

b)    The opinion letters stated that the Company Z shareholders became investors in the various PICOs in order to demonstrate the potential return available through interest rate arbitrage trading activity, when in reality, this step was necessary to accomplish the desired tax results.

c)    The opinion letters stated that the trading strategy was not designed to produce a predetermined result, when in reality, E&Y had marketed to its clients, and the clients had paid fees to E&Y and Company Z to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

d)    The opinions issued by Law Firm C failed to disclose that they were rendered by an attorney who had assisted the E&Y defendants and the principals of Company Z in designing, marketing, and implementing the transaction, and therefore were not independent.

## The IRS's 2002 Voluntary Disclosure Initiative

60.    In or about December 2001, the IRS announced a program under which taxpayers who had engaged in tax shelters could voluntarily disclose those transactions to the IRS, in exchange for amnesty from penalties that might otherwise be imposed if the IRS were to

-44-

audit the transactions and find a tax underpayment. In order to qualify for the program,

taxpayers were required to disclose the transaction to the IRS, and to include in their disclosures,

among other things, a statement describing the "material facts" of the transaction; the names and

addresses of parties who had promoted, solicited or recommended the transaction to the taxpayer,

and parties who had collected fees from the transaction; a statement agreeing to provide various

documents and materials relating to the transaction, including marketing materials and legal

opinions; and a statement signed by the taxpayers, under penalties of perjury, that the taxpayers

had examined their disclosures, and that to the best of their knowledge and belief, the disclosures

contained all the relevant facts and were true, correct and complete.

      61.    During 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM

and RICHARD SHAPIRO prepared, and assisted in preparing, templates that could be used by

E&Y clients who had engaged in tax shelters, and who wished to participate in the IRS's

voluntary disclosure initiative in order to eliminate the possibility of IRS penalties. Although

COPLAN, NISSENBAUM and SHAPIRO knew that participation in the program required the

submission of a "true, correct and complete" disclosure to the IRS of "all relevant facts" in a

statement that would subject their clients to penalties of perjury, they drafted template disclosure

letters that contained many of the same false and fraudulent statements that had previously been

included in transaction documents and opinion letters, and omitted many of the same material

facts. Tax shelter clients who participated in the voluntary disclosure initiative thereafter

submitted false, fraudulent and incomplete statements to the IRS.

-45-

### The E&Y Promoter Penalty Audit

62.     In or about April 2002, the IRS began an examination of whether E&Y

had complied with various legal requirements applicable to the firm's tax shelter activities.  In

connection with that examination – commonly referred to as a "promoter penalty audit" – the

IRS sought documents and sworn testimony from individuals knowledgeable about the

VIPER/SISG tax shelters.  In June and August of 2002, defendants ROBERT COPLAN,

MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN appeared before the

IRS to answer questions.  After being placed under oath, they sought to obstruct and impede the

IRS by providing false and misleading testimony concerning the origin, design, marketing and

implementation of E&Y's tax shelters.

        a)      Among other things, COPLAN provided the following false

and misleading testimony: that E&Y had no involvement in the operation of the CDS trading

partnerships; that the CDS clients were not sure whether the CDS swaps would terminate early,

and thus did not know whether the income they received in the second year of the swap would be

characterized as capital gains; that the fees charged to CDS clients were "fixed fees" rather than

fees calculated based on a percentage of the tax benefits; that when E&Y became involved with

CDS Add-On, the CDS partnerships were already planning to consolidate digital options in a

single LLC, and that E&Y learned about the plan as a "fortuitous circumstance";  that no

promotional materials had been distributed or shown to CDS Add-On clients because COPLAN

and others "didn't think the transaction was that complicated"; that the fees paid by the PICO

investment advisor to E&Y were paid "for consulting with them on the tax aspects of the PICO

transaction"; and that the reason an S-Corporation was used for PICO instead of a partnership

-46-

was that clients viewed the S-Corporation as a "good family investment vehicle."

    b)  Among other things, VAUGHN provided the following false and misleading testimony: that the VIPER/SISG group was not involved in the wide-spread marketing of tax shelters, but instead merely responded to questions and proposals that came from clients; that the CDS Add-On transaction was brought to E&Y's attention by defendant CHARLES BOLTON, who had already created a fund, and had offered E&Y's clients an opportunity to participate in that fund; that the digital options used in the Add-On transaction were purchased "from the investment standpoint," and were "just part of [the client's] investing"; that the fees charged by E&Y for the digital option transactions were "fixed fees" calculated based on E&Y's assessment of how much time would be spent by particular E&Y personnel involved with a particular transaction for a specific client; that E&Y did not set fees based upon a percentage of tax results; that E&Y "typically" encouraged its clients to use their own counsel, and recommended counsel if the clients felt their own counsel were "not competent in digital option taxation"; that the VIPER/SISG group maintained no database of documents relating to its tax shelters; that E&Y did not develop its own brand of digital option trade, and that there was "no tax strategy, per se, that was developed internally by E&Y's individual tax practice"; that there were no predetermined tax benefits for the Add-On strategy, and that "it was very difficult" to estimate the Add-On tax benefits until after the transactions were complete; and that he could not recall the nature of COPLAN's involvement in the Add-On strategy, or that SHAPIRO provided the subject matter expertise for the digital option transactions.

    c)  Among other things, NISSENBAUM provided the following misleading testimony: that the CDS partnership was a "trading partnership"; and that the

partnership "would be trading in short-term securities to get as much short-term profit as possible."

        d)      Among other things, SHAPIRO provided the following false and misleading testimony: that E&Y "received fees for tax consulting services" provided to Company Z in connection with the development of PICO; and that COBRA was designed to provide an investor with the ability to obtain a return of approximately 31% with "a probability of success of just under 40%."

### The BCP Promoter Penalty Audit

     63.     In or about May 2004, the IRS began an examination of whether BCP had complied with various legal requirements applicable to the firm's tax shelter activities. In connection with that promoter penalty audit, the IRS sought documents and information from BCP. In responding to those requests for information and documents, representatives of BCP produced to the IRS various false and fraudulent documents, including opinion letters issued by Law Firm A for the CDS and Add-On, representations letters relating to the opinions issued for CDS and Add-On, and loan agreements, notes and guarantees relating to Add-On.

### IRS Examinations of the Various Tax Shelters

     64.     As a result of information provided in connection with the voluntary disclosure initiative, as well as information produced by E&Y and the Bolton companies during the promoter penalty audits, and in taxpayer audits, the IRS undertook detailed examinations of many of the CDS, COBRA, CDS Add-On, and PICO shelters. In connection with these examinations, the IRS sent Information Document Requests ("IDRs") to many of

-48-

E&Y's individual tax shelter clients, and to many of the entities created by the conspirators in order to execute the tax shelters. Those IDRs sought additional information, and requested production of various documents. Defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, together with others at E&Y, participated in the production of information and documents to the IRS in response to those IDRs. Defendant CHARLES BOLTON, together with others at the Bolton companies, also participated in the production of information and documents to the IRS in response to those IDRs. In that process, many of the false and fraudulent explanations and cover stories that had been created by the conspirators to conceal the tax motivations behind the shelters were presented to the IRS, and many of the false and fraudulent documents that had been created by the conspirators to conceal those tax motivations – including opinion letters and correspondence – were produced to the IRS. The IRS also took sworn testimony from various individuals involved in the marketing and implementation of the shelters, including clients, financial advisors to clients, E&Y personnel, and defendants DAVID L. SMITH and CHARLES BOLTON.

65.    Represented by attorneys and professionals provided by E&Y, various tax shelter clients and their financial advisors gave false and misleading testimony and statements to the IRS concerning, among other things, the clients' motivations for entering into the tax shelter transactions in question.

66.    On or about December 9, 2003, defendant DAVID L. SMITH gave sworn testimony to the IRS concerning one of the CDS transactions implemented in 1999 by PCMG. Among other things, SMITH falsely testified that he not explained the tax ramifications of CDS to the bank that implemented the transaction, and that he had not received any money from

-49-

defendant CHARLES BOLTON in connection with CDS. In reality, SMITH had explained the

tax ramifications to the bank, and BOLTON had paid SMITH $3.75 million to license CDS.

67.    On or about April 12 and 13, 2005, defendant CHARLES BOLTON

gave sworn testimony to the IRS concerning two CDS transactions implemented by BCP in

2000. Among other things, BOLTON falsely testified that E&Y never indicated that the CDS

swaps would terminate early; that the decision to terminate the swaps was based on "economics";

that there was no understanding or agreement – either written or non-written – that the swaps

would terminate early; and that he did not recall what tax benefits CDS clients could receive

based on their loans.

### The E&Y Partners' Own Fraudulent Tax Shelter
### (The "Tradehill" Transaction)

68.    In addition to designing, marketing and implementing fraudulent tax

shelters for clients and prospective clients of E&Y, defendants ROBERT COPLAN, MARTIN

NISSENBAUM and RICHARD SHAPIRO developed and utilized a tax shelter to evade their

own taxes, and assisted eight other E&Y partners to do the same. The strategy they employed

was a short option strategy, similar to a COBRA shelter.

69.    In or about late 1999 or early 2000, E&Y announced a proposal to sell its

global consulting business to a French company called Cap Gemini. In that transaction, E&Y

partners would receive shares of stock in the new company. Those shares would be denominated

in euros, and would not be transferable for a period of time that was unknown, but that was

expected to exceed four years. Although the stock received by the partners could not be sold, the

E&Y partners were told that their receipt of the stock would constitute income on which they

-50-

would be taxed in 2000. Accordingly, in order to assist the partners in paying their tax liabilities on the stock received, E&Y proposed to sell some of the Cap Gemini stock at the time of the transaction, and to give each partner – in addition to shares of Cap Gemini stock – cash that could be used by that partner to cover his or her 2000 personal income tax liability generated by receipt of the stock.

70.     After a vote of E&Y's partners, the transaction took place in or about May 2000, and on or about May 23, 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, as well as other E&Y partners, each received a distribution of Cap Gemini stock. An amount of cash was set aside by E&Y for their use in paying income taxes on the stock they received.

71.     Upon learning of the intended Cap Gemini transaction, defendant MARTIN NISSENBAUM began discussing with other E&Y partners the possibility of using a tax shelter to eliminate the income tax liability arising from their receipt of the Cap Gemini stock. By late October 2000, a group of eleven E&Y partners, including defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, had decided to form an entity called Tradehill Investments, LLC ("Tradehill"), and to use Tradehill to carry out a transaction similar to COBRA, thereby eliminating all or most of their tax liability on the Cap Gemini stock ("the Tradehill transaction"). The three defendants undertook to act as representatives for the other E&Y partners.

72.     In order to execute the transaction, defendant MARTIN NISSENBAUM, working in conjunction with a tax shelter promoter and with attorneys from Law Firm D, created Tradehill, in which all eleven E&Y partners were members. The Operating Agreement for

-51-

Tradehill falsely stated that Tradehill was organized "for investment purposes." The defendants created a second entity called Churchwind Investments, LLC ("Churchwind"), which was wholly owned by Tradehill. The Operating Agreement for Churchwind – which was signed by NISSENBAUM, as well as by defendants ROBERT COPLAN and RICHARD SHAPIRO – falsely stated that Churchwind was organized "for investment purposes."

      73.    The eleven members of Tradehill collectively contributed $350,000 in cash, and on or about November 1, 2000, defendant MARTIN NISSENBAUM caused Churchwind to acquire three almost completely offsetting pairs of euro/dollar currency options. The premiums paid for the three long options totaled $25 million, but the actual cost to the partners (the "net premium") was only $350,000. The three option pairs all had different maturity dates, one in April 2001, one in May 2001, and one in June 2001.

      74.    On or about November 13, 2000, defendant MARTIN NISSENBAUM, acting on behalf of the group, caused Tradehill to contribute the three pairs of currency options to an entity called AD International FX Fund, LLC ("ADFX"), in exchange for 90% ownership of ADFX. The other two owners of ADFX were tax shelter promoters who had contributed a total of $30,000 in cash to the entity.

      75.    In or about mid-December 2000, ADFX closed out one of the euro/dollar option pairs that had been contributed by Tradehill, and purchased shares of stock. Then, on or about December 19, 2000, defendant MARTIN NISSENBAUM caused Tradehill to resign from ADFX in exchange for stock, dollars and euros worth approximately $187,246. At that time, none of the three option pairs contributed to ADFX by Tradehill was "in the money," and the maturity dates of the three options were approximately four, five and six months away.

76.    On or about December 26, 2000, defendant MARTIN NISSENBAUM

caused Tradehill to distribute the stock it had received upon resignation from ADFX to two new

entities, Hiddenbrook Holding, LLC ("Hiddenbrook"), and Greenoak Holdings, LLC

("Greenoak"). Hiddenbrook – which had been created only days earlier – had five members,

including defendants MARTIN NISSENBAUM, ROBERT COPLAN and RICHARD

SHAPIRO. The members of Greenoak – which had also been created only days before – were

the other six E&Y partners. The same day, NISSENBAUM directed the immediate sale of the

stock distributed to Hiddenbrook, and a member of Greenoak directed that Greenoak's shares be

sold. The shares were sold the following day, triggering artificial losses.

77.    From in or about December 2000 through in or about mid-April 2001, an

attorney at Law Firm D, working together with defendant MARTIN NISSENBAUM, drafted a

legal opinion. The opinion was intended to be used to support the position that the losses

triggered by the sale of stock by Hiddenbrook and Greenoak could be used by the eleven E&Y

partners to eliminate the tax liability related to their Cap Gemini stock, and to protect the eleven

partners against IRS penalties.

78.    In connection with the drafting of that opinion, defendant MARTIN

NISSENBAUM assisted in preparing a "Certificate of Facts." The "Certificate of Facts" – which

contained false and fraudulent statements – was intended to be incorporated by reference into

Law Firm D's opinion, and was intended to deceive the IRS into believing that the E&Y partners

executed the various steps of the Tradehill transaction for investment reasons rather than tax

reasons. Among other things, the document falsely stated: 1) that "[t]he purpose and purchase

and sale of [the] Options [was] that Tradehill believed that such investments could result in

-53-

substantial profits with only limited downside risk"; 2) that Tradehill contributed its membership

interest in Churchwind to ADFX to "diversify its risk"; 3) that Tradehill's "primary motivation"

in participating in the transaction "was to attain, on a risk-adjusted basis, an attractive return on

its investment . . . without regard to tax benefits"; and 4) that "the decision to withdraw from

[ADFX] was based on a variety of factors, including anticipated future market conditions,

currency exchange rates, interest rates, the availability of alternative investments, and Tradehill's

financial situation."

79.     In or about April 2001, Law Firm D – which had assisted the defendants in

creating the entities used to execute the shelter – issued a back-dated opinion letter to

Hiddenbrook and Greenoak. The opinion letter incorporated the false statements contained in the

"Certificate of Facts" described in paragraph 78, above. In addition, the opinion letter falsely

stated, among other things, that all "pertinent facts" relating to the transaction had been set forth

in the opinion.

80.     From in or about April 2001 through in or about October 2001, defendants

ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as their eight

partners, filed tax returns on which they used the losses generated through the Tradehill

transaction to eliminate tax liability on all or most of the income they received in the form of

stock and cash from the Cap Gemini transaction.

81.     In or about May 2003, the IRS notified the eleven participants in the

Tradehill transaction that their 2000 tax returns were being audited. In connection with that

audit, the IRS sent each of the eleven partners who had participated in the Tradehill transaction

an Information Document Request ("IDR #1"), requesting both information and documents. The

members of the group made arrangements for an attorney at Law Firm D to represent them in responding. Defendant MARTIN NISSENBAUM assisted that attorney in drafting responses on behalf of each partner to IDR #1, as well as to a second IDR ("IDR #2") and a third IDR ("IDR #3"). Copies of the partners' letters to the IRS were sent to defendant MARTIN NISSENBAUM.

82.     The responses to IDR #2 were sent to the IRS on or about September 25, 2003. Those responses contained false and misleading statements, including but not limited to the following: 1) statements that the E&Y partners had entered into the Tradehill transaction in order to generate profits, when in reality the transaction had no reasonable possibility of generating a profit; 2) a statement that the Tradehill transaction was intended fully to hedge the partners' exposure to fluctuation in the euro, when in reality, the transaction had no capacity to do so; 3) a statement that there were no unwritten understandings between the participants in the Tradehill transaction, when in reality, there was an understanding among all the parties to the transaction that the E&Y partners would exit their option positions before the end of 2000, in order to claim tax losses they could use to offset their Cap Gemini income; and 4) a statement that there was no expectation or referral of any future business to Law Firm D, when in reality, in 2001, the defendants referred PICO clients to Law Firm D for opinion letters.

### Charles Bolton's Own Fraudulent Tax Shelters

83.     In 2000 and 2001, in addition to implementing fraudulent tax shelters for clients of E&Y, defendant CHARLES BOLTON utilized CDS tax shelters to reduce and defer his own tax liability on income he earned from implementing CDS and CDS Add-On for numerous clients. In order to carry out the first CDS transaction, BOLTON caused the creation

-55-

of BIG Trading Partners, L.P. ("BIG Trading Partners") in October 2000. BCP was the general

partner of BIG Trading Partners, and BOLTON was the limited partner.

84.    In or about October 2000, defendant CHARLES BOLTON caused BIG

Trading Partners to enter into two swaps with a financial institution. As structured, those swaps

were designed to generate a business deduction for BOLTON of approximately $15 million in

2000. As part of the 2000 CDS transaction, BOLTON executed loan agreements with the same

financial institution, and signed one or more documents by which he agreed to be personally

liable for repayment of those loans, which totaled more than $9 million. BOLTON's 2000 CDS

transaction generated for him a tax deduction of approximately $14.9 million. He used that

deduction to offset his 2000 income.

85.    In late 2001, defendant CHARLES BOLTON again caused BIG Trading

Partners to enter two swaps with a financial institution. As structured, those swaps were

designed to generate a business deduction for BOLTON of approximately $25 million in 2001.

As part of the 2001 CDS transaction, BOLTON executed another loan agreement with the same

financial institution, and signed one or more documents by which he agreed to be personally

liable for repayment of that loan, which was in the amount of approximately $21 million. During

a period of approximately seventeen days in 2001, BOLTON's second CDS transaction

generated for him a tax deduction of approximately $24.9 million. He used that deduction to

offset his 2001 income.

86.    In connection with his own two CDS transactions, defendant CHARLES

BOLTON signed representation letters, prepared by Law Firm A, in which he falsely stated,

among other things, that he regarded the various investments of the Partnership – including the

-56-

swaps and the trading activities – as comprising one coherent business philosophy," and that this

diversity of investments was "an important element in [his] decision to invest in the Partnership."

87.    In support of each of his two tax shelters, defendant CHARLES BOLTON

obtained a legal opinion from Law Firm A.  Each opinion falsely stated, among other things, that

"a significant purpose of [BOLTON's] investment in the Partnership [was] to obtain a profit

through access to the specialized investment strategies and activities offered by the Partnership.

According to one of the two letters, such investments and activities were not otherwise readily

available to BOLTON.

88.    Defendant CHARLES BOLTON was audited by the IRS.  In connection

with that audit, he submitted the two legal opinions.

89.    On or about April 13, 2005, in connection with his own CDS transactions,

defendant CHARLES BOLTON gave sworn testimony to the IRS.  On that occasion, BOLTON

falsely testified, among other things, that the decision to terminate his 2000 swap at the early

termination date was made for economic reasons, and that he was not aware his own swap had to

terminate early in order for him to derive the tax benefits.

90.    On or about July 28, 2006, the IRS notified BOLTON that it intended to

assert penalties against BOLTON for claiming losses from CDS on his 2000 and 2001 tax

returns.  In its notification letter, the IRS informed BOLTON of its view that "a significant

purpose" of BOLTON's CDS transactions was tax avoidance.  In response, BOLTON submitted

a statement, signed under penalties of perjury, in which he stated that the IRS was incorrect in

asserting that a "significant purpose" of his CDS transactions was tax avoidance, and that his

decision was "primarily profit driven."

### Statutory Allegations

91.     From in or about early 1998 through in or about 2006, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, together and with each other and with others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 1001.

92.     It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

93.     It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by E&Y's Add-On clients, in violation of Title 26, United States Code, Section 7201.

94. It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by themselves and other E&Y partners, in violation of Title 26, United States Code, Section 7201.

95. It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did make materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001.

### Means and Methods of the Conspiracy

96. Among the means and methods by which ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, would and did carry out the objectives of the conspiracy were the following:

a) They would and did design, market and implement tax shelter transactions, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to E&Y, PCMG, the Bolton companies, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

-59-

b)      They would and did design, market and implement tax shelter transactions in ways that made them difficult for the IRS to detect;

c)      They would and did design, market and implement tax shelter transactions in ways that disguised the fact that the shelters were largely or exclusively tax-motivated, and lacked substantial non-tax business purposes;

d)      They would and did seek to prevent the IRS from learning that they had marketed strategies consisting of pre-planned steps leading to pre-determined tax benefits;

e)      They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and correspondence;

f)      They would and did assist in crafting legal opinions designed to shield E&Y's clients from penalties, knowing that these opinions contained false, fraudulent and misleading information and omitted other information, all of which was material to a determination of whether the tax results claimed by the clients were allowable;

g)      They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated phony tax losses and thereby substantially understated the tax due and owing by the shelter clients;

h)      They would and did destroy documents and take other steps to prevent the creation and retention of materials that would reveal to the IRS the true facts surrounding the fraudulent tax shelters;

i)      they would and did provide false, fraudulent and misleading information in response to IDRs issued by the IRS in connection with audits of tax shelter

-60-

transactions;

        j)      they would and did draft documents to be submitted by the tax shelter clients to the IRS in connection with the IRS's voluntary disclosure initiative, under penalties of perjury, which they knew contained false statements of material fact and omitted material facts; and

        k)      they would and did make false and misleading statements, under oath, in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing and implementation of the tax shelters.

## OVERT ACTS

    97.    In furtherance of the conspiracy and to effect the illegal objects thereof, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a)      In or about late 1998 or early 1999, defendant DAVID L. SMITH explained CDS to the E&Y defendants.

        b)      In or about early 1999, defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN and DAVID L. SMITH discussed conducting "box trades" in the CDS trading accounts.

        c)      In or about early 1999, defendants BRIAN VAUGHN and DAVID SMITH described CDS to potential clients.

-61-

d)      In or about mid-1999, defendant DAVID L. SMITH discussed CDS with defendant CHARLES BOLTON;

e)      In or about November 1999, the E&Y defendants created and distributed a "COBRA Action Plan" to PFC personnel, which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "DO NOT reference tax losses in the engagement letter."

f)      On or about December 5, 1999, defendant ROBERT COPLAN sent an email to PFC personnel whose COBRA clients had option positions that were "in the money," warning that if the clients cashed out of those positions at too large a discount, they would undermine their tax argument, which was based upon the chance of making a profit in excess of fees.

g)      In or about early February 2000, defendant CHARLES BOLTON agreed that Bolton Asset Management, LLC ("BAM") would license CDS from defendant DAVID L. SMITH, and would pay SMITH royalties based on the net fees generated.

h)      On or about February 8, 2000, defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN VAUGHN, offering to be involved in CDS sales contacts.

i)      On or about February 8, 2000, after reviewing a proposed "CDS Action Plan," defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM, and BRIAN VAUGHN, among others, expressing his concern about the existence of a document which laid out in writing "all the chapters and verses" of CDS, and which indicated "before the fact" that the swaps would terminate early.

-62-

j)      In or about early 2000, the defendants created and distributed a "CDS Action Plan" to PFC personnel which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "**DO NOT** reference tax losses in the engagement letter."

k)      On or about February 18, 2000, Belle Six, a co-conspirator not named as a defendant herein, sent an email concerning an economic model prepared for a CDS transaction, stating, "[I]n meeting with the E&Y people on Tuesday, we have a list of things that we would like you to change on the model. . . . We don't want to highlight that we don't anticipate trading profits.  Please remove it from the economic model."

l)      On or about April 14, 2000, defendant RICHARD SHAPIRO told defendants ROBERT COPLAN, MARTIN SHAPIRO, and BRIAN VAUGHN in an email that it was "essential" to delete from a CDS economic model a footnote stating that the calculations set forth in the model assumed early termination of the swap.

m)      On or about April 21, 2000, in response to concerns expressed by a PFC practice member that CDS could result in a complete loss of the CDS partnership's capital, thereby exposing the client to personal liability, Belle Six, a co-conspirator not named as a defendant herein explained, "In reality, even if the client loses everything they will not have to contribute any more money."

n)      In or about early May 2000, in an Instant Message ("IM") conversation between defendant BRIAN VAUGHN and defendant ROBERT COPLAN, VAUGHN told COPLAN about an idea to combine the CDS strategy with the COBRA strategy.

-63-

o)    On or about May 5, 2000, defendant ROBERT COPLAN forwarded his IM conversation with defendant BRIAN VAUGHN to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

p)    On or about June 5, 2000, defendant ROBERT COPLAN sent an email to PFC practice members, announcing the availability of the CDS Add-On strategy, in which he described it as an "indefinite capital gain deferral strategy."

q)    On or about June 14, 2000, defendant ROBERT COPLAN sent an email to PFC professionals, explaining that if PowerPoint slides setting out the steps of CDS Add-On "ever made their way to the IRS . . . the entire business purpose argument that [gave] us the ability to distinguish this from COBRA would be out the window."

r)    On or about July 10, 2000, defendant ROBERT COPLAN drafted a letter to be sent by E&Y to prospective CDS Add-On clients, in which he described the Add-On strategy as a consolidation of a portion of the client's trading account "to further diversify the trading and enhance performance."

s)    On or about July 20, 2000, a co-conspirator not named as a defendant herein who was employed by the Bolton companies sent an email to defendant CHARLES BOLTON and others, explaining that due to the limited volume of trading being done by traders for the CDS portfolios, it was necessary to consider allocating a portion of the portfolios to a trader who had lost money previously.

t)    In or about June or July 2000, defendant DAVID L. SMITH signed letters to E&Y's 1999 CDS clients, advising them that "in an effort to diversify trading returns and enhance performance," PCMG was considering the possibility of trading in digital currency

-64-

options, and stating that once such trading had begun, PCMG would "consider whether the
[client's CDS partnership] should consolidate its trading account into a single entity with the
trading accounts of others . . ., in order to further enhance returns by utilizing economies of scale,
reducing administrative costs, and simplifying the trading structure."

    u)  In or about mid- to late July 2000, defendants DAVID L. SMITH
and CHARLES BOLTON signed three agreements under which BCP took over PCMG's role as
the general partner for the 1999 CDS partnerships that were planning to participate in the Add-
On shelter.

    v)  On or about August 4, 2000, defendant ROBERT COPLAN sent
an email to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN
VAUGHN, as well as to PFC practice members, in which he explained that a loan amendment
document would highlight for the IRS the issue of whether the CDS clients had personal liability
on their CDS loans, and advised them "to dispose of the loan amendment document after you
have reviewed it."

    w)  On or about August 9, 2000, pursuant to an agreement to pay
defendant BRIAN VAUGHN for his role in providing tax shelter clients, defendant CHARLES
BOLTON directed that $1 million be transferred to another account, purportedly for the purchase
of a copyright on a song composed by VAUGHN.

    x)  From in or about August 2000 through November 2000, defendant
CHARLES BOLTON directed the payment of approximately $3.75 million to defendant DAVID
L. SMITH, pursuant to the CDS licensing agreement.

y)      In or about September 2000, defendant DAVID L. SMITH

signed a letter notifying the bank that served as the counter-party to the 1999 CDS transactions

that several CDS partnerships wished to terminate their swaps at the early termination date.

z)      On or about September 20, 2000, in an effort to increase the total

value of trades in the CDS trading accounts, approved hiring a trading firm without a significant

track record that was willing to create trades for the Bolton companies that involved low risk and

low returns.

aa)      On or about October 25, 2000, defendant CHARLES BOLTON

formed BIG Trading Partners, L.P.

bb)      On or about October 28, 2000, defendant CHARLES BOLTON

caused BIG Trading Partners to enter into two swaps and two loan agreements with a financial

institution.

cc)      On or about November 27, 2000, defendant ROBERT COPLAN

sent an email to another PFC professional, with a copy to defendants RICHARD SHAPIRO and

BRIAN VAUGHN, explaining that SISG did not leave with clients promotional materials that

went through the steps of a strategy, or that highlighted the benefits of a strategy, because "the

less evidence there is that the client responded to a tax-savings promotion, the better his

argument that there were non-tax motivations guiding his actions."

dd)      On or about November 20, 2000, defendant ROBERT COPLAN

sent an email to E&Y personnel whose clients had implemented Add-On transactions, explaining

the purpose of the "second round of digital options" letter.

-66-

ee)    In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the CDS strategy to clients.

ff)    In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the PICO strategy to clients.

gg)    In or about late 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO signed the Tradehill Operating Agreement and the Churchwind Operating Agreement.

hh)    In or about November 2000, defendant MARTIN NISSENBAUM caused the contribution of Churchwind to ADFX.

ii)    On or about January 22, 2001, in connection with the registration of CDS as a tax shelter, defendant CHARLES BOLTON submitted to the IRS a document entitled "Description of the Transaction Registered by Bolton," which stated, "If the general partner, based on market fluctuations, terminates the swap contracts early, capital gain would arise on such termination."

jj)    On or about February 7, 2001, defendant ROBERT COPLAN sent an email to the defendants and to other PFC personnel, explaining that assets placed in the PICO LLC's trading account should be used for trading, and that this needed to be addressed with clients who had "different ideas."

kk)    On or about April 15, 2001, defendant ROBERT COPLAN filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

ll)    On or about April 16, 2001, defendant MARTIN NISSENBAUM

filed his Form 1040 for the year 2000, on which he reported losses he had generated through the

Tradehill transaction.

mm)    On or about May 17, 2001, defendant RICHARD SHAPIRO

discussed COBRA with representatives of the IRS in connection with the audit of three COBRA

clients.

nn)    On or after May 9, 2001, defendant ROBERT COPLAN signed a

consulting agreement between E&Y and an affiliate of Company Z, which was backdated to

January 3, 2001.

oo)    On or about May 22, 2001, defendant RICHARD SHAPIRO sent

an email cautioning against leaving presentation materials with clients, explaining that in the

Minneapolis COBRA audit, the taxpayer had been asked to produce promotional materials.

pp)    On or about May 24, 2001, defendant ROBERT COPLAN sent an

email to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as others,

recommending that the CDS partnerships maintain their trading activity through the end of the

year in which the CDS swaps terminated, in order to avoid raising an issue with the IRS about

whether the CDS partnerships were actually engaged in a trade or business.

qq)    On or about June 6, 2001, defendant ROBERT COPLAN asked

Belle Six, a co-conspirator not named as a defendant herein, to consider changing the names of

the CDS partnerships so that it would be more difficult for the IRS to identify all the CDS

transactions.

-68-

rr)    On or about June 28, 2001, defendant BRIAN VAUGHN sent an email to a co-conspirator, stating with respect to a CDS transaction, "We should consider removing the footnote language concerning implied early termination. This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination."

ss)    On or about July 12, 2001, defendant ROBERT COPLAN sent an email directing that clients who had already implemented PICO transactions be given a brochure describing PICO, and explaining that the brochure conveyed information necessary "for the client to have made [an] informed decision" to embark on the PICO transaction.

tt)    On or about July 17, 2001, defendant ROBERT COPLAN sent an email directing the recipients immediately to "delete and dispose of" COBRA materials in their files and their computers.

uu)    On or about August 16, 2001, defendant RICHARD SHAPIRO filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

vv)    On or about September 14, 2001, defendant ROBERT COPLAN emailed a form letter to E&Y personnel whose CDS clients might wish to close down their trading accounts, suggesting that the clients use the form letter – which attributed their desire to end their trading activity to the September 11th terrorist attacks – to "document for the file a logical non-tax rationale."

ww)    On or about October 15, 2001, defendant CHARLES BOLTON filed his Form1040, for calendar year 2000, on which he claimed a loss of $14,919,583 from

-69-

participating in a CDS transaction through BIG Trading Partners.

xx)    On or about October 31, 2001, in response to an email from defendant ROBERT COPLAN inquiring about how to respond to an IDR sent by the IRS in connection with a COBRA audit, defendant MARTIN NISSENBAUM stated, "Never give them more than they ask for. (That's why we never allow clients to attend examinations, they talk too much)."

yy)    On or about November 12, 2001, defendant ROBERT COPLAN emailed defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, informing them, "Bolton is suggesting that the [CDS] partnerships be shut down after essentially 13.5 months," and asking, "Should we intercede and suggest running another year out with the trading account?"

zz)    On or about November 12, 2001, defendant MARTIN NISSENBAUM responded to the email sent by defendant ROBERT COPLAN earlier that day, stating, "Yes. They sound way too anxious to get out."

aaa)    On or about November 12, 2001, defendant RICHARD SHAPIRO responded to the two emails sent by defendants ROBERT COPLAN and MARTIN NISSENBAUM earlier that day, stating, "I AGREE WITH MARTIN."

bbb)    On or about November 26, 2001, defendant ROBERT COPLAN sent an email to an E&Y employee, discouraging the use of a document that described SISG's strategies and their accompanying tax benefits, explaining that such documents would provide evidence of their clients' tax avoidance motives, and that SISG's "ultimate goal" was "to make our strategies appear to be investment techniques that have advantageous tax consequences."

ccc)   On or about December 14, 2001, defendant CHARLES BOLTON caused BIG Trading Partners to enter into two swaps and two loan agreements with a financial institution.

ddd)   In or about February and March 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO drafted and reviewed template disclosure documents that would be used by clients who wished to participate in an amnesty program announced by the IRS.

eee)   On or about June 12, 2002, defendant BRIAN VAUGHN gave false and misleading testimony to the IRS.

fff)   On or about June 20, 2002, defendant ROBERT COPLAN gave false and misleading testimony to the IRS.

ggg)   On or about October 15, 2002, defendant CHARLES BOLTON filed his Form 1040 for calendar year 2001, on which he claimed a loss of $24,994,225 from participating in a CDS transaction through BIG Trading Partners.

hhh)   In or about September 2003, defendant MARTIN NISSENBAUM provided false and misleading information to an individual who was preparing responses to IDRs sent by the IRS to the eleven E&Y partners who had participated in the Tradehill transaction.

iii)   On or about December 9, 2003, defendant DAVID L. SMITH provided false and misleading testimony to the IRS.

jjj)   On or about April 12 and 13, 2005, defendant CHARLES BOLTON provided false and misleading testimony to the IRS.

# Exhibit A-3

kkk)    On or about August 18, 2006, defendant CHARLES BOLTON

signed a document under penalties of perjury, stating that his participation in his CDS

transactions was "primarily profit driven," and that tax avoidance was not a "significant

purpose."

(Title 18, United States Code, Section 371).

**COUNT TWO**

**(Tax Evasion of The L. Trading Group)**

The Grand Jury further charges:

98.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27

through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

99.    Among the entities that participated in the Add-On tax shelter

without first having done a CDS shelter was a trading group referred to herein as the "L. Trading

Group." The L. Trading Group was a company whose two members were involved in options

trading. In July 2000, E&Y personnel met with representatives of the L. Trading Group and

offered the L. Trading Group the opportunity to defer indefinitely the tax liability of the

company's members on income earned in 2000. The two L. Trading Group members decided to

use the Add-On strategy to generate a tax loss of $30 million. Because the L. Trading Group was

a "pass-through" entity for tax purposes, that tax loss could be used by the members to offset

their individual income for 2000.

100.    On or about August 3, 2000, the Bolton companies arranged for the L.

Trading Group to acquire three pairs of digital currency options. The premiums on the three long

-72-

options totaled approximately $30 million. The cost to the L. Trading Group of the three option

pairs (the "net premium") was approximately $150,000, and the maturity date was November 3,

2000. The option pairs were structured with a 30% probability of a 2:1 return. Thus, if at

maturity all three option pairs were "in the money" – which was statistically unlikely – the L.

Trading Group would receive a payout of approximately $300,000, representing a return of the

group's original contribution, plus a profit of approximately $150,000. However, the fees

charged in connection with the transaction included a $375,000 fee to E&Y, a $375,000 fee to

the Bolton companies, and a $75,000 fee payable to Law Firm A for a legal opinion.

Accordingly, the L. Trading Group had no realistic possibility to make a profit.

   101. On or about August 8, 2000, the L. Trading Group's option pairs were

transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-

On transaction. On or about November 3, 2000, representatives of L. Trading Group signed a

letter indicating that the L. Trading Group did not wish to participate in "a second round of

digital option purchases." Accordingly, in or about December 2000, the L. Trading Group

withdrew from BCPT&I, and BCPT&I distributed Japanese yen valued at approximately $21,000

to the L. Trading Group. The L. Trading Group exchanged the yen and claimed a tax loss of

approximately $30 million, which loss flowed through to the individual tax returns filed by the

members of the L. Trading Group.

   102. In or about April 2002, at the behest of E&Y, the managing member of the

L. Trading Group signed a representation letter that had been drafted by Law Firm A. That letter

contained false and misleading representations, including representations that "[t]he Company

regularly engage[d] in investments similar in opportunity and risk to those presented by the

digital foreign currency options," and that "Company management reasonably anticipated a pre-

tax profit" on the transaction.  Shortly thereafter, upon payment of a $75,000 fee, Law Firm A

issued a legal opinion that incorporated the false and misleading statements contained in the

representation letter, as well as the false and misleading "cover story" that had been created in

2000 to provide a purported business purpose for the Add On transaction.  The opinion letter also

stated that the L. Trading Group's digital currency options could have returned 200 times the

amount contributed by the L. Trading Group (200 x $150,000, or $30 million), and that "[t]he

potential for such a large payout was an important factor in the Company's analysis of the option

trades."  In reality, a $30 million payout on the option pairs – while hypothetically possible – was

virtually impossible as a practical matter, and the hypothetical possibility of such a payout played

no role whatsoever in the decision by the members of the L. Trading Group to implement the

Add-On tax shelter.

       103.    In or about early 2002, after the IRS announced its voluntary disclosure

initiative, the two members of the L. Trading Group elected to participate.  On or about April 22,

2002, they signed letters that had been prepared by E&Y, in order to disclose their Add-On

transaction to the IRS (the "amnesty letters").  Those amnesty letters, which were signed under

penalties of perjury by each taxpayer and his spouse, were submitted to the IRS, and contained

various false and misleading statements.  Among other things, the amnesty letters reiterated the

false "cover story" developed by the conspirators in 2000.  The amnesty letters also included the

false statements that the business objective of BCPT&I was capital appreciation; that the

management of the L. Trading Group "was familiar with [digital] options, and in particular, the

opportunity for significant economic returns in proportion to the funds invested"; and that each

taxpayer and his spouse "firmly believe[d] that [their] business purpose for this transaction was

-74-

sound and remain[ed] sound."

104.    On August 26, 2003, a representative of the L. Trading Group appeared before the IRS to provide sworn testimony concerning the company's Add-On transaction. During that proceeding, the representative of L. Trading Group gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

### Statutory Allegations

105.    From in or about January 1, 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by the members of the L. Trading Group to the United States of America for calendar year 2000, by various means, including among others:

a)    designing and implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate a total of approximately $30 million in tax losses which they knew could not properly be deducted on the returns of the L. Trading Group members;

c)    creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits for clients as well as fees for E&Y, the Bolton companies, Law Firm A and others;

-75-

d)      causing to be prepared, and causing to be signed and filed, false

and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for calendar year 2000, which

understated each member's taxable income and the tax due and owing thereon; and

e)      preparing, executing, and causing the execution of false and

fraudulent documents intended to deceive the IRS, including applications for participation in the

IRS's voluntary disclosure initiative.

(Title 26, United States Code, Section 7201 and
Title 18, United States Code, Section 2)


## COUNT THREE

### (Tax Evasion of The C. Partnership)

The Grand Jury further charges:

106.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27

through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

107.    Among the entities that participated in the Add-On tax shelter

without first having done a CDS shelter was a trading group referred to herein as the "C.

Partnership." The C. Partnership consisted of seven partners, most of whom were involved in

options trading.  In July 2000, E&Y personnel met with representatives of the C. Partnership and

offered the partnership the opportunity to defer indefinitely the tax liability of the individual

partners on income earned in 2000.  The partners decided to use the Add-On strategy to generate

a tax loss of $20 million.  Because the C. Partnership was a "pass-through" entity for tax

purposes, that tax loss could be used by the partners to offset their individual income for 2000.

108.    On or about August 9, 2000, the Bolton companies arranged for the C. Partnership to acquire two pairs of digital currency options. The premiums on the two long options totaled approximately $20 million. The cost to the C. Partnership of the two option pairs (the "net premium") was approximately $100,000, and the maturity date was December 7, 2000. The option pairs were structured with a 30% probability of a 2:1 return. Thus, if at maturity both option pairs were "in the money" – which was statistically unlikely – the C. Partnership would receive a payout of approximately $200,000, representing a return of the group's original contribution, plus a profit of approximately $100,000. However, the fees charged in connection with the transaction included a $225,000 fee to E&Y, a $250,000 fee to the Bolton companies, and a $75,000 fee payable to Law Firm A for a legal opinion. Accordingly, the C. Partnership had no realistic possibility to make a profit.

109.    On or about August 11, 2000, the C. Partnership's option pairs were transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-On transaction. On or about November 3, 2000, a representative of C. Partnership signed a letter indicating that the partnership did not wish to participate in "a second round of digital option purchases." Accordingly, in or about December 2000, the C. Partnership withdrew from BCPT&I, and BCPT&I distributed Japanese yen worth approximately $14,000 to the C. Partnership. The C. Partnership sold that asset and claimed a tax loss of approximately $20 million. That loss flowed through to the individual tax returns filed by the partners of C. Partnership for 2000.

110.    In or about early 2002, after the IRS announced its voluntary disclosure initiative, the C. Partnership partners elected to participate. On or about April 22, 2002, they signed letters that had been prepared by E&Y, in order to disclose their Add-On transaction to

-77-

the IRS (the "amnesty letters"). Those amnesty letters, which were signed under penalties of

perjury by each taxpayer and his spouse, were submitted to the IRS, and contained various false

and misleading statements. Among other things, the amnesty letters reiterated the false "cover

story" developed by the conspirators in 2000. The amnesty letters also included the false

statements that the business objective of BCPT&I was capital appreciation; that C. Partnership's

management "was familiar with [digital] options, and in particular, the opportunity for significant

economic returns in proportion to the funds invested"; and that each taxpayer and his spouse

"firmly believe[d] that [their] business purpose for this transaction was sound and remain[ed]

sound."

   111. In or about mid-2002, after the partners had already decided to participate

in the voluntary disclosure program, Law Firm A sent to the C. Partnership a representation letter

to be signed by one of the partners, a draft legal opinion, and a bill for $75,000. The

representation letter contained false and misleading representations, including representations

that "[t]he Partnership regularly engage[d] in investments similar in opportunity and risk to those

presented by the digital foreign currency options," and that "Partnership management reasonably

anticipated a pre-tax profit" on the transaction. The draft legal opinion incorporated the false and

misleading statements contained in the representation letter, as well as the false and misleading

"cover story" that had been created in 2000 to provide a purported business purpose for the Add

On transaction. The draft opinion letter also stated that the C. Partnership's digital currency

options could have returned 200 times the amount contributed by the C. Partnership (200 x

$100,000, or $20 million), and that "[t]he potential for such a large payout was an important

factor in the Company's analysis of the option trades." In reality, a $20 million payout on the

-78-

option pairs – while hypothetically possible – was virtually impossible as a practical matter, and the hypothetical possibility of such a payout played no role whatsoever in the decision by the partners of the C. Partnership to implement the Add-On tax shelter. Because the partners had already decided to participate in the voluntary disclosure initiative, they did not pay for, or obtain, a final legal opinion from Law Firm A.

112.    On December 15, 2003, one of the partners of the C. Partnership appeared before the IRS to provide sworn testimony concerning the partnership's Add-On transaction. During that proceeding, the partner gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

### Statutory Allegations

113.    From in or about January 1, 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by the partners of the C. Partnership to the United States of America for calendar year 2000, by various means, including among others:

a)    designing and implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate a total of approximately $20 million in tax losses which they knew could not properly be deducted on the returns of the C.

Partnership partners;

        c)      creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits for clients as well as fees for E&Y, the Bolton companies, Law Firm A and others;

        d)      causing to be prepared, and causing to be signed and filed false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for calendar year 2000, which understated each partner's taxable income and the tax due and owing thereon; and

        e)      preparing, executing, and causing the execution of false and fraudulent documents intended to deceive the IRS, including applications for participation in the IRS's voluntary disclosure initiative.

            (Title 26, United States Code, Section 7201 and
            Title 18, United States Code, Section 2)

## COUNT FOUR

### (Tax Evasion of T.M. and K.M.)

The Grand Jury further charges:

114.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27 through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

115.    Among the E&Y clients who participated in a CDS tax shelter as well as the Add-On tax shelter were T.M. and K.M., a married couple.

116.    In 2000, T.M. held stock options in his company. Under the tax law, if T.M. elected to exercise those stock options, he would incur an immediate tax liability on the

-80-

difference between his purchase price and the fair market value of the stock on the exercise date. In addition, if he exercised the options, he would be prohibited from selling the stock for a significant period of time, and thus would not be able to sell stock in order to satisfy his tax obligation.

117.    In or about July 2000, K.M. spoke with a representative of E&Y, and learned that if T.M. exercised the stock options, he could use CDS to defer the tax liability on the stock purchase to 2001, and convert the tax rate to the capital gains rate. K.M. learned that if T.M. also implemented CDS Add-On, he could further defer the tax liability beyond 2001. Thus, as explained by E&Y, by implementing these shelters, T.M. and K.M. could defer their tax liability until such time as they could sell the stock, and pay their tax at a lower rate.

118.    Based on E&Y's advice, T.M. exercised his stock options, and T.M. and K.M. implemented both CDS and CDS Add-On, in order to reduce and defer to a future year their tax liability on approximately $20 million in income. On or about July 28, 2000, they formed a CDS partnership, M. Trading Partners, L.P. ("M. Trading Partners"), with BCP as its general partner. As planned, M. Trading Partners entered into two swaps and a loan with a financial institution, and engaged in trading activity designed to secure "trader" status for the partnership.

119.    On or about August 8, 2000, the Bolton companies arranged for M. Trading Partners to acquire two pairs of digital currency options. The premiums on the two long options totaled approximately $20 million. The cost to M. Trading Partners of the two option pairs (the "net premium") was approximately $100,000, and the maturity date was December 7, 2000. The option pairs were structured with a 30% probability of a 2:1 return. Thus, if at

-81-

maturity both option pairs were "in the money" – which was statistically unlikely – M. Trading

Partners would receive a payout of approximately $200,000, representing a return of their

original contribution, plus a profit of approximately $100,000. However, fees charged in

connection with the transaction included a $150,000 fee to E&Y, a $150,000 fee to the Bolton

companies, and a $75,000 fee payable to Law Firm A for a legal opinion. Accordingly, M.

Trading Partners had no realistic possibility to make a profit on the Add-On transaction.

　　　　　120.　　On or about August 11, 2000, M. Trading Partners' option pairs were

transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-

On transaction. T.M. and K.M. were sent a "second round of digital option trading" letter, but

did not sign it, thereby indicating that they would retain their membership in BCPT&I into 2001.

In 2001, M. Trading Partners withdrew from BCPT&I, and BCPT&I distributed Japanese yen to

the partnership. M. Trading Partners sold that asset and claimed a tax loss of approximately $20

million, which flowed through to the individual tax return they filed for 2001. In order for T.M.

and K.M. to use the tax losses generated through the Add-On transaction, defendant CHARLES

BOLTON signed a loan agreement on behalf of L. Trading Partners, by which the partnership

purported to borrow $8.5 million from a financial institution. On the same day, T.M. and K.M.

signed documents by which they agreed to be personally liable for the repayment of that loan.

　　　　　121.　　On September 25, 2001, at the behest of E&Y, T.M. and K.M.

each signed a representation letter that had been drafted by Law Firm A in connection with the

CDS Add-On shelter. The letters contained false and misleading representations, including

representations that they regarded the various activities of their CDS partnership, "including the

-82-

swaps, the trading activities, loan, and the investment in [BCPT&I], as comprising one coherent business philosophy," and that "this diversity of investments was an important element in [their] decision to invest in the Partnership[.]"

122.    On September 24, 2001, defendant CHARLES BOLTON also signed a representation letter in connection with the Add-On transaction implemented by T.M. and K.M.  That letter falsely stated, among other things, that BOLTON intended to utilize the funds supposedly loaned to M. Trading Partners "as appropriate, to leverage the existing trading programs of the Partnership and/or invest in other programs designed to yield returns in excess of the cost of the funds while minimizing risk to capital[.]"

123.    In exchange for a fee of $75,000, Law Firm A issued a legal opinion that incorporated the false and misleading statements contained in the representation letters signed by T.M. and K.M., as well as the false and misleading "cover story" that had been created in 2000 to provide a purported business purpose for the Add On transaction.  The opinion letter also stated that M. Trading Partners' digital currency options had a potential payout of "many times the amount of the net premium," and that "[t]he potential for a large payout was an important factor in the partners' interest in the option trades."  In reality, a payout of "many times the amount of the net premium" – while hypothetically possible – was virtually impossible as a practical matter, and the hypothetical possibility of such a payout played no role whatsoever in the decision by T.M. and K.M. to implement the Add-On tax shelter.  The opinion letter also falsely stated that the Add-On loan taken out by M. Trading Partners would be used "to opportunistically invest" in trading programs, and would therefore be deemed a genuine loan for tax purposes.

-83-

124.    In or about early 2002, after the IRS announced its voluntary disclosure initiative, T.M. and K.M. elected to participate. On or about March 13, 2002, they signed a letter that had been prepared by E&Y, in order to disclose their Add-On transaction to the IRS (the "amnesty letter"). The amnesty letter, which was signed under penalties of perjury by T.M. and K.M., was submitted to the IRS, and contained various false and misleading statements. Among other things, the amnesty letter reiterated the false "cover story" developed by the conspirators in 2000, and asserted that the business objective of BCPT&I was to accomplish asset appreciation.

### Statutory Allegations

125.    From in or about January 1, 2000 through at least in or about April 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by T.M. and K.M. to the United States of America for calendar year 2001 by various means, including among others:

a)    designing and implementing a CDS Add-On tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate more than $19 million in tax losses they knew could not properly be deducted on the returns of the partners;

c)    creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits;

-84-

d)        causing to be prepared, and causing to be signed and filed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which substantially understated T.M. and K.M.'s taxable income and the tax due and owing;

e)        preparing, executing, and causing the execution of false and fraudulent documents intended to deceive the IRS, including applications for participation in the IRS's voluntary disclosure initiative; and

f)        taking various other steps to conceal from the IRS the true facts relating to the tax shelter, including providing false information in response to IDRs.

(Title 26, United States Code, Section 7201 and
Title 18, United States Code, Section 2)

## COUNTS FIVE THROUGH SEVEN

### (Tax Evasion of E&Y Partners)

The Grand Jury further charges:

126.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, 68 through 82, 96 and 97 are repeated and realleged as if fully set forth herein.

127.    From in or about 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by each of them to the United States of America for calendar year 2000, as set forth below, by various means, including among others:

-85-

a)    designing and then implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate tax losses they knew could not properly be deducted on their respective tax returns;

c)    creating entities that served no legitimate business purpose, but were used merely to obtain tax benefits;

d)    preparing and executing false and fraudulent documents intended to deceive the IRS, including but not limited to transactional documents and a Certificate of Facts;

e)    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which substantially understated each defendant's taxable income and tax due and owing; and

f)    taking various steps to conceal from the IRS the true facts relating to the tax shelter, including providing false information in response to IDRs sent by the IRS.

| Count | Defendant/ Taxpayer | Return | Approx. Amount of Fraudulent Underpayment | Approx. Filing Date |
|-------|--------------------|--------|-------------------------------------------|---------------------|
| 5 | ROBERT COPLAN | 2000 Form 1040 | $ 291,913 | April 15, 2001 |
| 6 | MARTIN NISSENBAUM | 2000 Form 1040 | $ 340,262 | April 16, 2001 |
| 7 | RICHARD SHAPIRO | 2000 Form 1040 | $ 201,565 | August 16, 2001 |

(Title 26, United States Code, Section 7201)

-86-

**COUNT EIGHT**

**(Obstruction of the IRS)**

The Grand Jury further charges:

128.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, and 68 through 82, 96 and 97 are repeated and realleged as if fully set forth herein.

129.    On or about September 25, 2003, in the Southern District of New York and elsewhere, MARTIN NISSENBAUM, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and did endeavor to obstruct and impede, the due administration of the Internal Revenue Code; to wit, in response to IDR #2, NISSENBAUM caused the false and misleading statements set forth in paragraph 82, above, to be submitted to the IRS on behalf of himself and ten other E&Y partners.

(Title 26, United States Code, Section 7212).

**COUNT NINE**

**(Obstruction of the IRS)**

The Grand Jury further charges:

130.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, 64, 65, 96 and 97 are repeated and realleged as if fully set forth herein.

131.    On or about July 17, 2001, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the internal revenue laws, to wit, with knowledge that one of E&Y's COBRA transactions was

-87-

then under audit, and that the IRS had formally requested production of COBRA promotional

materials, COPLAN sent an email directing PFC professionals and others throughout the country

immediately to "delete and dispose of" COBRA materials in their files and their computers.

(Title 26, United States Code, Section 7212).

## COUNT TEN

### (False Statements To The IRS)

The Grand Jury further charges:

132.    The allegations set forth in paragraphs 1 through 10, 13 through 18, 21

through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

133.    On or about June 12, 2002, in the Southern District of New York and

elsewhere, BRIAN VAUGHN, the defendant, in a matter within the jurisdiction of the executive

branch of the Government of the United States, unlawfully, wilfully, and knowingly made

materially false, fictitious and fraudulent statements and representations, to wit, in connection

with an examination by the IRS of tax shelters marketed by Ernst & Young, VAUGHN gave the

false testimony underlined below:

(Page 22, line 17)

|     | Q. | How did you get involved in these digital option transactions? |
|-----|----|----|
|     | A. | Mainly from our clients. Our clients, as I mentioned before, were getting bombarded by a couple of other accounting firms. And they would – it would bubble up to us, and come to the client service professional, and they'd call and say, "Hey, look. My client is being called on on these various solutions. We need an answer. Does it work or doesn't it? And what is the firm's position?" And so |
| (a) |    | that's how we were first introduced to the concept. Other time – <u>to my knowledge, there was one other time when a fund was created, and certain of our</u> |

-88-

<u>high net worth individuals were offered the potential to go into the fund, so that
came through a broker-dealer.</u>

* * * *

(Page 31, line 13)

Q.    [D]o you know anything about the fees that investors paid to enter into these
      [digital option] contracts? I already asked about the premium amounts, but do
      you know any fees that were paid to [financial institution], fees that were paid to
      [bank]? Were there any standard fees?

A.    Like I said, I think the counterparty did take a fee for the execution. There was a
      tax fee for the tax advice, and for – for future examination, if they were to be

**(b)**    examined. <u>We would forecast what we thought our time and expense would be
      to go through an examination process with that specific client.</u> So our – there was
      a tax fee paid to Ernst & Young, there was a fee paid to the attorney, whichever
      attorney they chose to issue the tax opinion. And then there was, I'm sure, the
      investment fees that – whoever the counterparty would charge.

Q.    Was Ernst & Young's fees fixed fees?

**(c)**    A.    It was fixed per client, but they were negotiated fees. <u>As always, we try to start
      with our 100 percent per diem billing rates, but we never somehow got there. So
      but on all our solutions, whether it is wealth management, which is our personal
      CFO service, whether its investment advisory services, we always do a front-end
      work plan, sort of a budget, on here is the various professionals in the national
      group, in the local group, in the area groups, what their billing rates are, how much
      time that we would think to expend on a particular transaction. And then we try to
      back that into a fixed fee, because we found our clients liked fixed fees </u> rather than
      open-ending, you know, invoice, invoice me at your will, and it keeps coming. So
      all of our engagement letters, for whatever we do, is fixed.

* * * *

(Page 49, line 10)

Q.    Who developed the structure ... of the digital currency option trade?

A.    The digital option trade, I believe, was – [Law Firm] actually approached one of

-89-

our clients with that. . . . [I]t was either [Law Firm], or it was Arthur Andersen had approached one of our clients that had this particular program, then it came bubbling up to us. Then we had to assess whether our client should go into this particular transaction. . . .

Q.    So did E&Y develop its own brand?

**(d)**    A.    No.  The only thing we do is, again, we look at the tax issue surrounding how the proposed structure is.  And if we can get to a filing position, then we will tell the client service professionals that we believe we can sign this return.  But we don't –

**(e)**    we – since day one, the only solutions that I know that we have created ourself is wealth management solutions, investment advisory services, equity risk management services.  But there was no tax strategy, per se, that was developed internally by our individual tax practice.

* * * *

(Page 53, line 4)

Q.    Are you familiar with BCP Trading and Investments, LLC?

A.    BCP Trading and Investments, LLC?  That sounds like – sounds like one of the funds that Chuck Bolton used for one of the, seems like, one of the clients for the swap, but I can't recall specifically.  Sounds like a Bolton entity.

Q.    So you don't know anything about the structure of the LLC of BCP Trading and Investments, LLC?

**(f)**    A.    All I know was to the best of my knowledge, that entity was structured by Chuck Bolton as a private offering to clients, whether they were clients of Ernst & Young or clients of, you know, Chuck Bolton's, et cetera, to participate in foreign currency trading.  That's my knowledge of it. . . .  But I know that that was one where Chuck felt that he could take advantage of the dollar-yen movements and some Euro-yen movements, and felt that he came to us and said, look, I've got this private offering, a fund that I want to set up, and do you have any high net worth clients that could participate?  I'm offering it to, you know, sort of a universe of people.  That was my knowledge of it.

* * * *

-90-

(Page 61, line 11)

      Q.    Were subject matter specialists involved in the digital currency option trade?

**(g)**    A.    Oh, I'm sure.  <u>That's why I was trying to remember who the right subject matter person on that would have been.</u>  I – but yes.  There had to have been a subject matter expert involved in every – if it was – involved a tax strategy that the client was looking at, then it had to go to the appropriate subject matter expert on that.

* * * *

(Page 67, line 3)

      Q.    Did E&Y ever develop its own investment strategies that it would then pitch to its own clients, similar to the way you described it earlier, that, let's say, Arthur Andersen went to one of your clients?

      A.    Well, we have investment advisory services, which we believe is our propriety [sic] investment advisory solution.  That's where we've gone out and we've contacted what we believe is the best agreed money managers, we got them to reduce their minimums that a client could get into that specific manager, and we got them to reduce their fees that they would charge off the street, because we felt our clients – we could bring a lot of clients to them. . . . So that is our investment – when you say have we developed an investment alternative for our clients, that is one that we developed in-house and we are taking out to our clients to market for investment advisory services.

      Q.    But the digital currency option trade did not come out of that group?

      A.    No.  No.  That was, again, brought to us by an outside organization.

      Q.    And who was that?

**(h)**    A.    Again, <u>Chuck Bolton came to our clients with a fund to participate in.</u>  That was one instance.  And, again, the other instance is when a client was shown a digital option strategy, and [Bank] had been, you know, the counterparty with that.

* * * *

(Page 70, line 21)

      Q.    So it would be someone like Bolton that would develop [a swap transaction] and bring it to E&Y?

-91-

**(i)**    A.    Yeah.  That would be for one instance, yeah.  Bolton would have a – I mean, because they did.  They created a fund, and they brought it to a client – the client of the firm.  And of course, that client service professional says hey, what do you think of this.  And that's you know, how the process works.

* * * *

(Page 71, line 22)

    Q.    Did Bolton bring . . . the digital currency option trade to E&Y?  Was it Bolton who approached the client of yours?

**(j)**    A.    Bolton approached the client with a fund, with a private offering memorandum that dealt with foreign currency trading, which included some, you know – with the digital, whether American, European, it was a foreign currency fund.

* * * *

(Page 84, line 4)

    Q.    How did you – how did E&Y determine its fees when it came – or did it – with its consulting fees for, let's say, is it done on a transaction-by-transaction basis?

    A.    Client by client.

    Q.    Client by client.  For providing tax advice on –

    A.    Yes.

    Q.    – let's say, that – the digital currency option trade, the client came to you and said, "Can you look at this and let me know what you think," how would you determine the fees?

**(k)**    A.    Time and expense, and forecasting, again, as I mentioned before.  Part of our engagement was not only to consult with them to give them tax advice on their specific investment, but also to build in, if we thought there was a high likelihood of examination, we were not just going to, you know, bill them again.  So we had to try to best estimate what our fee is going to be, based on the time that we would incur from a national perspective, you know, defending the client.

    Q.    And –

    A.    Then we would fix – then it would be a fixed fee.

    Q.    How would you determine the fixed fee?  Was there any kind of formula used?

-92-

(l) A. Well, again, with each – <u>every time that we go about working on a solution, we come up with a budget, sort of a work plan. It involves the level of personnel assigned to it, their appropriate billing rate, the hours that we estimate it's going to expend with that particular client, and then we come to our best guess of what that is from a fixed fee standpoint, and the margin that we want, you know, from a business perspective</u>. If we want a 15 percent margin or 10 percent margin, that affects, obviously, from a pricing standpoint, what we want. We got to have a business, you know.

    Q. None of that fee was ever based on a tax savings?

(m) A. <u>No.</u> We never – our policy as a firm is not to take a percentage of tax savings. So we, from an individual perspective, – and I can't speak to what other groups in Ernst & Young but only the PFC practice, we take no contingent fees and <u>we don't take a percentage of tax savings</u>. Now, the fixed fee may be a percentage of their investment, because a lot of times the private offering memorandum will have to state all fees associated with it. And the normal rule of thumb on how private offering memorandums is always related back to the fixed fee as a percentage of your invested capital.

* * * *

(Page 87, line 8)

    Q. Let's go back to the Bolton fund, that type of transaction that then went to your client, and you did your review, came back with a more likely than not, and then determined that it could work for X amount of clients, how would you then bill your time when you presented it to your – the various clients?

(n) A. Client by client. . . . <u>So it's all determined in about – the team assigned to that client, how many hours they anticipate there's an amortization of the research and development time, there's forecast for defense. But really, it's client by client by client, because we don't know how this particular investment is going to fit with their overall financial plan. . . . I have never seen a cookie-cutter deal. You know, I've never seen, you know, let's just replicate this, because every client's demands are so unique.</u>

* * * *

-93-

(Page 100, line 11)

    Q.    Do you know Robert Copeland [sic]?

    A.    Yes. He is our subject matter expert in estate and gift tax area.

    Q.    So would he have been involved in this transaction [CDS Add-On]?

**(o)**    A.    If it dealt – <u>maybe tangentially</u>, because his expertise is estate and gift. I think – I'm sure – I'm sure Bob was involved to some extent. <u>To what his personal involvement was, I don't know.</u> Because anything dealing, you know, with a fund that affects a person's gift and estate tax ramifications, definitely Bob could have been called. . . . <u>Bob probably did get called, but I don't know. I don't know.</u>

\* \* \* \*

(Page 103, line 14)

    Q.    Did E&Y ever come out with a more likely than not conclusion to any deal that he –

    A.    One.

    Q.    One. Okay. Which one?

    A.    That was a swap with Bolton.

    Q.    What was Bolton's role in the swap?

    A.    Execute. They executed the swap. . . .

    Q.    Do you know what type of entity would have been used to facilitate the swap?

    A.    I think most of the time it was either LLCs or limited partnerships or general partnerships.

    Q.    Do you know why you would use that type of entity?

**(p)**    A.    <u>Client choice. Either client choice or the recommendation of client counsel.</u>

\* \* \* \*

(Page 107, line 20)

    Q.    And there was the name of someone that you had mentioned before that had left E&Y that worked – Belle Six, I think you –

    A.    Yeah. She was an employee I think in 1998, and then pursued other –

    Q.    Where did she go?

**(q)**    A.    <u>I couldn't tell you. I don't know where she is.</u>

\* \* \* \*

(Page 126, line 12)

        Q.     So who would bring all the parties to the transaction together, be it, you know, the broker-dealer, who would bring that entity in?

(r)     A.     Well, for instance, on the fund that we talked about earlier, [Company X] already had all the pieces together from the investment standpoint.   And so they were bringing the transaction to us.  So they had already put – you know, they had put everything together from the investment standpoint, the private offering memorandum, et cetera.

\* \* \* \*

(Page 136, line 6)

        Q.     Do you recall what the probability of a tax benefit was?

(s)     A.     No, I don't recall.

\* \* \* \*

Page 138, line 21)

        Q.     Would you give any advice to clients as to timing of exiting?

(t)     A.     I think that was – well, only from an investment standpoint.  Obviously, if they were making money, stay in.  If they were losing money, let's look at alternatives.

        Q.     In terms of tax benefits, though?

(u)     A.     No.  I mean, this was an investment for the client.  So our advice was centered around if you're going to – if you believe this is a good investment and it makes sense, stay in.  Continue to do, you know, to do the digital trading, do the foreign currency trading.  If it doesn't make sense, let's think about exiting and how should we exit.

\* \* \* \*

(Page 139, line 22)

        Q.     Do you know if clients withdrew from it?

        A.     Yes.  I do know clients withdrew from it.

-95-

|       |    |                                                                                  |
|-------|----|----------------------------------------------------------------------------------|
|       | Q. | Do you know what the basis would have been for withdrawing from it?              |
| (v)   | A. | <u>Lack of profit</u>.                                                           |

* * * *

(Page 142, line 9)

|       |    |                                                                                  |
|-------|----|----------------------------------------------------------------------------------|
|       | Q. | When you were determining the entrance, . . . [h]ow would you calculate what their contribution would be? |
|       | A. | I think a lot was dictated on how much percentage profits that they wanted in the fund, and how much they felt comfortable with contributing. |
|       | Q. | What are the types of assets that they were contributing?                        |
|       | A. | If I remember the fund, the fund was a digital, foreign currency digital program. . . . |
|       | Q. | Where did they get the options from?                                             |
| (w)   | A. | <u>Well, the digital options were purchased as part of their, from the investment standpoint, as part of their alternative investment, you know, that was just part of their investing</u>. |

* * * *

(Page 165, line 6)

|       |    |                                                                                  |
|-------|----|----------------------------------------------------------------------------------|
|       | Q. | Are you aware of any of the listed transactions that your clients engaged in prior to them being listed? |
|       | A. | [Looking at Notice 2001-51] Yes.                                                 |
|       | Q. | Do you know which ones?                                                          |
|       | A. | CDS, I think, just got listed, if I remember right, is a listed transaction, the swap transaction.  . . . |
|       | Q. | Are you familiar with any of the other ones? . . . What about No. 11, the Notice 2000-44? |
| (x)   | A. | Inflating the basis of partnership interests?  <u>I don't think we did any inflation of partnership interest</u>. |

* * * *

-96-

(Page 169, line 8)

Q,    I'm going to get off the list of transactions and ask whether at any time did you ever consult an E&Y database for strategy?

A.    An E&Y database for strategy. Trying to think. Database. We have – if the client asked for a – trying to think what an example would be – an engagement letter, then we would have  – there is a repository for engagement letters so that we wouldn't have to duplicate that effort. . . .

Q.    Where would that be?

A.    That is in a just – I think it's a general PFC database. And you're talking to someone that's administratively, again, very weak in this. . . . So, yeah, I do think there's a PFC database that would have engagement letters there.

Q.    Would there be a database where after you review, say, the currency, the fund, where you could let everyone out there in the country know that hey, this is a good vehicle for your clients if you have someone that wants it?

(y)    A.    Other than email? <u>I don't know.</u>  <u>I mean, if a client – see, everything was driven from the client's perspective.  So if the client came to the client service professional and said, you know, we've got this that's – you know, got this fact pattern, or whatever, and then they call the subject matter expert, the subject matter expert said send them an email, look, this has been done for another client and, you know, the fact pattern sounds similar, you may want to investigate this particular deal[.]</u>

* * * *

(Page 176, line 4)

Q.    [T]ake just a digital currency option trade as an example, would that fit into the definition of a solution?

(z)    A.    <u>That would be a one off tax strategy.  So, in other words, there would be no database or this thing formed for digital option, because it was a one off investment fund that was produced by a third party that came to us.</u>  Most of our solutions, I think almost all the solutions are internally developed. So a solution is just a way that Ernst & Young has been doing a service, it needs to be standardized. If it was a tax strategy that was brought to us by a third-party vendor, that's not a solution per se. We used to call it just, you know, a tax strategy.

Q.    Did Ernst & Young create its own tax strategies?

**(aa)**    A.    Unfortunately, <u>no.  We – the only, I guess, strategies, per se, a Chuck Bolton would have brought to us.</u>

* * * *

Page 186, line 22)

Q.    Would – back to the fund, the Bolton fund . . . – the eight to ten that you actually were involved in . . . did each client approach E&Y to engage in the fund?

**(bb)**    A.    <u>For financial planning assistance.  They would have come to their relationship person and said, you know, for whatever reason I've got this fact pattern.  And then the relationship person would say, "Hey, Brian, you know, this is the fact pattern."  Well, if I was aware this fund was being offered, I'd say, "Well, look, you need to probably check with Chuck Bolton, see if the facts of this make sense for you."  If it was an investment planning professional that had done an asset allocation, said we need to look at a hedge fund, you know, Chuck Bolton's hedge fund at that time would have been one that they probably would have considered.  So it really just, you know, it really depended upon the risk tolerance of the client from an investment perspective and whether a hedge fund fit in their asset allocation.</u>

(Title 18, United States Code, Section 1001).

**COUNT ELEVEN**

**(False Statements To The IRS)**

The Grand Jury further charges:

134.    The allegations set forth in paragraphs 1 through 10, 13 through 18, 21 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

135.    On or about June 20, 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, in a matter within the jurisdiction of the executive

-98-

branch of the Government of the United States, unlawfully, wilfully, and knowingly made

materially false, fictitious and fraudulent statements and representations, to wit, in connection

with an examination by the IRS of tax shelters marketed by Ernst & Young, COPLAN gave the

false testimony underlined below:

(Page 24, line 10)

> Q.  Who produced the materials [to be distributed to clients] for the Bolton transaction.
>     . . . a description of the transaction that you would give to investors before they
>     invest --
>
> A.  Yeah.  On the Bolton transaction, there were no materials given.  That was just
>     explained. . . .  I believe 1 office did produce something, and it was on their own
>     and without national involvement. . . .
>
> Q.  What office was it?
>
> A.  Seattle.
>
> Q.  Did you review any of those materials?
>
> A.  I did after I became aware of them, but not for distribution.  In other words, I
>     basically said, these are not to be distributed.
>
> Q.  And why did you say they were not to be distributed?
>
> **(a)**  A.  We didn't see the need to, and anything – or even show it to clients.  We didn't
>     think the transaction was that complicated, to be honest with you, so we only really
>     had it for internal purposes.

* * * *

(Page 34, line 9)

> Q.  And who was the counterparty in most of these [CDS Add-On transactions]?
>
> A.  I believe it was [Financial Institution] in both transactions.
>
> Q.  And [Financial Institution] is a U.S. entity?
>
> A.  Again, I've become aware there was some confusion about that . . . .  On the
>     [Company X] transaction, it was really being – all the investments aspects of it
>     were being done in connection with the existing partnerships.  And those existing
>     partnerships had trading accounts that were doing exotic option trading and other
>     **(b)**  trading, and so – and Ernst & Young had nothing really to do with the operation of
>     that partnership.

Q.    M-hm.

A.    So Bolton was the asset manager. Bolton was not necessarily at the time, but they became the general partner also of those accounts during the period in question. And so they were leading the investment decisions of who to use, and they were using a trader who specialized in these type of currency options. And so we

**(c)**    really didn't – we, Ernst & Young, really didn't have involvement in the decisions that the general partner made as to who to use to do the trading, how to structure those trades. It was really their investment decision and their decision as general partner. They didn't have to ask us anything.

* * * *

(Page 38, line 11)

Q.    What were the risks on the tax transaction?

A.    That the IRS would disagree, that you had basis in the partnership.

Q.    What did you think the IRS would – just on the basis issue alone, that's what you thought the issue would be?

A.    Yeah. But I think in the explanations that have been put forth of the facts and amnesty disclosures, et cetera, on this transaction, the surrounding facts were such that when we analyzed it, we looked at the fact that the partnerships were existing

**(d)**    partnerships, they had been doing some of this trading, and that there was going to be a transfer of a portion of the trading accounts to this [Financial Advisor] outfit for management, and he said, I'm not going to manage a whole bunch of these little accounts, I'm going to put all of these things into an LLC so I can do 1 account trading for these options. And it was 1 of those circumstances where his tax planner – as we say, we're aware of this idea that's out there. We hear about the concept of transferring a long and a short option that aren't matched and getting basis and not having to reduce it for the liability, and so here was kind of a fortuitous circumstance where if these accounts are going to be transferred into an entity anyway, that it's a matter of taking the tax position, because along with that transfer, if someone felt appropriate to do it.

* * * *

-100-

(Page 62, line 7)

Q.    So how did Bolton get involved in the option transaction?

A.    Bolton got involved – this was later on after David Smith brought the idea to us. So in other words, we had the idea. That's why I said at some point, we kind of married an idea with facts in the Bolton transaction, so that it was what we did with Bolton. But we had the idea at some previous time from David Smith.

Q.    Okay. So maybe I asked this: How did Bolton actually come to do the transaction? Did you have – is this based on a preexisting relationship with Bolton?

A.    Yeah. I mean, I said we – Bolton was involved in the swap partnerships.

Q.    Okay.

A.    And so they were involved as the asset allocators and the investment folks. And they were dealing with these trading-type people like [Financial Advisor] is the 1 involved.

(e)    And so we're the tax advisors, and we said, hey, if you are happening to be forming these – transferring these trading accounts over to [Financial Advisor] and he's going to put them in an LLC, we know this tax idea. That's kind of what I said before.

                                * * * *

(Page 98, line 6)

Q.    Were clients concerned about the large capital gain at the end of the [CDS] transaction in that they would have a large amount to pick up in income that year?

(f)    A.    That was – well, they weren't sure that that would happen, because they had to make a decision on the economic side to – they would have to decide to early-terminate the swap, because the swap was scheduled to run for 18 months. And so a decision was required on their part or the counterparties' part to terminate the swap prior to the majority. Otherwise, you'd have ordinary income on the back end.

Q.    Did – do you know, did all the partnerships terminate early?

A.    I believe they did.

                                * * * *

-101-

(Page 118, line 116)

    Q.    Was there a reason why [the Add-On transaction] was done through an LLC and not for the Jenkens partnerships for lack of a better description?

    A.    Well, as I think I explained, the – well, the Jenkens came first.  They were done with individual folks forming a partnership.  And they did their ... currency contracts and contributed them to partnerships.  The [Add-On] transaction wasn't really done that way.  It was done based on the fact that the partnerships were transferring their trade – I mean, it really was a fact that existed prior to the tax idea.  In other words, the LLC was formed as an LLC because of Mr. [K's] interest in forming an LLC for all those trading accounts. . . .  For the – for all those partnerships that were doing this type of trading that Bolton said, we can't use [Financial Institution] anymore to do this kind of trading, we've got to move the trading account over to [Financial Advisor].  And so they moved it and he said, if I'm going to do this trading for you, I'm going to have all these accounts in 1 entity.

**(g)**

\* \* \* \*

(Page 139, line 12)

    Q.    Who would pay E and Y fees [for PICO], the individual or the S Corp?

    A.    We had an engagement letter with the individual.

    Q.    The individual was responsible for paying the fees?

**(h)**    A.    We were paid by the individual.  We also received a fee from [Company Z] for consulting with them on the transaction. . . .  We were advising them on the tax aspects of the results of investors investing in these types of S corporations.

(Title 18, United States Code, Section 1001).

-102-

## COUNT TWELVE

### (Tax Evasion of David L. Smith)

The Grand Jury further charges:

136.    The allegations set forth in paragraphs 11, and 21 through 23 are repeated and realleged as if fully set forth herein.

137.    During 1997 and 1998, before defendant DAVID L. SMITH founded PCMG, he was the part owner of a so-called "investment advisory" firm referred to herein as "Q Advisors." At that time, Q. Advisors was involved in designing, marketing and implementing tax shelters, including CDS.

138.    As of January 1998, SMITH owned his interest in Q. Advisors through two layers of entities. The first entity was S&L Advisors, LLC (S&L Advisors), which was a 50% owner of Q. Advisors. S&L Advisors, in turn, was owned by two other entities: 1) the Smith Family Trust (the 99% owner of S&L Advisors), a pass-through entity for tax purposes, which was controlled by SMITH; and 2) S&L Advisors, Inc. (the 1% owner of S&L Advisors), another pass-through entity which was also controlled by SMITH.

139.    In 1998, S&L Advisor's share of the income earned by Q. Advisors was $18.4 million. Based on the structure described in paragraph 138, above, the $18.4 million paid to S&L Advisors should have passed through to defendant DAVID L. SMITH, and been reported as income by SMITH on his individual income tax return.

140.    During the period from mid-1998 through at least July 2003, defendant DAVID L. SMITH took numerous steps to evade the tax on the $18.4 million paid by Q. Advisors to S&L Advisors. Among other things:

-103-

a)      In mid-June 1998, SMITH set up a Cayman Islands entity called "Aegis Capital Investments Ltd. ("Aegis"), which was controlled by SMITH, but was designed to appear as though SMITH had no control over it or relationship to it;

b)      In mid-June 1998, SMITH set up one or more accounts in the name of Aegis in the Cayman Islands;

c)      On or about June 26, 1998, SMITH engaged in a sham sale of the Smith Family Trust's 99% interest in S&L Advisors to Aegis, a step which appeared to give an unrelated company the right to receive SMITH's portion of the income from Q. Advisors. SMITH thereafter directed Q. Advisors to transfer S&L Advisors' income to a Cayman Island account opened in the name of Aegis;

d)      In August 1998, SMITH arranged to implement a CDS-type transaction on behalf of S&L Advisors, using a $20 million swap (including an $18 million "loan" from a bank) to defer from 1998 to 1999 the tax liability on the income from Q. Advisors;

e)      On or about January 5, 1999, the day S&L's swap terminated, SMITH directed that the cash proceeds of the termination payment be transferred to the Aegis account in the Cayman Islands;

f)      On or about October 15, 1999, SMITH signed and filed a 1998 tax return (a Form 1065) on behalf of S&L Advisors, on which he reported the $18.4 million in income from Q. Advisors, but also reported $19.9 million in deductions from the CDS swap, resulting in zero taxable income;

g)      Although SMITH knew that the proceeds of S&L's CDS swap had been paid to S&L Advisors in January 1999, and that the full amount of the termination payment

-104-

was reportable as income to S&L Advisors in 1999, SMITH indicated on the 1998 return he

signed and filed on behalf of S&L Advisors that the return was a "Final return," thus indicating to

the IRS that S&L anticipated no reportable income in 1999;

        h)     On or about October 15, 1999, SMITH signed and filed a 1998

individual income tax return (Form 1040) on behalf of himself and his spouse, on which he

reported zero taxable income and claimed a refund;

        i)     Although SMITH owned and controlled one or more Aegis

accounts in the Cayman Islands during 1998, on his 1998 individual income tax return, where the

return asked whether at any time during 1998 SMITH had "an interest in . . . or other authority

over a financial account in a foreign country," SMITH indicated "No."

        j)     In or about April 2002, an individual income tax return for 1999

was prepared for SMITH by a tax preparer in New York, New York. SMITH filed but did not

sign the return. The return did not report the $19.9 million swap termination payment made to

S&L Advisors on January 5, 1999.

        k)     On the 1999 individual tax return filed by SMITH in April 2002,

where the return asked whether at any time during 1999 SMITH had "an interest in . . . or other

authority over a financial account in a foreign country," SMITH indicated "No."

        l)     On or about November 5, 2002 and November 6, 2002, in

connection with a civil audit of SMITH's tax liabilities, SMITH was interviewed by an IRS

revenue agent. During that interview, SMITH told the revenue agent that he had sold his interest

in S&L Advisors to Aegis, and that SMITH had no interest in Aegis.

m)    On or about December 1, 2002, SMITH signed and filed his

individual income tax return for 2000.  Where the return asked whether at any time during 2000

SMITH had "an interest in . . . or other authority over a financial account in a foreign country,"

SMITH indicated "No."

n)    On or about July 19, 2003, SMITH signed a declaration, under

penalties of perjury, that he had examined his 1999 individual income tax return and that, to the

best of his knowledge, it was true, correct and complete.

### **Statutory Allegations**

141.    From in or about January 1, 1998, through at least on or about July 19,

2003, in the Southern District of New York and elsewhere, DAVID L. SMITH, the defendant,

unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the

income tax due and owing by him to the United States of America, on $18.4 million he earned

from Q. Advisors, by various means, including among others:

a)    creating and utilizing an off-shore entity designed to disguise his

receipt and control of the $18.4 million from Q. Advisors;

b)    entering into a tax shelter transaction to defer his tax

liability on the $18.4 million from 1998 to 1999, with the intent not to report the income in 1999;

c)    causing to be prepared, and causing to be signed and filed, false

and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which understated his taxable

income and the tax due and owing thereon, and which concealed his interest in, and authority

over, the foreign bank account or accounts  into which the income from Q. Advisors had been

-106-

transferred; and

          d)      making false statements to an IRS revenue agent in connection

with an audit of his tax liability.

          (Title 26, United States Code, Section 7201).


## COUNT THIRTEEN

**(False 1999 Tax Return Filed by David L. Smith)**

     142.    The allegations set forth in paragraphs 11, 21 through 23, and 136 through 140 are repeated and realleged as if fully set forth herein.

     143.    From in or about April 2002, up to and including July 19, 2003, in the Southern District of New York and elsewhere, DAVID L. SMITH, the defendant, unlawfully, willfully and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, on behalf of himself for calendar year 1999, which was verified by a written declaration that the return was made under penalties of perjury, which was filed with the Internal Revenue Service, and which SMITH did not believe to be true and correct as to every material matter, in that, among other things, the return indicated that during 1999, SMITH had no interest in, or other authority over, a financial account in a foreign country.

          (Title 26, United States Code, Section 7206(1).)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

-107-

# Exhibit B

# MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P. C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO
LAWRENCE S. BADER
BARRY A. BOHRER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
STEPHEN M. JURIS
ROBERT G. MORVILLO
BARBARA MOSES*
JODI MISHER PEIKIN
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
JOHN J. TIGUE, JR.
CYRUS R. VANCE, JR.
RICHARD D. WEINBERG

COUNSEL
CHRISTOPHER J. MORVILLO
E. SCOTT MORVILLO
GREGORY MORVILLO
*ALSO ADMITTED IN CALIFORNIA AND D.C.
**ALSO ADMITTED IN CONNECTICUT

MICHAEL C. SILBERBERG
1940-2002

565 FIFTH AVENUE
NEW YORK, N.Y. 10017
TELEPHONE
(212) 856-9600
www.maglaw.com
FACSIMILE
(212) 856-9494

WRITER'S DIRECT DIAL

(212) 880-9450

JENNIFER L. ACHILLES
DAVID C. AUSTIN
LAWRENCE M. BARNES*
BENJAMIN S. FISCHER
ELIZABETH HAINES**
JAMES V. HAYES****
RACHEL HEMANI
TIMOTHY M. HUDSON**
RENÉE L. JARUSINSKY
JASMINE JUTEAU
THOMAS M. KEANE
RACHEL M. KORENBLAT
KRISTY WATSON MILKOV
ELLEN M. MURPHY
SARAH J. NORTH
CLAUDIO R. OCHOA***
JANEY ROUNTREE****
ASHLEY E. RUPP
ANDREW J. SCHELL
E. SCOTT SCHIRICK
MARYANNE SEXTON
KATHRYN M. SPOTA
DAVID STANKIEWICZ**
JERROLD L. STEIGMAN
JAMES R. STOVALL
BARBARA L. TRENCHER
AMY M. TULLY
KEFIRA R. WILDERMAN

*ALSO ADMITTED IN N.J.
**ADMISSION PENDING
***ALSO ADMITTED IN WASHINGTON, D.C.
****ADMITTED IN ILLINOIS ONLY
†ALSO ADMITTED IN MASSACHUSETTS

March 24, 2008

## BY E-MAIL AND U.S. MAIL

Assistant United States Attorney Deborah E. Landis
Special Assistant United States Attorney John Sullivan
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Re:   United States v. Coplan, et al., 07 Cr. 453 (S-1) (SHS)

Dear Counsel:

We write this letter on behalf of Robert Coplan, Martin Nissenbaum, Richard Shapiro, Brian Vaughn and Charles Bolton (collectively referred to as "the defendants"). While we recognize that you are still in the process of providing document discovery, we write to set forth our detailed requests in writing. In order to permit the defendants to file appropriate motions by the Court's May 5 deadline and adequately prepare for trial, we ask that you furnish the following discovery material pursuant to Rule 16 of the Federal Rules of Criminal Procedure; Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, including Giglio v. United States, 405 U.S. 150 (1972), United States v. Agurs, 427 U.S. 97 (1976), United States v. Bagley, 473 U.S. 667 (1985), Kyles v. Whitley, 514 U.S. 419 (1995), United States v. Gil, 297 F.3d 93 (2d Cir. 2002), and United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007); the Jencks Act; the Fifth and Sixth Amendments to the United States Constitution; and applicable rules of prosecutorial ethics and Justice Department regulations. If any of the requested materials are in the voluminous discovery that the government has produced or is in the process of producing, please identify where they can be found. We also request that you notify us on or before April 14,

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 2

2008, specifically of any material that you do not intend to make available, so that our May 5 motions can address any disagreements and permit the Court to rule on them.

**Discovery Requests**

    1.  In addition to the proffer session notes previously produced, any written or recorded statement, confession, or admission or the substance of any oral statements relating, directly or indirectly, to the charges in this case made by any of the defendants to investigating officers or to third parties. This request includes, without limitation:

        a.  Any relevant written or recorded statements made by any of the defendants, or copies thereof, within the possession, custody or control of any federal, state, county or municipal government agent or attorney (hereinafter "government agent"), the existence of which is known, or by the exercise of due diligence may become known to a government agent;

        b.  any statement or admission by any of the defendants which may have been incorporated in any report, memorandum, transcript, or other document or recording prepared by a government agent, or by any person working in conjunction with such agents;

        c.  that portion of any written record containing the substance of any relevant oral statement made by any of the defendants whether before or after arrest in response to interrogation by any person then known by that defendant to be a government agent; and

        d.  the substance of any other relevant oral statement made by any of the defendants whether before or after arrest in response to interrogation by any person then known by that defendant to be a government agent.

    2.  Any written or recorded statement, or the substance of any oral statement, made by anyone, including any co-defendant, that inculpates any of the other defendants, the use at trial of which would raise issues under Crawford v. Washington, 541 U.S. 36 (2004), or Bruton v. United States, 391 U.S. 123 (1968). [1] This request includes, but is not limited to, any testimony or non-public correspondence provided by any co-defendant to the Internal Revenue Service ("IRS") during the course of its investigation of the events that form the basis of the indictment in this case. In addition, please identify specifically the testimonial statements of any

---

[1] On July 2, 2007, you produced to counsel for each of the Ernst & Young LLP defendants documents containing statements made by their client, and only their client, during proffer sessions with the Government. We request that you produce to counsel for each defendant documents containing statements made by the other defendants during proffer sessions with the Government, if applicable.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 3

of the defendants you intend to utilize in your case in chief so that we can timely move for any relief to which the defendants may be entitled pursuant to, among other things, Rule 8 of the Federal Rules of Criminal Procedure.

   3. A copy of any prior criminal record of any of the defendants, if the government believes such to exist. Fed. R. Crim. P. 16(a)(1)(D). We note that in your June 22, 2007 letter, you said that to your knowledge, none of the defendants had a prior criminal record. Please confirm that your understanding remains the same, specifically with respect to Charles Bolton.

   4. All books, papers, documents, photographs, videotape recordings, audiotape recordings, microfilm, microfiche, computer data storage systems or tangible objects, or copies or portions thereof (hereinafter referred to in this letter as "documents"), that were obtained by or obtained from or belong to any of the defendants. This request includes any documents obtained from or which were the property of any employee or agent of, or professional consultant to any of the defendants, in either his personal or business capacity. Fed. R. Crim. P. 16(a)(1)(E)(iii). This request includes, but is not limited to, documents previously produced in response to grand jury subpoenas.

   5. All documents, or copies or portions thereof, which are within the possession, custody or control of the government, which are material to the preparation of the defense. Fed. R. Crim. P. 16(a)(1)(E)(i). This request includes, but is not limited to, all documents produced to the government, whether or not pursuant to a grand jury subpoena, by the entities and individuals referenced in Exhibit A, which is attached hereto.[2] The request also includes, but is not limited to, all documents the government believes support the allegations in the indictment and all documents concerning the transactions referenced in the indictment. Finally, the request includes any additions to the set of "Core" documents you produced to us shortly after the defendants were indicted.

   6. All documents, or copies or portions thereof, which are within the possession, custody or control of the government that the government intends to use at trial in its case in chief. Fed. R. Crim. P. 16(a)(1)(E)(ii). Given the volume of documents in this case, we request that you specifically identify from among the documents produced pursuant to Rule 16 the documents in this category, both to enable counsel to prepare for trial effectively and to

---

[2] We note that the government has already produced voluminous discovery that falls within the parameters of this request. Before that production commenced you indicated that you had received documents from various entities implicated in this and other investigations. Exhibit A contains a list of those individuals and entities and any additional entities we believe have produced documents to the government. As stated above, we request that the government produce all documents it has received from those entities. In Exhibit A we also identify several deficiencies that currently exist in the government's production, which we request you remedy.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 4

afford us an opportunity to file appropriate motions. See, e.g., United States v. Turkish, 458 F. Supp. 874, 882 (S.D.N.Y. 1978), aff'd, 623 F.2d 769 (2d Cir. 1980).

            Moreover, given the volume of materials being produced on DVDs or on computer hard drives, please specifically identify any documents that were printed out by the government during the course of its investigation of this case, or presented to any grand jury hearing evidence in this case, but which are being produced to the defendants in electronic (rather than paper) form.

       7.     Any and all photographs and audiotape and videotape recordings that were made in conjunction with this case, or which relate in any manner to this case, that are in the possession, custody or control of the government. Fed. R. Crim. P. 16(a)(1)(E).

       8.     All results or reports of physical or mental examinations, scientific tests or experiments, or copies thereof, and all documents referring or relating to such reports, that were conducted in connection with any investigation of the charges contained in the indictment, including, but not limited to, forensic analyses of any documents, physical, mental or polygraph examinations, handwriting analyses, finger-print comparisons and electronic testing. Fed. R. Crim. P. 16(a)(1)(F). We note that in your June 22, 2007 letter, you said that you had no such reports in your possession. Please confirm that this remains the case.

       9.     With respect to evidence that the government intends to use at trial under Rules 702, 703 or 705 of the Federal Rules of Evidence, a list of the names of the persons the government intends to call as expert witnesses, a written summary describing the witnesses' opinions, the bases and reasons for those opinions and the witnesses' qualifications. Fed. R. Crim. P. 16(a)(1)(G).

      10.     As a predicate to motions pursuant to Rule 12 of the Federal Rules of Criminal Procedure:

          a.     Please confirm that no evidence or other information in the government's possession, custody, or control was obtained by a search and seizure. If any evidence was obtained by search and seizure, please provide a description of such evidence and if said search was warrantless, set forth the nature of the information upon which the search was based and the date said information was received by the government;

          b.     Please confirm that no evidence or other information in the government's possession, custody, or control was obtained through the use of a beeper, other tracking device, mail cover or electronic or audio surveillance of

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 5

any kind. If any evidence was obtained through these investigative techniques, please:

    i. set forth the date, time, place and a description of each interception;

    ii. provide any and all documents related to or reflecting any information derived therefrom;

    iii. inform us as to whether any recording or other result of electronic or audio surveillance has been scientifically tested, altered or treated in any way and if so, please:

        a. set forth the time, date, place and a description of each test or alteration;

        b. identify the examiner, and

        c. provide a copy of any reports and all documents relating or referring to such reports.

    c.    Please inform us as to whether any reports of communications or notes of any interview requested herein have been or are intended to be discarded or destroyed. In the event the government obtained any information through search and seizure or electronic or audio surveillance please also inform us as to whether any such tapes or fruits of any such interception or search have been destroyed and identify such materials in sufficient detail to permit us to make a timely request to the Court for appropriate relief.

    d.    Please inform us whether any persons were present during grand jury proceedings other than the grand jurors, the witness under examination, the court reporter and Assistant United States Attorneys.

    e.    Please inform us whether any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury, were disclosed or released to any person other than the grand jurors, court reporters and Assistant United States Attorneys.

If any evidence was obtained through any means set forth in subparagraphs (a) and (b), we also request all relevant applications or other supporting documents for court orders, all such court orders, all reports by the government to the court, and all tapes, logs, transcripts and line sheets resulting from such interception or surveillance.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 6

      11.     Pursuant to Rule 12(b)(4)(B) of the Federal Rules of Criminal Procedure and Rule 1006 of the Federal Rules of Evidence, please inform us whether the government will seek to offer any chart, summary or calculation in evidence and if so, please make available for inspection and copying any such chart, summary or calculation, as well as all writings, recordings, photographs, videotape recordings or other information on which such charts, summaries or calculations are based.

      12.     Pursuant to the provisions of Rule 104 of the Federal Rules of Evidence, Rule 12(b)(4)(B) of the Federal Rules of Criminal Procedure and the defendants' right to effective representation by counsel and a fair trial, we request that the government disclose whether it intends to offer in its case in chief as a statement by the defendants any of the following and if so, that the government identify the applicable statements:

      a.     Any statement made by any of the defendants in either an individual or a representative capacity, Fed. R. Evid. 801(d)(2)(A);

      b.     Any written or recorded statement or the substance of any oral statement as to which any of the defendants manifested his adoption or belief in its truth, Fed. R. Evid. 801(d)(2)(B);

      c.     Any written or recorded statement or the substance of any oral statement made by another individual or entity which was purportedly authorized by any of the defendants, or is deemed to be an admission by any of them, Fed. R. Evid. 801(d)(2)(C);

      d.     Any statement by an agent or servant of any of the defendants concerning a matter within the scope of his agency or employment made during the existence of such a relationship, Fed. R. Evid. 801(d)(2)(D); or

      e.     Any written or recorded statement, or the substance of any oral statement, by a co-conspirator made during the course of or in furtherance of the conspiracy alleged in the indictment, Fed. R. Evid. 801(d)(2)(E).

      13.     Pursuant to the Fifth and Sixth Amendments to the United States Constitution, Rule 16(a)(1)(D) of the Federal Rules of Criminal Procedure and Rules 403 and 404(b) of the Federal Rules of Evidence, we request that, as soon as possible, the government disclose all evidence of other similar crimes, wrongs or acts, allegedly committed by the defendants, upon which the government intends to rely. If the government intends to offer any such evidence, please set forth the date, place and nature of each "similar" act so that we can properly ask the Court for a determination concerning its admissibility pursuant to Fed. R. Evid. 403 and 404.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 7

14.    Further to Mr. Tucker's February 29, 2008 letter, we request that the government (1) disclose the impanelment and adjournment dates of each grand jury that heard evidence concerning this case, (2) disclose all information relating to the attendance of individual jurors for each day on which the grand jury convened, including the day the indictment was returned, (3) confirm that the group of jurors that voted for indictment (both the original and the superseder) were present to hear the evidence the government presented in support of indictment, (4) disclose the legal instructions provided to the grand jury before the indictment was returned and (5) provide us with a copy of the signed true bill.

15.    All defendants requested that the Department of Justice's Tax Division review, prior to indictment, the charges proposed by the Office of the United States Attorney for the Southern District of New York. We request that the government inform us whether any current member of the prosecution team was present at the final Tax Division meeting wherein the decision was made to allow the United States Attorney's Office to proceed with the indictment of the defendants, or participated in any internal Tax Division discussions leading up to or substituting for such a meeting.

16.    We request that the government provide a list of the names and addresses of all witnesses that the government intends to call in its case in chief. See United States v. Savin, 2001 WL 243533 (S.D.N.Y. 2001); United States v. Rueb, 2001 WL 96177 (S.D.N.Y. 2001). We also request that the government provide marked copies of the exhibits it intends to offer in its case in chief. With respect to the timing of the provision of these materials, we suggest that the parties follow the schedule as ordered in the KPMG case. On April 7, 2006, the Court directed the government to provide a witness list and marked exhibits to the defendants approximately two months before trial. The Court directed the defendants to provide a list of defense witnesses and marked exhibits to the government approximately one month before trial. We are prepared to enter into a stipulation reflecting this schedule. Please inform us whether you would agree and stipulate to such a schedule.

17.    Given the scope of this case, we request production of all materials required to be produced under 18 U.S.C. § 3500 no later than two months before the trial date. This request follows the schedule established by the Court in the KPMG matter in its July 19, 2006 order. We are prepared to enter into a stipulation reflecting this schedule. Please inform us whether you would agree and stipulate to such a schedule.

18.    Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, including United States v. Agurs, 427 U.S. 97 (1976), Giglio v. United States, 405 U.S. 150 (1972), and United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007), and pursuant to the Department of Justice's Policy Regarding Disclosure of Exculpatory and Impeachment Information, set forth in section 9-5.001 of the U.S. Attorney's Manual, we request (i) immediate disclosure of all exculpatory material in the government's possession, custody, or control or

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 8

otherwise known to the government; and (ii) disclosure at least 90 days prior to the trial date of all impeachment material in the government's possession, custody or control or otherwise known to the government.

Exculpatory and impeachment "material" includes not only documents or other tangible items (including written statements or statements that have been reduced to writing by the government), but also the substance of any statements made to the government that have not been reduced to writing. In other words, if a witness's statements to the government contain exculpatory or impeachment material, Brady and its progeny require the government to disclose the substance of those statements, whether or not they have been reduced to writing. See United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007).

Although explained in detail below, this request generally seeks copies of all materials known to the government, or which through due diligence may be learned from the investigating agents or witnesses in this case or persons interviewed in connection with the investigation, that are favorable to, or tend to mitigate any punishment of, the defendants or which may lead to such materials. Please include the names, addresses and telephone numbers of all persons who know or may know of any such favorable material or who may lead to persons or material which may be favorable to the defendants. Also include all written or recorded statements or the substance of oral statements by any person which are in any way conceivably inconsistent with the testimony or expected testimony any witness will give at trial and any other evidence that otherwise reflects upon the credibility, competency, bias or motive of the government's witnesses.

### Detailed Requests for Exculpatory Material

a.    All information indicating that any client of Ernst & Young LLP ("E&Y") who participated in any "tax shelter" identified in the indictment (i.e., "CDS," "COBRA," "PICO," and the "Add-On") has, at any time, asserted that he, she or it had a profit motive in entering into any such transaction, including statements made to the IRS (or any division thereof, including the Examination Division, the Office of Appeals, the Office of Tax Shelter Analysis, or the Office of Chief Counsel) or to any court (including the United States Tax Court, any United States District Court, or the Court of Federal Claims) or any arbitration panel.

b.    All information indicating that any law firm referred to in the indictment (including those designated as "A," "B," "C" and "D") stated or believed that any opinion issued by such firm was legally correct, and/or that the factual representations contained therein were true.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 9

       c.     All information indicating that any client of E&Y who participated in any "tax shelter" identified in the indictment did, in fact, have the potential to make a profit in excess of the costs of the transaction in which he, she or it participated.

       d.     All information indicating that any client of E&Y who participated in any "tax shelter" identified in the indictment has been allowed all or any part of the losses, deductions, credits or benefits associated with such transaction by the IRS, or any court.

       e.     All information indicating that any client of E&Y who participated in the CDS transaction has, at any time, stated that he, she or it in fact regarded "the various investments of the partnership . . . as comprising one coherent business philosophy" and/or that "diversity of investments was an important element" in that person's decision to invest in a CDS partnership.

       f.     Any analysis performed, at any time, showing that it was possible for the CDS partnerships, or any of them, to profit from short term market movements.

       g.     Any information showing that any client who participated in a CDS partnership was, in fact, personally liable for the debts of the partnership.

       h.     All information indicating that E&Y clients who participated in COBRA transactions did, in fact, have the possibility of earning a profit on the transactions, and the amount of such potential profit.

       i.     All information indicating the position that any E&Y client who participated in any COBRA transaction did, as a matter of law, have tax basis in the partnership equal to the costs of the long option.

       j.     All information indicating that additional cash contributed to a COBRA partnership by any client of E&Y who participated in that COBRA partnership was, in fact, used to engage in trading activity.

       k.     All information indicating that any client of E&Y who participated in a COBRA transaction has, at any time, stated that he, she or it engaged in the transaction or contributed a partnership interest to an S corporation for substantial non-tax business reasons.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 10

      l.     All information indicating that E&Y's decision to stop marketing COBRA was for business reasons, and not because E&Y formed a conclusion that COBRA did not have meaningful business purpose.

      m.    All information indicating that any person who was managing activity in the CDS trading partnerships suggested consolidating option transactions in a new LLC.

      n.    All information indicating that the suggestion to consolidate the CDS trading partnerships was presented to the E&Y defendants by Charles Bolton.

      o.    All information indicating that the E&Y clients who participated in the Add-On transaction had the possibility of making a profit in excess of the costs of the transaction, and the amount of such potential profit.

      p.    All information indicating that any E&Y client who participated in a PICO transaction has, at any time, stated that he, she or it intended to use the S corporation involved in the transaction as his, her or its principal (or significant) investment vehicle, and/or for asset protections and/or for estate planning purposes, including information indicating that such person did in fact use the S corporation in any such manner.

      q.    All information indicating that any E&Y client who participated in a PICO transaction continued to conduct trading activities in his, her or its PICO entity after redeeming out Company Z shareholders.

      r.    All information indicating that the IRS was aware of the existence and nature of the CDS, COBRA, Add-On and PICO transactions, or any of them, prior to receiving submissions related to E&Y's "tax shelter" transactions in 2002 and thereafter.

      s.    All information indicating that the IRS did not rely on, and did not intend to rely on, any statement related to business purpose, profit potential or investment motive made by any E&Y client in any submission made to the IRS as part of the disclosure initiative.

      t.    All information indicating that Charles Bolton was not involved in the E&Y promoter penalty examination.

      u.    All information indicating that the E&Y defendants were not involved with the Bolton Capital Planning promoter penalty examination.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 11

      v.      All information indicating that E&Y clients who were represented by professionals other than E&Y or who represented themselves, submitted information in response to Information Document Requests ("IDRs") issued by the IRS in taxpayer audits asserting that they had a substantial non-tax business purpose and/or profit motive for engaging in any of the "tax shelter" transactions.

      w.      All information indicating that the E&Y defendants and Charles Bolton were not aware of or did not have any role in procuring David Smith's testimony to the IRS on December 9, 2003.

      x.      All information indicating that the E&Y defendants were not aware of or did not have any role in procuring Charles Bolton's testimony to the IRS on April 12 and 13, 2005.

      y.      All information indicating that Charles Bolton was not aware of or did not have any role in procuring Brian Vaughn's testimony to the IRS on June 12, 2002.

      z.      All information indicating that Charles Bolton was not aware of or did not have any role in procuring Robert Coplan's testimony on June 20, 2002.

      aa.      All information indicating that Proskauer Rose LLP ("Proskauer") did not rely upon the document referred to in the indictment as a Certificate of Facts in drafting its Opinion Letter for the "Tradehill transaction".

      bb.      All information indicating that Proskauer drafted the Certificate of Facts for the Tradehill transaction.

      cc.      All information indicating that the E&Y partners who invested in the Tradehill transaction had a reasonable possibility of earning a profit, and the amount of such potential profit.

      dd.      All information indicating that the E&Y partners that invested in the Tradehill transaction believed that they had a reasonable possibility of earning a profit, and the amount of such potential profit.

      ee.      All information indicating that the E&Y partners who invested in the Tradehill transaction discussed with either Proskauer or Diversified Group Inc. ("Diversified") the objective of utilizing the Euro as the currency involved in the transaction in order to hedge their exposure to the Euro through their ownership of Cap Gemini stock.

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 12

        ff.      All information indicating that no E&Y partner who invested in the Tradehill transaction was the source of the representation in IDR #2 that there was no expectation of a referral of future business to Proskauer.

        gg.     All information that the choice of Proskauer to draft opinion letters on behalf of certain E&Y clients in connection with the PICO transaction was not related to Proskauer's involvement in the Tradehill transaction.

        hh.     The names and addresses of all persons whom the prosecution, its agents and its representatives, believe to have favorable information with reference to the charges contained in the indictment, and the substance of that information.

        ii.      All documents or any other information reflecting or relating to any debate, discussion or disagreement within the IRS or any other government agency concerning the legitimacy, legality or permissibility of any transaction mentioned in the indictment.

**Detailed Requests for Impeachment Material**

        jj.      Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including, but not limited to, relevant "rap sheets" of each witness the government intends to call at trial;

        kk.     Any and all records and information revealing misconduct, criminal acts or bad acts of any witness the government intends to call at trial;

        ll.      Any and all considerations or promises of consideration given during the course of the investigation or prosecution of this matter by any law enforcement officials, including prosecutors, agents, police or informers, to or on behalf of any witness the government has interviewed or intends to call at trial, or any such consideration or promises requested by such witness, or any such consideration expected or hoped for by any such witness at any future time. Such "consideration" refers to anything that arguably could be of value or use to a witness or a witness' employer, including, but not limited to: (i) formal or informal, direct or indirect leniency, favorable treatment or recommendations, or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative or other matter involving the state or federal government, or any other matter involving the state or federal government, any other authority or other parties; (ii) civil, criminal or tax immunity grants to a witness; (iii) reductions in or agreements not to assess any

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 13

tax liabilities, interest or penalties; (iv) payments of money, rewards or fees, witness fees and special witness fees; (v) provisions of food, clothing, transportation, legal services or other benefits; (vi) letters to anyone informing the recipient of a witness' cooperation; (vii) recommendations concerning federal aid or benefits; (viii) promises to take affirmative action to help the status of a witness in a profession, business or employment, or promises not to jeopardize such status; (ix) aid in efforts in securing or maintaining the business or employment of a witness; and (x) anything else that arguably could reveal an interest, motive or bias in a witness in favor of the prosecution or against the defendant, or act as an inducement to testify or to color the witness' testimony;

mm.    Any and all statements—formal and informal, oral or written—by the prosecution, its agents and representatives to any person (including counsel for such persons) whom the government has interviewed or intends to call as a witness at trial pertaining in any way to the possibility, likelihood, course or outcome of any government action—state or federal, civil or criminal—or immigration matters against the witness, or anyone related by blood or marriage to the witness;

nn.    Any and all threats, express or implied, direct or indirect, or other coercion directed against any witness whom the government has interviewed or intends to call at trial, or anyone related by blood or marriage to the witness, with the purpose or effect of inducing testimony favorable to the government or suppressing testimony favorable to any defendant; criminal prosecutions, investigations or potential prosecutions pending, threatened or which could be brought against any such witness, or anyone related by blood or marriage to the witness; any probationary, parole or deferred prosecution status of any such witness, or anyone related by blood or marriage to the witness; and any civil, Tax Court, Court of Claims, administrative or other pending or potential legal disputes or transactions involving any such witness, or anyone related by blood or marriage to the witness, and the state or federal government, or over which the state or federal government has real, apparent or perceived influence;

oo.    A list of any and all requests or demands made to the government by any witness whom the government intends to call at trial that arguably could be developed on cross-examination to demonstrate any hope or expectation on the part of the witness for favorable governmental action on behalf of the witness (regardless of whether or not the government has agreed to provide any favorable action);

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 14

pp.    All documents and other evidence regarding drug and alcohol
usage or dependency by any individual the government intends to use as a witness
at trial, including, but not limited to, records relating to treatment of such
individual in any federal, state, territorial, city or military drug or detoxification
program;

qq.    All documents and other evidence regarding any physical or
mental disease, disability or disorder affecting any individual the government
intends to use as a witness at trial, or affecting any family member of any such
witness, including but not limited to records of hospitalization or other treatments
for a physical or mental disease, disability or disorder;

rr.    Any material not otherwise listed that reflects or evidences the
motivation of any witness to cooperate with the government or reflects or
evidences the competency or credibility of the government's witness or the
witness' bias or hostility against any of the defendants;

ss.    A list of all other judicial proceedings involving a criminal matter
in which any person who is a potential prosecution witness in this action
participated as a witness, was identified as an unindicted co-conspirator or an
aider and abettor or was charged as a defendant;

tt.    Any statements or documents, including, but not limited to, grand
jury testimony and federal, state, and local tax returns made or executed by any
potential prosecution witness at the trial in this action which the prosecution
knows, or through reasonable diligence should have reason to know are false;

uu.    The existence and identification of each occasion on which any
witness, including any witness who is or was an informer, accomplice, co-
conspirator or expert, has testified in any judicial or administrative proceeding,
before the grand jury, any court, or other tribunal or body, or otherwise has given
an official narration regarding any of the defendants, the investigation or the facts
of this case;

vv.    Any written or oral statements, whether or not reduced to writing,
made by any potential prosecution witness, which in any way contradicts or is
inconsistent with or different from other oral or written statements he or she has
made or his or her anticipated trial testimony;

ww.    Any written or oral statements, whether or not reduced to writing,
made to the prosecution, its agents or representatives by any individual, whether

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 15

or not that individual is or may be a witness, which in any way contradict, or are inconsistent with or different from any statements made by a potential prosecution witness or the anticipated trial testimony of any potential prosecution witness, and the name and address of the individual making any such statement;

xx.    Any requests prepared by the prosecution for permission to grant immunity or leniency to any witness, whether or not such request was granted;

yy.    Any statements read or given by the government to the Departments of Pretrial Services or Probation in connection with the prosecution or conviction of any prosecution witness or potential prosecution witness;

zz.    Copies of all letters or memoranda written to the court in connection with the sentencing of any potential prosecution witness;

aaa.    Any and all other records and/or information that arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the prosecutor's evidence;

bbb.    The same records and information requested in items jj through aaa with respect to each non-witness declarant whose statements may be offered in evidence;

ccc.    Copies of any and all records of law enforcement or other governmental agencies reflecting intra departmental disciplinary action taken against any law enforcement or agency official who will testify in this proceeding, including all such records from any governmental agency for which the witness previously worked; and

ddd.    Copies of any and all records of any law enforcement or other governmental agency reflecting any commendations, awards or recognition of any kind received by, or requests for any commendations, awards or recognition of any kind made by, any government agent or law enforcement officer for any work, action or conduct undertaken in connection with the investigation and prosecution of this case.

Each of these requests calls for all responsive items within the possession, custody or control of the government, or items the government knows to exist or could know to exist by the exercise of reasonable due diligence. As used in this letter, the terms "government," "prosecutor(s)," "you" and "your" refer not only to the United States Attorney's Office for the Southern District of New York, but also to all federal, state or local agencies that have provided

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 16

assistance to, or are allied with, the U.S. Attorney's Office, including, but not limited to, the IRS and the Department of Justice Tax Division.

      Each request is of a continuing nature and calls for supplementation as soon as the government discovers additional responsive evidence, information or material.

      We also request that the government preserve and maintain all relevant notes, reports and recordings prepared by or for government agents or prosecutors, as well as any document, paper, tangible object, tape recording or other potential item of evidence which is not or may hereafter come within the government's possession, the production of which is requested in this letter.

Very truly yours,

John J. Tigue, Jr.

Paula M. Junghans

Brian D. Linder

Peter H. Barrett

Deborah E. Landis, Esq.
John Sullivan Esq.
March 24, 2008
Page 17

Howard Heiss /KWM
Howard Heiss

Paul Bergman /KWM
Paul B. Bergman

Encl.

# EXHIBIT A

EXHIBIT A

1. Ernst & Young LLP

2. Jenkens & Gilchrist ("J&G")

   - Please produce an index for the J&G documents, prepared by either the government or J&G, as you informed us you would in your October 16, 2007 letter. Please include in that index information relating to the entire universe of J&G documents in your possession and not just the limited universe you have produced thus far. We reserve the right to request the production of further documents from the J&G database after receipt and review of the index.

3. Bolton Capital Planning (includes any affiliated entity)

4. Arnold & Porter LLP

5. Sidley Austin LLP (includes any documents from the former Brown & Wood LLP)

6. Proskauer Rose LLP

7. Deutsche Bank AG ("DB")

   - In addition to the more than 10 million pages of documents you have produced to us in electronic format, please also produce the following:

       - in hard copy, any documents or memoranda produced to the government by DB that relate to any internal or other investigation conducted by Deutsche Bank in connection with this matter; and
       - an index for the electronic documents, prepared by either the government or DB.
       - In addition, please specify which documents in the DB electronic database you believe are material to the preparation of the defense and any documents from the DB database that the government intends to use in its case in chief at trial.

8. Quadra Capital Management LLC

9. UBS

10. Refco, Inc. ("Refco")

- In addition to documents obtained from Refco, please also produce any documents you have obtained or may obtain from any entity that acted as a swap or digital option counterparty or a lending institution in any of the CDS and/or CDS Add-On transactions including, but not limited to, any entity affiliated with Credit Suisse Group or Citigroup, Inc.

11. Bricolage Capital LLC (or any affiliated entities)

12. Jason Chai

13. Andrew Krieger

14. Deerhurst Management Company, Inc. (or any affiliated entities) ("Deerhurst")

- In addition to documents obtained from Deerhurst, please also produce any documents you have obtained or may obtain from any entity that acted as an investment manager, trader or clearing broker for any of the CDS partnerships.

15. Lehman Brothers, Inc. ("Lehman")

- Please provide us with a disk containing electronic versions of the paper copies produced by Lehman as you said you would in your December 4, 2007 letter.

16. Sheef & Stone LLP

17. Internal Revenue Service ("IRS")

- With respect to the IRS audit documents please provide a privilege log or other document explaining what documents are missing from the production and why.

18. Bear Stearns & Co., Inc.

19. Locke, Liddell & Sapp PLLC ("Locke Liddell")

- We believe that Locke Liddell had to have produced documents to you in addition to those it originally produced to the IRS in connection with the promoter penalty audit. Thus, we reiterate our request that you produce any and all documents from Locke Liddell in your possession.

2

20. John Cortese

21. William Esrey

22. Ronald LeMay

23. LaRocque Trading Partners

24. Cornerstone Group

25. Robert Cooper

26. Private Capital Management Company

27. Belle Six

- Please provide us with clean copies of the documents you produced on July 6, 2007; certain of the ones you provided to us have Post-It notes copied onto them.

28. Fred Goldman

29. Mark Cuban

30. Todd Wagner

31. Marvin Herb

32. The Munro Family

33. Documents you have obtained from any entity not already identified in this Exhibit A that conducted a substantive review of any of the transactions identified in the indictment, including, but not limited to, any documents obtained from King & Spalding LLP relating to its review of the CDS transaction/s entered into by any Sprint executives.

# Exhibit C

LAW OFFICES

## CLAYMAN & ROSENBERG

305 MADISON AVENUE

NEW YORK, NEW YORK 10165

(212) 922-1080

FAX: (212) 949-8255

CHARLES E. CLAYMAN
SETH L. ROSENBERG
BRIAN D. LINDER
AMY E. MILLARD
PAUL S. HUGEL
ISABELLE A. KIRSHNER
THOMAS C. ROTKO

ELLEN YAROSHEFSKY
COUNSEL

April 9, 2008

<u>VIA FEDERAL EXPRESS</u>

Deborah Landis, Esq.
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, N.Y. 10007

Re: <u>United States v. Robert Coplan, et al.</u>
S1 07 Crim. 453 (SHS)

Dear Ms. Landis:

Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure and Local Criminal Rule 16.1, defendants Robert Coplan, Martin Nissenbaum, Richard Shapiro, and Brian Vaughn ("E&Y defendants"), and defendant Charles Bolton, request that the government provide the following particulars to the allegations in the Superseding Indictment:[1]

1. The Superseding Indictment contains references to a number of entities and individuals who are not identified by name. Please confirm the following:

> Law Firm A - Locke, Liddell & Sapp (¶ 25)

> Law Firm B - Brown & Wood (partner - R.J.Ruble) (¶ 27)

> Law Firm C - Arnold & Porter (¶ 54)

---

[1]In light of the volume of documents produced by the Government in this case, to the extent the response to any of the requests to identify information (as opposed to confirm information) is reflected in documents, please identify the relevant documents.

Law Firm D - Proskauer, Rose (¶ 54)

Company Z - Bricolage (¶ 56)

L. Trading Group  - LaRocque Trading (Count Two)

C. Partnership - Cornerstone Partners LP (Count Three)

T.M. - Thomas Munro (Count Four)

K.M. - Kathryn Munro (Count Four)

<u>Count One</u>

2. ¶ 5 - Identify the "banks, financial institutions, investment advisory firms, law firms" that each of the defendants worked  with to "design, market, and implement" tax shelters.

3. ¶¶ 7, 8, 9, and 10 - Identify the dates, times, and places of "sales presentations" made by each of the defendants, and the client(s) to whom they were made.

4. ¶¶ 13, 14, 15, 16, 18, and 31 - Identify the individuals and/or entities who the government will claim were co-conspirators of the defendants, as alleged in the foregoing paragraphs of the indictment.

5. State whether the government will claim that each of the above identified co-conspirators were also, as claimed in the Superseding Indictment, a co-conspirator in the alleged fraudulent CDS shelters (¶¶ 26 and 26(d)), the alleged fraudulent COBRA shelters (¶¶ 29, 30,(e), 31, and 33), the alleged fraudulent CDS Add-On shelter (¶ 53), and the alleged fraudulent PICO shelter (¶59).  If not, identify which of the co-conspirators were involved in each of the alleged fraudulent tax shelters.

6. ¶¶ 13, 14 - Indicate whether the government will claim that the phrase "tax shelters" includes any tax shelter other than those identified in the Superseding Indictment, and if so, identify the tax shelter.

7. ¶ 14 - State whether the government will claim that there were other "costs" to the client than those enumerated and if so, state what such additional costs were.

8. ¶ 16 - If not already contained in the government's production of "core documents," identify the "transactional documents and other materials containing false and fraudulent descriptions. . ." that the government claims were created by the defendants or that they assisted in creating.

9. ¶ 16- Confirm that the PFC professional who received an email from Robert Coplan in 2001 is

Page -2-

John Shockley.

10. ¶ 17 - Identify the acts of each E&Y defendant which the government will claim helped clients to obtain false and fraudulent opinion letters.

11. ¶ 23(a) - Identify the statute, regulation, or common law standard which required the formation documents of the CDS partnerships to disclose that tax benefits were sought.

12. ¶ 23(b) - Identify the statute, regulation or common law standard that defines "trading partnership."

13. ¶ 23 (c) - Confirm that the identity of the "co-conspirator employed by Bolton companies" is Greg Firtik.

14. ¶ 23 (c) - Confirm that "another co-conspirator" who sent an email in February 2000 is Belle Six.

15. ¶ 23(c) - Identify which of the CDS limited partnerships engaged in "high volume short term trades."

16. ¶ 23 (c) - Identify which of the CDS limited partnerships engaged in trades that were not designed to preserve the client's capital.

17. ¶ 23(e) - Identify the tax code provision which required the client to have $20,000,000.00 "at risk."

18. ¶ 23(e) - Identify the statute, regulation, or common law standard which defines the term "loan," as contrasted with "purported loan" or "so-called loan."

19. ¶ 23(f) - Identify which prospective CDS clients were told by "E&Y" that the swaps would last for just over one year.

20. ¶ 23(f) - Identify who at "E&Y" told clients that the swaps would last for just over one year.

21. ¶ 23(f) - Confirm that the identity of the co-conspirator who received an email from Brian Vaughn in June 2001 is James Hutchison.

22. ¶ 24 - Identify the "additional documents" that purported to provide non-tax business motivations for steps that were actually tax-motivated.

23. ¶25 - Identify who directed CDS clients to sign the document which related to the diversity of the investments.

24. ¶26(c) - Identify who assured the clients that they would not be liable for any amount over their initial cash contribution and describe the assurances that were provided.

25. ¶29 - Particularize what is meant by the allegation that the options had "some chance" of earning the clients a profit after the fees were paid.

26. ¶ 29 - Identify the services "offered generally" through E&Y's investment advisory services.

27. ¶ 34 - Confirm that the individual within E&Y's management who decided that E&Y would no longer market COBRA to its clients is Michael Kelley.

28. ¶34 - Identify the subject matter experts who expressed the view that COBRA would not survive scrutiny under applicable law, and identify to whom these views were expressed.

29. ¶34 - Identify the "others within E&Y" who objected to COBRA as lacking meaningful business purpose.

30. ¶ 39 - Confirm that the individual who described a "similar idea" to Brian Vaughn in or around May 2000 is Ed Ahrens.

31. ¶40 - Identify who, among the defendants, created a "false cover story" relating to CDS Add-On.

32. ¶40 - Identify who claimed that the "false cover story" had been presented by Charles Bolton, and to whom the claim was made.

33. ¶ 44 - Confirm that the individual "outside of the Viper/SISG group" who created the PowerPoint presentation is Robert Haynie.

34. ¶ 46 - Identify the "E&Y defendants" who offered CDS Add-On to existing entities and the "E&Y personnel" who met with representatives of those entities.

35. ¶46 - Identify the "representatives" and their "entities" who met with E&Y personnel.

36. ¶ 48 - Confirm that Belle Six "crafted a letter for Add-On clients." Identify any other "conspirators" who crafted the letter.

37. ¶49 - Identify the steps taken to conceal from the IRS that the "loans" were not real loans.

38. ¶50 - Confirm that Sandy Maggio of Refco is a "representative of the financial institution" who "assisted in concealing that the loans were not genuine."

39. ¶ 51 - Identify who arranged for CDS Add-On clients to sign representation letters prepared

by Law Firm A.

40. ¶ 57 - Identify who developed a "false cover story" to explain to the IRS.

41.  ¶ 58(f) - Identify the "conspirators" who arranged for the balance of E&Y's fee to be paid by the client, and the "conspirators" who "created a phony contract."

42. ¶ 61 - Identify the false and fraudulent statements and omissions that the government will claim were contained in the template disclosure letters drafted by the defendants.

43.  ¶ 62(a), (b), (d) - Identify which portions of the testimony the government contends are "false" and which portions of the testimony the government contends are "misleading."

44. ¶62 (c) - Identify the portion of the testimony provided by Martin Nissenbaum which was "misleading."

45. ¶ 62(c) - Identify whether or not the government contends that the testimony provided by Martin Nissenbaum was false.

46.  ¶ 64 - Identify "E&Y's individual tax shelter clients," and "the entities created by the conspirators," to which the IRS sent Information Document Requests.

47. ¶ 65 - Identify the tax shelter clients and financial advisors who gave false and misleading testimony to the IRS,  and identify the statements that were false and misleading.

48.  ¶ 71 - Identify the "other E&Y partners" with whom Martin Nissenbaum discussed the possibility of using a tax shelter.

49. ¶ 72 - Confirm that the "tax shelter promoter" was Diversified Group Incorporated ("Diversified"), and that the "attorneys from Law Firm D" are Ira Akselrad and Matthew Sabloff.

50. ¶ 74- Confirm that the "other two owners" of ADFX are Diversified and Alpha Consultants.

51. ¶77- Confirm that the "attorney at Law Firm D" who drafted a legal opinion is Ira Akselrad.

52.  ¶78 - Identify who Martin Nissenbaum allegedly assisted in preparing a "Certificate of Facts."

53. ¶81- Identify the "members of the group" who made arrangements for an attorney to represent them.

54. ¶ 81 - Confirm that the attorney who Martin Nissenbaum "assisted" in drafting responses to the IDRs is Abraham Gutwein.

55. ¶81- Specify the conduct by which Nissenbaum "assisted" the attorney in the preparation of responses to the IDRs.

56. ¶82 - Identify all "false and misleading statements" contained in the responses to IDR #2.

57. ¶82(1) - Particularize what is meant by the term "no reasonable possibility" of generating a profit.

58. ¶82- Identify which of the defendants referred PICO clients to Law Firm D for opinion letters.

59. ¶82 - Identify the PICO clients who were referred to Law Firm D for opinion letters.

60. ¶ 96(j) - Identify the false statements and omissions that the government contends were contained in the documents drafted in connection with the voluntary disclosure initiative.

61. ¶97(z) - Specify who approved the hiring of a trading firm without a significant track record.

62. ¶97 (ee), (ff) - Identify the dates, times, and places of the presentations in which Martin Nissenbaum participated, and identify the clients to whom these presentations were made.

63. ¶97 (hhh) - Identify the individual to whom Martin Nissenbaum allegedly provided false and misleading information.

64. ¶97 (hhh) - Particularize the "false and misleading information" which Martin Nissenbaum provided.

65. In paragraphs  8, 31, 32, 33(a), 33(b), 33(c), 34, 51, 58, 62(a), 62(b), 62 (c), 62(d), 65, 66, 67, 78, 79, 86, 87, 89, 96, 96(g), 97, 103, 105, 110, 113, 120, 122, 124, 127, 140, and 141, the indictment refers to  "among other things," "among other steps," "among others," "among the ways," and "other entities."   With respect to each of these paragraphs, please identify the additional items (e.g., things, reasons, statements, ways, etc.) to which the Grand Jury was referring.

66. With respect to each of the tax shelters as to which the government intends to offer proof, does the government allege that the tax shelter was fraudulent as designed and approved by Ernst & Young, and if so, in what respects?

Count Two

67. ¶ 102 - Identify who at E&Y requested that the managing member of L. Trading Group sign a representation letter drafted by Law Firm A.

68. ¶103 - Identify who at E&Y prepared the "amnesty letter" submitted by L. Trading Group to the IRS.

69. ¶104 - Identify the "representative" of L. Trading Group who appeared before the IRS on August 26, 2003.

70. ¶104 - Identify the "false, misleading, and evasive testimony" given by the representative of the L. Trading Group.

<u>Count Three</u>

71. ¶107 - Identify the "E&Y personnel" who met with representatives of C. Partnership in July 2000.

72. ¶110 - Identify who at "E&Y" prepared the letters signed by the C. Partnership partners.

73. ¶112 - Identify the representative of the C. Partnership who appeared before the IRS on December 15, 2003.

74. ¶112 - Identify the "false, misleading, and evasive testimony" given to the IRS during the proceeding on December 15, 2003.

<u>Count Four</u>

75. ¶117 - Identify the "representative of E&Y" who spoke with K.M. in or about July 2000.

76. ¶121 - Identify who at "E&Y" requested that T.M. and K.M. sign a representation letter that had been drafted by Law Firm A.

77. ¶124 - Identify who at "E&Y" prepared the "amnesty letter" signed by T.M. and K.M.

We would appreciate it if you inform us by April 23, 2008 if it is your intention to provide the information requested. Thank you for your attention to this matter.

Very truly yours,

Isabelle Kirshner

cc:    AUSA Lauren Goldberg (via Federal Express)

Page -7-

AUSA Marshall Camp (via Federal Express)
All Defense Counsel (via First Class Mail)

April 9, 2008

Mailing List for E&Y

Paula M. Junghans, Esq.
Andrew Goldfarb, Esq.
Zuckerman Spaeder LLP
1800 "M" Street, NW
Washington, DC 20036-5802

James Tucker, Esq.
Peter Barrett, Esq.
Butler, Snow, O'Mara, Stevens & Cannada
AmSouth Plaze
210 East Capitol Street
Suite 1700
Jackson, MS 39201

Howard Heiss, Esq.
O'Melveny & Myers
7 Times Square
New York, NY 10036

Paul Bergman, Esq.
950 Third Avenue
New York, NY 10022-2705

John Tigue, Jr., Esq.
Kristy Milkov, Esq.
Morvillo, Abramowitz, Grand,
Iason, Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017

FEDERAL EXPRESS
Deborah Landis, Esq.
U.S. Attorney's Office
for the Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

FEDERAL EXPRESS
Lauren Goldberg, Esq.
U.S. Attorney's Office
for the Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

FEDERAL EXPRESS
Marshall Camp
U.S. Attorney's Office
for the Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

# Exhibit D



# FACSIMILE COVER SHEET

**U.S. ATTORNEY'S OFFICE, SDNY
ONE ST. ANDREW'S PLAZA
NEW YORK, NY 10007**

AUSA Name: __Lauren Goldberg__

AUSA Telephone No: __(212) 637-1040__

AUSA Fax No.: __(212) 637-2937__

Date: __April 15, 2008__

No. pages (including cover sheet): **5**
Date sent:

"FOR OFFICIAL USE ONLY" U.S. ATTORNEY FACSIMILE COMMUNICATION

The information contained in this facsimile message, and any and all accompanying documents, constitute "FOR OFFICIAL USE ONLY" information. This information is the property of the U.S. Attorney's Office. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this information in error, please notify us immediately by telephone at the above number and destroy the information.

| To: | | |
|---|---|---|
| | Paula Junghans & Andrew Goldfarb | 202- 822-8106 |
| | Brian Linder & Isabelle Kirshner | 212-949-8255 |
| | John J. Tigue, Jr. | 212-856-9494 |
| | Peter H. Barrett | 228-868-1531 |
| | Paul Bergman | 212-755-5509 |
| | James Tucker | 601-985-4500 |
| | Howard Heiss & Mark Racanelli | 212-326-2061 |

Fax No.:

REMARKS: _____



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 15, 2008

<u>By Fax and First Class Mail</u>

Paula M. Junghans, Esq.
Andrew Goldfarb, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW
Washington, D.C.  20036-5802

James Tucker, Esq.
Peter Barrett, Esq.
Butler, Snow, O'Mara, Stevens, and Cannada
AmSouth Plaza
210 East Capitol Street
Suite 1700
Jackson, MS 39201

Howard Heiss, Esq.
Mark Racanelli, Esq.
O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, NY 10036

Brian Linder, Esq.
Isabelle Kirshner, Esq.
Clayman & Rosenberg
305 Madison Avenue
New York, New York 10165

John Tigue, Jr., Esq.
Kristy Milkov, Esq.
Morvillo, Abramowitz, Grand,
   Iason, Anello & Bohrer P.C.
565 Fifth Avenue
New York, NY 10017

Re:   <u>United States v. Coplan et al., S1 07 Cr. 453 (SHS)</u>

Dear Counsel:

        We write in response to your letter dated March 24, 2008 requesting disclosure of various documents and items of information.[1]  As you know, "[t]here is no general constitutional right to discovery in a criminal case." <u>Weatherford</u> v. <u>Bursey</u>, 429 U.S. 545, 559 (1977); <u>United States</u> v. <u>Evanchik</u>, 413 F.2d 950 (2d Cir. 1969) (a defendant in a criminal case has no "general

---

        [1]        We are reviewing the other discovery letters we received and will respond to them separately.

Counsel List
April 15, 2008
Page 2

right of discovery"); United States v. McGuiness, 764 F. Supp. 888, 894 (S.D.N.Y. 1991); United
States v. Percevault, 490 F.2d 126, 130 (2d Cir. 1974) ("Rule 16 . . . was not intended to provide
the defendant with access to the entirety of the government's case against him"). Instead,
defendants are entitled only to that discovery permitted under Rule 16 or otherwise required
under Brady, Giglio, and the Jencks Act. See United States v. Abdel Rahman, 1996 WL 185735
at *2 (S.D.N.Y. Apr. 18, 1996). Your letter goes far beyond these bounds, running over sixteen
single-spaced pages and containing more than 80 numbered and lettered paragraphs and sub-
paragraphs. Such "indiscriminate, free-wheeling, shotgun demands are usually denied out of
hand." United States v. King, 49 F.R.D. 51, 53 (S.D.N.Y. 1970).

The Government has and will continue to comply in good faith with its discovery
obligations. Indeed, as specifically stated in some of our letters, the Government has to date
provided discovery well beyond that required by Rule 16, including production of document
indices and various document databases that are sortable, word-searchable, and which contain
millions of pages of materials, in addition to a production of certain "core documents" the
Government identified during its investigation. The Government's production was made
available to you on a rolling basis well before your March 24, 2008 letter.[2]

Your letter fails to acknowledge the Government's comprehensive discovery,
specifically requesting certain items (e.g. various categories of documents, statements of the
defendants and other items), which have either been produced or addressed in the Government's
discovery to date. Thus, we request that you review the discovery produced and the
accompanying letters, and let us know whether there are any materials requested in your letter
that are both (a) discoverable, and the authority for such request, and (b) not already produced.
We do, however, provide the following responses in connection with certain of your requests:

    a.    Footnote 1 of your letter requests production of statements made by all
defendants during proffer sessions with the Government. As required by
Rule 16, the Government has provided such statements to the individual
defendant who made each statement. Please provide any legal authority
you rely upon in making this broader request.

    b.    With respect to request #10, the Government is not aware of any searches,
seizures or tracking devices used in connection with this investigation.

    c.    You have provided no authority to support request #15 for information
regarding who attended the final Tax Division meeting where charging
decisions were made. In any event, no member of the prosecution team

---

[2]    The Government's production of Rule 16 material is continuing as of this date.

Counsel List
April 15, 2008
Page 3

(current or former) was present during such meeting.

    d.    As indicated above, the Government's production of Rule 16 material is ongoing. With respect to the entities and individuals listed in Exhibit A to your letter, with the exception of some documents that fall plainly outside the bounds of Rule 16, we will provide you with documents produced to us by those parties. We are in the process of producing and continuing to produce documents provided by E&Y, Jenkens & Gilchrist ("J&G"), Arnold & Porter LLP, Sidley Austin LLP, Refco, and Bear Stearns & Co., Inc., among others. As we previously indicated, we will produce to you an index of the J&G documents, as well as a description of the Deutsche Bank documents provided to us by Deutsche Bank to assist in your review.

    e.    As we previously indicated, IRS audit documents are being reviewed for privilege. Earlier this week, IRS documents with redacted "DIF scores" were made available. When the remaining privilege review is complete, we will consider whether to provide you with a privilege log for any documents withheld.

Your letter also requests various items that are not discoverable at all, such as "any documents that were printed out by the government during the course of its investigation of this case, or presented to any grand jury hearing evidence in this case, but which are being produced to the defendants in electronic (rather than paper) form." March 24, 2008 Ltr. p. 4. This particular request is utterly inappropriate. While we would be happy to discuss the mutual exchange of additional information beyond that required by Rule 16, we do not plan to unilaterally provide you with the sort of detailed roadmap of the government's evidence and investigative strategy that you have requested. This is particularly so since the Government has produced voluminous discovery in a user-friendly format beyond what it is required to do under the Rule, yet has not received a single page of reciprocal discovery from the defense.

You also request various items, such as witness and exhibit lists, 3500 material and impeachment material, and ask that the Government agree to the schedule set by Judge Kaplan in the KPMG matter for the production of these items. These requests are premature, as we are months from trial and the Government's investigation and trial preparation are ongoing. While we would be happy to discuss with you a proposed schedule for the production of these items, the Government will not agree to any schedule that restricts entirely the Government's ability to supplement such productions beyond any original date agreed to by the parties.

In your letter, you request disclosure of any evidence the Government intends to offer pursuant to Rule 404(b) "as soon as possible." At the present time, we have not identified any 404(b) evidence we intend to offer in evidence at trial, but will provide you with notice of

Counsel List
April 15, 2008
Page 4

any such evidence if, and when, we do so.

       With regard to your request for information regarding any improper disclosure of grand jury material, or other improprieties related to the grand jury, you have identified no basis for any claim that there has been improper disclosure, see United States v. Rioux, 97 F.3d 648, 662 (2d Cir. 1996) (outlining requirement for showing prima facie case of improper disclosure) and accordingly, we do not believe you have any right to discovery on this topic. See United States v. Wilson, 565 F. Supp. 1416, 1436 (S.D.N.Y. 1983) (Weinfeld, J.) ("[c]ounsel's unsupported view that abuses may have occurred in . . . the grand jury system is insufficient . . . to overcome the presumption of regularity of the grand jury proceedings and does not justify disturbing the traditional secrecy surrounding such proceedings"). In any event, we are not aware of any improper disclosure of grand jury material or any other impropriety related to the functioning of the grand jury.

       If you wish to provide additional authority to support your entitlement to any of the items you have requested, we will be happy to review it.

             Very truly yours,

             MICHAEL J. GARCIA
             United States Attorney
             Southern District of New York

By:             

             Lauren Goldberg / Marshall A. Camp
             Assistant United States Attorneys
             (212) 637-1040/1035

# Exhibit E

# MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P. C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO
LAWRENCE S. BADER
BARRY A. BOHRER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
STEPHEN M. JURIS
ROBERT G. MORVILLO
BARBARA MOSES*
JODI MISHER PEIKIN
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
JOHN J. TIGUE, JR.
CYRUS R. VANCE, JR.
RICHARD D. WEINBERG

*ALSO ADMITTED IN CALIFORNIA AND
 WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

565 FIFTH AVENUE
NEW YORK, N.Y. 10017

TELEPHONE
(212) 856-9600

www.maglaw.com

FACSIMILE
(212) 856-9494

WRITER'S DIRECT DIAL
(212) 880-9450

COUNSEL
JUDITH L. MOGUL
CHRISTOPHER J. MORVILLO
E. SCOTT MORVILLO
GREGORY MORVILLO

SENIOR ATTORNEY
THOMAS M. KEANE

MICHAEL C. SILBERBERG
1940-2002

April 18, 2008

**BY E-MAIL AND U.S. MAIL**
Assistant United States Attorney Deborah E. Landis
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Re:    United States v. Coplan, et al., 07 Cr. 453 (S-1) (SHS)

Dear Ms. Landis:

I write this letter on behalf of Robert Coplan, Martin Nissenbaum, Richard Shapiro, Brian Vaughn and Charles Bolton (collectively, "the defendants") as a supplement to our letter of March 24, 2008, which requested the government provide the defendants with certain documents and information as part of its discovery obligations.

In addition to the requests in that letter, we ask that you identify all individual investors in any of the purported "tax shelters" described in the Superseding Indictment that have been or are being prosecuted by the United States Department of Justice (the "DOJ"). Furthermore, please identify individual investors that have been or are being prosecuted by the DOJ for investing in any other actual transactions promoted by accounting, investment, and/or law firms that the government claims (a) were designed to create the appearance of having been undertaken to generate profits, and (b) were actually intended to generate tax losses and deductions.

Very truly yours,

John J. Tigue, Jr.

cc:    Lauren Goldberg, Esq. (via e-mail)
       Marshall Camp, Esq. (via e-mail)
       All Defense Counsel (via e-mail)

# Exhibit F



# FACSIMILE COVER SHEET

**U.S. ATTORNEY'S OFFICE, SDNY**
**ONE ST. ANDREW'S PLAZA**
**NEW YORK, NY  10007**

*COPY To*
*B&Y TEAM*
*PLC*

AUSA Name: __Lauren Goldberg_____

AUSA Telephone No: ___(212) 637-1040_____

AUSA Fax No.: _____(212) 637-2937_____

Date: _____*April 22, 2008*_____

No. pages (including cover sheet): 4
Date sent:

"FOR OFFICIAL USE ONLY" U.S. ATTORNEY FACSIMILE COMMUNICATION

The information contained in this facsimile message, and any and all accompanying documents, constitute "FOR OFFICIAL USE ONLY" information.  This information is the property of the U.S. Attorney's Office.  If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited.  If you received this information in error, please notify us immediately by telephone at the above number and destroy the information.

To:  Paula Junghans & Andrew Goldfarb      202-822-8106
     Brian Linder & Isabelle Kirshner      212-949-8255
     John J. Tigue, Jr.                    212-856-9494
     Peter H. Barrett                      228-868-1531
     Paul Bergman                          212-755-5509
     James Tucker                          601-985-4500
     Howard Heiss & Mark Racanelli         212-326-2061

Fax No.:

REMARKS: _____



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 22, 2008

By Fax and First Class Mail

Paula M. Junghans, Esq.
Andrew Goldfarb, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW
Washington, D.C.  20036-5802

James Tucker, Esq.
Peter Barrett, Esq.
Butler, Snow, O'Mara, Stevens, and Cannada
AmSouth Plaza
210 East Capitol Street, Suite 1700
Jackson, MS 39201

Howard Heiss, Esq.
Mark Racanelli, Esq.
O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, NY 10036

Brian Linder, Esq.
Isabelle Kirshner, Esq.
Clayman & Rosenberg
305 Madison Avenue
New York, New York 10165

John Tigue, Jr., Esq.
Kristy Milkov, Esq.
Morvillo, Abramowitz, Grand,
    Iason, Anello & Bohrer P.C.
565 Fifth Avenue
New York, NY 10017

Re:   United States v. Coplan et al., S1 07 Cr. 453 (SHS)

Dear Counsel:

This letter is in response to the letter of Isabelle Kirshner, Esq., dated April 9, 2008, requesting a bill of particulars on behalf of all the defendants, the March 26, 2008 letter of James Tucker, Esq., requesting a bill of particulars with respect to defendant Brian Vaughn, and the April 15, 2008 letter of Mark Racanelli, Esq., requesting additional particulars on behalf of defendant Charles Bolton.  In light of the detailed allegations set forth in the superseding indictment, and the voluminous discovery provided by the Government, no bill of particulars is warranted here.

Counsel List
April 22, 2008
Page 2

       As you know, a bill of particulars is not a general investigatory tool for the defense. *See United States* v. *Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973). Rather, the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charges to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *see United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States* v. *Remire*, 400 F.Supp.2d 627, 633 (S.D.N.Y. Nov. 30, 2005) (Stein, J.). If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery, no bill of particulars is required. *Bortnovsky*, 820 F.2d at 572; *United States* v. *Spy Factory*, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997). The Government is not required to (1) "particularize all of its evidence," *United States* v. *Cephas*, 937 F.2d 816, 834 (2d Cir. 1991); *Torres*, 901 F.2d at 234 ("acquisition of evidentiary detail" is not the function of a bill of particulars); (2) disclose the precise manner in which the crimes charged in the Indictment were committed, *United States* v. *Andrews*, 381 F.2d 377, 378 (2d Cir. 1967); *Torres*, 901 F.2d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pre-trial discovery); *Remire*, 400 F.Supp.2d at 633; or (3) provide the defendant with a preview of the Government's case or legal theory. *United States* v. *Mason*, 2007 WL 541653 at *5 (S.D.N.Y. Feb. 16, 2007) (bill of particulars is not to be used to give defendant a road map to the Government's case); *United States* v. *Muyet*, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996).

       The superseding indictment in this case is extraordinarily particularized, setting forth at great length and in considerable detail the fraudulent schemes in which the defendants participated, and the means and methods by which they accomplished their criminal objectives. It describes in painstaking detail, over the course of 107 pages, the defendants' efforts to defraud the IRS and to impede and impair the functions of the IRS in ascertaining, evaluating, assessing and collecting hundreds of millions of dollars in taxes, while reaping substantial fees for Ernst & Young and other entities. The allegations describe in detail the conspirators' sustained, multi-year effort to conceal the fraudulent transactions from the IRS and defeat the IRS's efforts to investigate the transactions. In the conspiracy count, the superseding indictment specifically identifies sixty-three overt acts committed in furtherance of the scheme, as well as specifically describing eleven means and methods of the conspirators. The superseding indictment alone is more than enough to advise you of the "specific acts" of which the defendants are accused.

       In addition, the Government has provided, and is continuing to provide, you with voluminous discovery, much of which is electronically searchable. The volume of discovery produced, along with the accessible format in which it has been produced, provides you with more than enough information about the nature of the charges and the evidence against the defendants to eliminate any prospect of unfair surprise. Moreover, many of your requests ask the Government to "confirm" information that is patently obvious from the discovery already produced. Such requests are not an appropriate function or use of a bill of particulars.

       Thus, although styled as demands for particulars, your requests are in fact simply efforts to determine "evidentiary detail about the Government's case," which defendants have no

Counsel List
April 22, 2008
Page 3

right to obtain by way of a bill of particulars. *See, e.g., Mason*, 2007 WL 541653 at *5; *United States* v. *Felix*, 1992 WL 322015 at *2 (S.D.N.Y. Oct. 28, 1992).

Accordingly, the Government declines to provide at this time the particulars requested in your letter. If you wish to provide authority to support your entitlement to any of the particulars requested (none is cited in your letters), we will be happy to review it.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: _____
Lauren Goldberg/Marshall A. Camp
Assistant United States Attorneys
(212) 637-1040/1035

# Exhibit G

MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P. C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO
LAWRENCE S. BADER
BARRY A. BOHRER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
STEPHEN M. JURIS
ROBERT G. MORVILLO
BARBARA MOSES*
JODI MISHER PEIKIN
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
JOHN J. TIGUE, JR.
CYRUS R. VANCE, JR.
RICHARD D. WEINBERG

*ALSO ADMITTED IN CALIFORNIA AND
 WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

565 FIFTH AVENUE
NEW YORK, N.Y. 10017

TELEPHONE
(212) 856-9600

www.maglaw.com

FACSIMILE
(212) 856-9494

WRITER'S DIRECT DIAL
(212) 880-9450

COUNSEL
JUDITH L. MOGUL
CHRISTOPHER J. MORVILLO
E. SCOTT MORVILLO
GREGORY MORVILLO

SENIOR ATTORNEY
THOMAS M. KEANE

MICHAEL C. SILBERBERG
1940-2002

April 24, 2008

**BY E-MAIL AND U.S. MAIL**
Assistant United States Attorney Deborah E. Landis
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

      Re:    <u>United States v. Coplan, et al., 07 Cr. 453 (S-1) (SHS)</u>

Dear Ms. Landis:

      I write this letter as a supplement to the letter submitted by Martin Nissenbaum's counsel on April 9, 2008 (the "Nissenbaum Letter"). In the Nissenbaum Letter the defendants asked for particulars regarding allegedly fraudulent transaction documents, Contingent Deferred Swap ("CDS") partnerships, clients and loans, and other documents. <u>See</u> ¶¶ 8, 15, 16, 19, 22, 37 and 42 of the Nissenbaum Letter. Given the number of transactions identified in the Superseding Indictment, I ask that you provide following particulars to the allegations therein:

      Out of the 218 tax shelter transactions entered into by clients of Ernst & Young LLP and referred to in paragraphs 21, 27, 35 and 54 of the Superseding Indictment, identify each of those about which you intend to present evidence at trial.

                       Very truly yours,

                       John J. Tigue, Jr.

cc:   Lauren Goldberg, Esq. (via e-mail)
       Marshall Camp, Esq. (via e-mail)
       All Defense Counsel (via e-mail)

# Exhibit H



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

April 21, 2006

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

     Re:    <u>United States v. Stein et al.</u>, S1 05 Cr. 888 (LAK)

Dear Judge Kaplan:

       The Government submits this letter in compliance with the Court's April 7, 2006 Order requiring that the Government submit a bill of particulars stating "With respect to each of the tax shelters as to which the government intends to offer proof, does the government allege that the tax shelter was fraudulent as designed and approved by KPMG and, if so, in what respects?"[1]

       As an initial matter, various defendants' motion papers appear to take the position that the template opinion letters relating to the transactions described in the Indictment as FLIP/OPIS, BLIPS, and SOS constitute a description of the transactions "as designed." The Government disagrees and intends to prove at trial that these transactions "as designed" are as set forth below, not as set forth in the template opinion letters. The Government alleges that these opinion letters do not reflect the transactions "as designed," but instead contain misleading information, false statements, and material omissions designed to disguise the transaction and mislead the IRS. Moreover, the

---

    [1]The Court's Order refers to design and approval "by KPMG," but the Government alleges that the conspirators, including but not limited to KPMG, participated in the design and approval of the tax shelter transactions described in the Indictment. For example, Presidio, banks and the defendant Ruble participated in designing these transactions or portions thereof, and in some sense approved of the implementation of those transactions. Thus, in this response, the Government refers to the design and approval by the conspirators.

Honorable Lewis A. Kaplan
April 21, 2006
Page 2

Government alleges that the conspirators drafted these opinion letter so that they misrepresented not only the facts of the transaction, but also conspirators' conclusions regarding the application of the law to the facts. Thus, while the opinions state that certain tax treatments of certain facts (falsely) described in the opinion letter are more likely than not to survive IRS challenge, the Government alleges that conspirators did not, in truth, believe that to be so.

Nevertheless, in addition to complying with the Court-ordered particulars disclosure by describing below the Government's allegations regarding the transactions as designed and approved and the manner in which the designs were fraudulent, the Government also sets forth its position on whether it would be criminally fraudulent to advise the claiming of tax benefits as a result of transactions that actually occurred as described in the opinion letters (assuming no material facts were omitted from that description).

## BLIPS

With respect to BLIPS, the Government alleges that BLIPS was fraudulent as designed and approved by the conspirators. BLIPS was designed and approved by the conspirators to be a short-term tax shelter program terminating prior to calendar year-end, and virtually always within approximately 67 days. BLIPS was designed and approved by the conspirators to include a purported non-recourse loan and loan premium from a bank. As designed, the proceeds of the purported loan and loan premium would not be used by a BLIPS client to make, leverage or secure pegged currency investments. BLIPS was designed and approved by the conspirators so that this purported loan and loan premium would nominally be advanced to a BLIPS client and assumed by an entity, but would not be placed at risk and would not at any time leave the custody of the bank. As designed, the entire proceeds of the purported loan and loan premium remained in the custody of the bank as collateral for the obligation to repay the loan and loan premium to the bank. BLIPS was designed and approved by the conspirators so that entire amount of the purported loan and loan premium would be repaid to the bank at the end of the transaction and prior to year-end. BLIPS was designed and approved by the conspirators so that it would not include a bona fide, above-market, fixed-interest loan, but instead through the use of a retroactive interest-rate swap would include a floating, market rate purported loan. BLIPS was designed and approved by the conspirators so that it included a nominal investment that (1) was purchased with the clients' money and was not financed, leveraged, or secured by, and did not serve as collateral for, the purported loan and loan premium, (2) had a fixed, down-side risk of loss, and (3) had only a remote

Honorable Lewis A. Kaplan
April 21, 2006
Page 3

possibility of resulting in a large return on the nominal amount of the clients' money that
was used for this investment component.

      The above aspects of the BLIPS design were fraudulent. The short-term
nature of the transaction meant that there was no real loan premium, no realistic
possibility of making a reasonable pre-tax profit, no contingency to the obligation to
repay the loan premium, and no purpose for the purported borrowing except to generate a
tax loss. The design of the loan and loan premium meant that there was not a bona fide
loan in BLIPS, that the purported loan and loan premium had no relationship to the
nominal investment, and that there was no contingency to the obligation to repay the loan
and loan premium. The design of the purported loan and the swap meant that there was
no bona fide above-market, fixed-interest loan (and thus no bona fide loan premium).
The design of the nominal pegged currency investment meant that the purported loan had
no relationship to that nominal pegged currency investment, and the nominal pegged
currency investment had only a remote possibility of returning a profit in excess of all
BLIPS-related costs and fees.

      The above aspects of the BLIPS design were also concealed and
misrepresented in the BLIPS opinion letter. Thus, by design, the BLIPS opinion letter
concealed the true facts and misrepresented the facts in order to reach various legal
conclusions. If the true facts had been presented, the legal principles set forth in the
BLIPS opinion letter would have compelled a legal conclusion opposite from that stated
by the conspirators.

      The Government's position on the facts and discussion set forth in the
BLIPS opinion letter is as follows. If a series of transactions were conducted with a
business purpose and profit motive and not as part of a pre-arranged plan, and
subsequently were accurately described to a tax professional in a manner consistent with
the statement of facts and representations contained in the BLIPS opinion letter,[2] and

---

    [2]It is far from clear that these conditions could occur for various reasons. For
example, it is unlikely that any bank would provide non-recourse loans and permit the
loaned funds to be used to make investments on foreign currency contracts, absent
sufficient additional posted collateral. Thus, it is unlikely that a financial institution
would engage in the transactions described in the BLIPS opinion letter on a "highly
leveraged" basis. Moreover, it seems unlikely that any financial institution would
provide an above-market, fixed-rate loan with loan premium, without mechanisms

Honorable Lewis A. Kaplan
April 21, 2006
Page 4

assuming the tax professional believed in good faith the legal analysis of those facts as
set forth in the opinion letter, the Government does not allege for purposes of this
criminal case[3] that an opinion letter drafted under those circumstances recounting those
facts and containing the legal analysis in the BLIPS opinion letter would be criminally
fraudulent.[4] However, the BLIPS opinion letter as drafted and approved — prior to the
execution of any transactions — falsely misrepresents the series of transactions
described therein as not pre-planned or pre-arranged, and instead falsely claims that the
transactions were entered into according to one plan (i.e., to engage in three-stage, seven-
year investment program), but that in the midst of the transaction, the plan was
abandoned; this purported change of plans is critical to the tax treatment described in the
opinion letter. Thus, while various bona fide business transactions might be planned or
designed such that they might legitimately minimize taxes (and might even involve an
opinion issued before the transactions on the expected tax treatment of the planned
transactions), BLIPS is not such a transaction. This is because the analysis contained in
the BLIPS opinion depends on a change in plans, and therefore the Government alleges

---

(which actually existed in BLIPS) that would convert such a loan and premium into a
fully collateralized market-rate loan (with a principal amount equal to sum of the
purported loan and premium amounts) the proceeds of which could not be used by the
client absent adequate security. Similarly, it seems unlikely that BLIPS clients would
seek to obtain a loan that had to be overcollateralized by cash. In other words, it is not
likely that a client would obtain a loan that required the client to post $101 in cash in
order to use $100 in loan proceeds. And, it is not likely that a client would pay high fees
and carrying costs for a purported loan and loan premium unless the client could utilize
that money in some manner that had the potential to return an amount greater than those
fees and costs. In BLIPS, the clients could not and did not. And a client interested in
engaging in forward contracts relating to pegged currencies using only the client's money
would not likely incur the high fees and costs relating to the various promoters of BLIPS
and the unused loan.

   [3]The Government does not concede that such a series of transactions would create
the tax effects claimed in BLIPS, nor does the Government concede that claiming (or
advising a client to claim) such tax effects would not result in civil liability and penalties.

   [4]The allegations of the Indictment relating to the defendants' conspiracy to
defraud the IRS (such as by using various methods to conceal the shelters from the IRS
and other conduct) would remain regardless of the criminality of the tax positions taken
in the opinion letters.

Honorable Lewis A. Kaplan
April 21, 2006
Page 5

that BLIPS cannot be anything but fraudulent if it is a designed transaction. In other words, the fact that the conspirators drafted but did not issue an opinion letter prior to executing any BLIPS transactions demonstrates that BLIPS was always intended to be and always was a short-term tax transaction designed to be terminated before year-end for tax purposes.

## FLIP/OPIS

The Government alleges that FLIP/OPIS was fraudulent as designed and approved by the conspirators. FLIP/OPIS was designed and approved by the conspirators as a pre-planned, short-term tax shelter transaction. FLIP/OPIS was designed and approved by the conspirators to involve purported borrowing by a Cayman Islands entity from a bank, which borrowing was purportedly used to purchase the lending bank's stock from the lending bank, which transactions were designed to be reversed on a pre-arranged date. The purported stock purchase by the Cayman Islands entity in FLIP/OPIS as designed and approved in at least some of those transactions included a delayed settlement term that delayed settlement of the purported purchase until the date on which other components of the transaction guaranteed that the purported stock would be purportedly repurchased by the bank. FLIP/OPIS was designed and approved by the conspirators to involve a nominal investment component that (1) was purchased with the clients' money and was unrelated to the purported Cayman Islands borrowing and purported Cayman Islands stock purchase, (2) did not have a reasonable expectation of returning a profit in excess of fees and costs. Although a separate investment in the foreign bank's stock conducted outside the tax shelter by the client had a possibility of resulting in a gain or loss on that stock, this separate investment was unrelated to the Cayman Islands transactions and was artificially combined with the Cayman Islands transactions in order to create the appearance of a more than nominal investment. FLIP/OPIS was designed and approved by the conspirators to involve the payment of fees disguised as payments for investments with the Cayman Islands entity, which entity had virtually no assets other than money paid to it by the client for such warrants, options, or swaps. FLIP/OPIS was designed and approved by the conspirators to involve a foreign person who purportedly acted independently of the other participants and purportedly owned and controlled the Cayman Islands entity, but who in reality was simply a nominee for the conspirators.

These aspects of the FLIP/OPIS design were fraudulent. The short-term nature of the transaction meant that the clients did not have a reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees. The design of the

Honorable Lewis A. Kaplan
April 21, 2006
Page 6

purported loan and purported stock purchase by the Cayman Islands entity meant that
there was no bona fide loan and no bona fide stock purchase. The design of the nominal
investment component of FLIP/OPIS meant that it was not related to the purported loan
or purported stock purchase (which transactions generated the purported tax effects) and
that it did not have a reasonable opportunity to earn a reasonable pre-tax profit in excess
of fees and costs. The designed involvement of a foreign person who is a mere nominee
meant that there was no bona fide foreign participant in the transaction.

     The above aspects of the FLIP/OPIS design were also concealed and
misrepresented in the FLIP/OPIS opinion letters. Thus, by design, the FLIP/OPIS
opinion letters concealed the true facts and misrepresented the facts in order to reach
various legal conclusions. If the true facts had been presented, the legal principles set
forth in the FLIP/OPIS opinion letter would have compelled a legal conclusion opposite
from that stated by the conspirators.

     The Government's position on the facts and discussion set forth in the
FLIP/OPIS opinion letters is as follows. If the facts set forth in the opinion letter were
(a) true and (b) complete,[5] and if the individuals who participated in creating and issuing
the opinion letters believed in good faith the legal analysis of those facts as described in
the opinion letters, the Government does not allege for purposes of this criminal case[6]

---

[5] It is far from clear that this could be so. For example, the opinion letters state
that transactions were entered into with "the expectation" "for capital appreciation," yet
the end result of the various derivative transactions and purported Cayman Islands stock
purchase is that the only opportunity for capital appreciation in the transaction is based
on the nominal investment made with the clients' money. And, since the call option
purchased from the bank by the Cayman Islands entity locked in a 5% loss on the stock
purportedly purchased by the Cayman Islands entity, it is unlikely that this transaction
could have been conducted "in order to protect" the stock position of the Cayman Islands
entity "from a significant drop in the price of Foreign Bank" or was consistent with the
stated "expectation" "for capital appreciation." It is also not likely that a financial
institution would sell its own stock on 100% margin to a recently formed Cayman Islands
entity that had virtually no assets beyond the cash paid to it by the client, no business, and
no business plan.

[6] The Government does not concede that such a series of transactions would create
the tax effects claimed in FLIP/OPIS, nor does the Government concede that claiming
(or advising a client to claim) such tax effects would not result in civil liability and

Honorable Lewis A. Kaplan
April 21, 2006
Page 7

that an opinion letter based on such facts and analyzing them to result in the tax
treatments reached in the opinion letter would be criminally fraudulent.[7]

## SOS

      The Government alleges that SOS was fraudulent as designed and
approved by the conspirators.  SOS was designed and approved by the conspirators as a
pre-planned, short-term tax shelter transaction.  As designed, SOS involved two
purported virtually offsetting and self-financed options.  SOS was designed such that the
purported option positions would almost fully offset each other or would both expire
worthless, resulting in either a small payment from the bank to the client, or a loss by the
client of all funds contributed by the client.  SOS was designed such that the purported
option positions would not, and as a practical matter could not, be separated.

      These aspects of the SOS design were fraudulent.  The short-term nature of
the transaction meant that the clients did not have a reasonable expectation of earning a
reasonable pre-tax profit in excess of costs and fees.  The designed inseparability and
offsetting structure of the purported option positions meant (1) that there was no
reasonable expectation of earning a reasonable pre-tax profit in excess of costs and fees,
and (2) that there were no bona fide long and short option positions but instead there was
in reality only a single, small net long position.  The aspect of the design that ensured that
the options would almost fully offset each other or would both expire worthless meant
that there was no reasonable expectation of earning a reasonable pre-tax profit in excess
of costs and fees.

      The above aspects of the SOS design were also concealed and
misrepresented in SOS opinion letters.  Thus, by design, the SOS opinion letters
concealed the true facts and misrepresented the facts in order to reach various legal
conclusions.  If the true facts had been presented, the legal principles set forth in the SOS
opinion letters would have compelled a legal conclusion opposite from that stated by the
conspirators.

---

penalties.

    [7]The allegations of the Indictment relating to the defendants' conspiracy to
defraud the IRS (such as by engaging using various methods to conceal the shelters from
the IRS and other conduct) would remain regardless of the criminality of the tax
positions taken in the opinion letters.

Honorable Lewis A. Kaplan
April 21, 2006
Page 8

       The Government's position on the facts and discussion set forth in SOS opinion letters is as follows. If the facts set forth in the opinion letters were (a) true and (b) complete,[8] and if the individuals who participated in creating and issuing the opinion letters believed in good faith the legal analysis of those facts as described in the opinion letters, the Government does not allege for purposes of this criminal case[9] that an opinion letter based on such facts and containing the legal analysis set forth in the opinion letter would be criminally fraudulent.[10]

                    Very truly yours,

                    MICHAEL J. GARCIA
                    United States Attorney
                    Southern District of New York

By:      _____/S/_____

                    JUSTIN S. WEDDLE
                    KEVIN M. DOWNING
                    STANLEY J. OKULA, JR.
                    MARGARET GARNETT
                    Assistant United States Attorney
                    (212) 637-2312

---

[8]It is far from clear that this could be so. For example, a financial institution would not likely permit a shell entity with virtually no assets other than the offsetting option positions and a limited amount of cash to separate the two option positions because unless those positions were paired, the financial institution would be subjected to massive credit risk. And, it is not likely that a client would enter into these option positions with all of the attendant fees and costs, when the client could execute the same investment (i.e., the small net long option position) for far less.

[9]The Government does not concede that such a series of transactions would create the tax effects claimed in SOS, nor does the Government concede that claiming (or advising a client to claim) such tax effects would not result in civil liability and penalties.

[10]The allegations of the Indictment relating to the defendants' conspiracy to defraud the IRS (such as by engaging using various methods to conceal the shelters from the IRS and other conduct) would remain regardless of the criminality of the tax positions taken in the opinion letters.

Honorable Lewis A. Kaplan
April 21, 2006
Page 9

cc:     all defense counsel (by email)